# EXHIBIT A

FILED

2019 Jul-09  PM 05:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

**C & H MANAGEMENT GROUP, LLC,**
**and ATTENTIVE HEALTH &**
**WELLNESS, LLC,**

      **Plaintiffs,**

**vs.**

                                             **CIVIL ACTION NO.:**

**JEROME DELUCCIO,**
**DAVID COFFEY, and**
**ENHANCEDCAREMD,**

      **Defendants.**

---

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

---

## I. INTRODUCTION

Plaintiffs, C & H Management Group, LLC and Attentive Health & Wellness, LLC (hereafter collectively referred to as "Attentive" or "Plaintiff"), hereby bring the following Complaint against Defendants Jerome DeLuccio also known as Jerry DeLuccio (hereafter, "DeLuccio"), David Coffey (hereafter, "Coffey"), and enhancedcareMD (hereafter, "ecMD"), (collectively, the "Defendants").

This is an action to enjoin DeLuccio, Coffey, and ecMD from further violation of a sales contract and a confidentiality and non-competition/non-solicitation agreement with Attentive. Attentive respectfully requests that this Honorable Court enjoin Defendants

1

from competing with Attentive, soliciting Attentive's customers, and disclosing Attentive's confidential information. If Defendants are not immediately and permanently enjoined, Attentive will continue to suffer irreparable harm.

## II. PARTIES

1. Plaintiff C & H Management Group, LLC is an Alabama Limited Liability Company with its principal place of business in Guntersville, Alabama.

2. Plaintiff Attentive Health & Wellness, LLC, is an Alabama Limited Liability Company with its principal place of business in Guntersville, Alabama.

3. Defendant Jerome DeLuccio is an individual over the age of 18 who is a resident of Rochester, New York, with a partnership interest in enhancedcareMD.

4. Defendant David Coffey is an individual over the age of 18 who is a resident of Rochester, New York, with a partnership interest in enhancedcareMD.

5. Defendant enhancedcareMD is believed to be a partnership with its principal place of business in Rochester, New York.

## III. JURISDICTION AND VENUE

6. The jurisdiction of this Court is invoked pursuant to an "Agent/Broker Sales Agreement" entered into by the parties on June 1, 2017, wherein the Defendants submitted to the personal jurisdiction of the Courts in Etowah County, Alabama, as well as the United States District Court for the Northern District of Alabama, Middle Division. *See* Exhibit A, p. 3. In said Sales Agreement, Defendants waived any objection that it

2

may ever have as to venue being in either Etowah County, Alabama, or the United States District Court for the Northern District of Alabama, Middle Division, including an objection based on either court being an inconvenient forum.

7.      The jurisdiction of this Court is invoked pursuant to a "Confidentiality, Non-Competition and Non-Disclosure Agreement" entered into by the parties on June 1, 2017, wherein the parties agreed that any claim brought by one party against the other must be maintained in the Northern District of Alabama if said claim was to be maintained in a federal court. *See* Exhibit B, p. 9. The parties further consented to personal jurisdiction in the State of Alabama.

8.      The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. § 1332. This is an action for declaratory judgment, equitable relief, injunctive relief, and monetary damages which exceed the sum or value of $75,000, and each plaintiff is a citizen of a different state from each defendant.

9.      Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1391(b)(2).

### IV.  FACTS

10.     Attentive is in the business of self-insured group wellness and limited medical plans and related services (hereafter, the "Business"). Attentive offers its patrons a unique wellness program that focuses on the benefits of a participatory group wellness plan with an employer-sponsored medical plan. Because participatory wellness programs

are so heavily regulated in regard to how the employees are taxes, Attentive's program has enjoyed success by being the only company in the Business with the right documents to allow the wellness program to produce favorable tax results for employees while still being in compliance with all Internal Revenue Service regulations and qualifying with the Employee Retirement Income Security Act of 1974, or "ERISA." Attentive's program is copyrighted and its materials trademarked, namely its materials for its self-insured medical expense reimbursement program, or SIMERP™.

11.    DeLuccio and Coffey d/b/a enhancedcareMD are brokers of related services in the Business who, with their preexisting relationships in the Business, were able to market wellness programs such as Attentive's through ecMD's software suite and incorporate additional benefits.

12.    On June 1, 2017, Attentive and Defendants entered into an "Agent/Broker Sales Agreement" (hereafter, "Sales Agreement") wherein Attentive allowed Defendants to market Attentive's unique wellness program through Defendants' sales platform. *See* Exhibit "A", generally. At the time, Attentive's program was also accessible through a website portal belonging to U.S. HealthCenter, Inc. (hereafter, "USHC") and its associated platform.

13.    Also on June 1, 2017, Defendants executed a "Confidentiality, Non-Competition and Non-Disclosure Agreement" (the "Non-Competition Agreement") with Attentive. *See* Exhibit "B", generally.   By executing the Non-Competition

4

Agreement, Defendants acknowledged and agreed that Attentive has a "valid and enforceable Protectable Interest." *Id*. at Section II(A). "Protectable Interest," according to the Non-Competition Agreement, "means Trade Secrets, Confidential Information, Protected Customers, Protected Agent and any substantial relationship or contact with specific prospective or existing customers, patients, vendors or clients." Exhibit "B", Section I(G).

14.     The Non-Competition Agreement further provided the following relevant definitions in Section I:

> A. "Competing Business" means any business engaged in or contemplating engagement in the Business. The parties acknowledge that the [Attentive] carries on the Business in multiple States and intends to solicit clients in all 50 States and, therefore, a Competing Business necessarily includes businesses in any state in the United States that engages in or contemplates engaging in the Business.
>
> B. "Trade Secret" means, in addition to any information covered by any definition of "trade secret" or any equivalent term under state, local or federal law, all information pertaining to the Business, without regard to form, whether oral, in writing, in electronic or computer format, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, distribution lists, a list of actual or potential customers, or a list of actual or potential contractors, consultants or suppliers, which is not commonly known by or available to the public and which information: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. "Trade Secret" shall not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any right or privilege. Nothing in this Agreement is intended, or shall be construed, to limit the protections of the Alabama

Trade Secrets Act or any other applicable law protecting trade secrets or other confidential information.

C. "Confidential Information" means any confidential or proprietary business information, other than Trade Secrets, regarding the Business that is the subject of reasonable efforts to maintain its confidentiality and that is not generally disclosed by practice or authority to persons not employed or otherwise engaged by [Attentive], whether oral, in writing or in electronic or computer format. Confidential Information shall include, but not be limited to, the following with respect to the Business: (i) business or operating plans, strategies, know-how, portfolios, prospects or objectives; (ii) structure, products, product development in progress as of the date hereof, technology, distribution, sales, advertising services, support and marketing plans, practices, and operations; (iii) methods of pricing, costs and details of services; (iv) financial condition and results of operations; (v) the performance of any accounts; (vi) research and development, operations or plans; (vii) lists of customers, and payors (including, without limitation, the identity of customers, addresses, and any other characteristics of such Persons); (viii) information received from third parties under confidential conditions; (ix) management organization and related information (including, without limitation, data and other information concerning the compensation and benefits paid to officers, directors, Receiving Parties and management); and (x) personnel and compensation policies. This dennition shall not limit any definition of "confidential information" or any equivalent term under applicable state or federal law.

**Exhibit "B", Section I(B, C, and G).**

15. By executing the Non-Competition Agreement, Defendants acknowledged and agreed with the following:

...that [Attentive's] Protectable Interest would enable [Defendants] to establish goodwill with the customers, potential customers, Receiving Parties, independent contractors, consultants, and suppliers who provide products and services on behalf of a Competing Business or who receive services from a Competing Business and that the Protectable Interest constitutes a valuable asset of [Attentive]. Accordingly, [Defendants] hereby agrees as follows: (i). [Defendants] shall not, at any time during the Restricted Period, directly or indirectly transmit or disclose any Confidential Information or Trade Secrets to any Person or make use of any

such Confidential Information or Trade Secrets, directly or indirectly, for his benefit without the prior written consent of [Attentive]. (ii). The restrictions of this section shall apply regardless of whether the Confidential Information or Trade Secrets are in written, graphic, computer, recorded, photographic or any machine-readable form, is orally conveyed to or is otherwise known by [Defendants]. (iii). [Defendants] agrees not to directly or indirectly designate, disclose, lecture on, or in any manner publish any Confidential Information or Trade Secrets of [Attentive] without [Attentive]'s prior written permission. [Defendants] agrees to leave with [Attentive] or turn over to [Attentive] any and all records, notebooks, materials, documents or other personal property containing Confidential Information or Trade Secrets or not, including copies, whether prepared by him or others.

**Exhibit "B", Section II(F).**

16. As to any breach of the Non-Competition Agreement, the Defendants agreed as follows:

Without limiting the remedies available to [Attentive], the parties acknowledge that a breach of any of the covenants contained herein this Article will result in material, irreparable injury for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof by [Defendants], *[Attentive] shall be entitled to obtain a temporary restraining order and/ or a preliminary or permanent injunction* restraining [Defendants] from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants hereof without the necessity of posting any bond.

[Defendants] shall be liable in connection with any breach by an affiliate, director, shareholder, officer, parent, subsidiary or spouse of [Defendants] of the terms hereof. [Defendants] also specifically acknowledges and agrees that [Attentive] shall be entitled to seek monetary damages and other remedies at law for breaches of this Agreement in addition to any injunctive or other equitable relief. The rights and remedies hereunder are cumulative and not alternative.

**Exhibit "B", Section II(H-I)(emphasis added).**

17. Pursuant to the Non-Competition Agreement, Defendants were bound to their covenants therein for a period of eighteen (18) months after termination of the parties' Sales Contract. As of the date of this Complaint, the Sales Contract between Defendants and Attentive has not been terminated.

18. In reliance upon the executed Sales Agreement and the Non-Competition Agreement, the Defendants were provided with Attentive's confidential and proprietary documents and materials, customer lists, customer contracts, plan processes--including the processes for SIMERP™--and other confidential and proprietary information.

19. After a year into the parties' business relationship, Defendants approached Attentive with a new software platform allegedly developed by Defendants to streamline ecMD's suite of services. Attentive contracted to use this service on a "case-by-case basis" through an Addendum to the Sales Agreement as executed on June 6, 2017.

20. Thereafter, Attentive was notified by existing and potential/pending clients that Defendants were contacting said clients about a self-insured medical reimbursement program that ecMD itself was offering and solicited the clients to move their program enrollment away from Attentive to the new ecMD program. Using Attentive's customer list, Defendants successfully steered existing, potential, and pending clients away from Attentive to Defendants' program. DeLuccio and Coffey, who were agents/brokers of Attentive at the time, did not inform Attentive of the losses of clients. It was only when Attentive inquired as to the status of the clients did it realize its program had been

8

usurped by Defendants' program.

21. Further investigation by Attentive revealed that the Defendants' program was actually Attentive's program. Defendants solicited existing and potential Attentive clients with materials that had been copied from the proprietary documents Attentive provided to Defendants and re-labelled with enhancedcareMD's name. Defendants even used the name "SIMERP" in the misappropriated documents in order to sell the program as ecMD's even though SIMERP™ is and has been the property of Attentive.

22. Attentive determined that the Defendants' actions were in violation of the Sales Agreement and Non-Competition Agreement. To avoid a complete dissolution of the parties' business relationship, Attentive generously offered Defendants the opportunity to continue what they were doing under a new contract providing compensation to Attentive for Defendants' use of Attentive's materials and program. Defendants, however, rejected the opportunity.

23. On May 7, 2019, a letter was issued by USHC demanding that Defendants cease and desist misappropriating USHC's confidential and proprietary information in violation of Defendants' agreement with USHC. **Exhibit "C" – USHC Cease and Desist Letter.** Following notice of USHC's letter to Defendants, Attentive removed Attentive clients from the ecMD wellness portal to avoid the dispute between Defendants and USHC.

24. On June 6, 2019, counsel for Attentive sent a letter to Defendants

9

demanding that they refrain from committing any further violations of the Sales Agreement and Non-Competition Agreement. **Exhibit "D" – Plaintiff Cease and Desist Letter to Defendants.**

25.    Although Attentive's Addendum to the Sales Agreement with Defendants was non-exclusive and on a case-by-case basis, Defendants have used the removal of Attentive clients from ecMD's portal as a basis to withhold Attentive's share of profits that were due to Attentive on June 20, 2019, in the approximate amount of $15,000.00.

26.    If Defendants are permitted to continue to violate its agreements with Attentive, Attentive will suffer further irreparable harm to its company, its customer relationships, its copyright and trademarked materials, and its confidential information, among other things.

## COUNT I
## INJUNCTIVE RELIEF

27.    The allegations of Paragraphs 1 through 26 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

28.    Pursuant to Rule 65 of the Alabama Rules of Civil Procedure, Attentive seeks a temporary restraining order, interlocutory injunction and permanent injunction against DeLuccio enjoining him from further violation of the Agreement.

29.    Defendants stipulated that any breach of the provisions of the Non-Competition Agreement would "result in irreparable Injury to [Attentive]", and that Attentive would be "temporary restraining order and/or a preliminary or permanent

10

injunction restraining [Defendants] from engaging in activities prohibited by [the Non-Competition Agreement]." Exhibit "B", Section TWO(I).

30.    In clear violation of the Non-Competition Agreement, Defendants are competing with Attentive and soliciting Attentive's clients. Defendants have also violated the Agreement by using and/or disclosing Attentive's confidential and proprietary information.   Accordingly, based upon the terms of the Non-Competition Agreement, Defendants' multiple violations of the Agreement will result and have resulted in irreparable injury to Attentive, and Attentive is entitled to obtain an injunction restraining Defendants from further violations of the Non-Competition Agreement.

31.    Attentive has a substantial likelihood of success on the merits of this cause, and the entry of a temporary injunction and/or preliminary injunction will not conflict with the public interest.

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate result of the above described conduct, the Plaintiff requests that this Court:

(A)    Temporarily, and following a hearing, permanently, enjoin Defendants from further violating the Non-Competition Agreement; and

(B)    Award all attorneys' fees incurred by Plaintiff.

**COUNT II**
**BREACH OF CONTRACT**

32.    The allegations of Paragraphs 1 through 31 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

33.    Attentive avers that Defendants' above-described conduct constitutes a breach of contract.   Defendants directly breached the Sales and Non-Competition Agreements by, among other things, competing with Attentive and soliciting Attentive's customers while the parties maintained an active business relationship. Defendants have also disclosed and/or used Attentive's confidential information in violation of the Agreement.

34.    Furthermore, Defendants are in breach of the Sales Agreement between the parties due to the withholding of funds that are owed and lawfully belong to Attentive.

35.    Attentive has been damaged by Defendants' numerous breaches of the Agreement.

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate result of the above described conduct, Plaintiff requests that this Court:

(A)    Award all damages sustained by Plaintiff, including, but not limited to, lost business;

(B)    Award all attorney's fees incurred by Plaintiff; and

(C)    Award all other damages that Plaintiff is entitled to recover under Alabama law.

## COUNT III
## TORTIOUS INTERFERENCE WITH BUSINESS
## OR CONTRACTUAL RELATIONS

36.    The allegations of Paragraphs 1 through 36 are hereby incorporated herein

with reference and with the same force and effect as if set forth in full below.

37. Plaintiff avers that Defendants' conduct constitutes tortious interference with Plaintiff's contractual relationship with employer and employee clients as well as the potential and/or pending clients that Defendants solicited away from Plaintiff.

38. Plaintiff and Defendants entered into an enforceable agreement that contained, among other things, a non-compete provision, a non-solicitation provision, and a confidentiality or nondisclosure/non-use provision.

39. Plaintiff has suffered damages as a result of Defendants' intentional interference.

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate result of the above described conduct, the Plaintiff requests that this Court:

(A) Award all compensatory damages incurred or suffered by Plaintiff as a result of Defendant's tortious conduct;

(B) Issue punitive damages against all Defendants;

(C) Award all attorney's fees incurred by Plaintiff; and

(D) Award all other damages that Plaintiff is entitled to recover under Alabama law.

**COUNT IV**
**VIOLATION OF THE ALABAMA TRADE SECRETS ACT**

40. The allegations of Paragraphs 1 through 40 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

41.     One or more of the following are considered a "trade secret" as defined under Alabama law: 1) Plaintiff's list of customers; 2) the prices customers were paying for Plaintiff's products and services; 3) specific technical data regarding Plaintiff's program and plan processes; or 4) the level of Plaintiff's customer's satisfaction with Plaintiff's products and services.

42.     One of more of these trade secrets were disclosed and divulged by Defendants, without a privilege to do so, to Plaintiff's competitors, which resulted in a breach of confidence reposed in Defendants by Plaintiff.

43.     As a result of Defendants' misappropriation of Plaintiff's trade secrets, Plaintiff has suffered material, irreparable injury.

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate result of the above described conduct, Plaintiff requests that this Court:

(A)     Award all compensatory damages incurred or suffered by Plaintiff to compensate it for Defendant's violation of the Alabama Trade Secrets Act;

(B)     Award punitive damages against all Defendants;

(C)     Award all attorney's fees incurred by Plaintiff; and

(D)     Award all other damages that Plaintiff is entitled to recover under Alabama law.

## COUNT V
## FRAUD, CONSPIRACY, AND COLLUSION

44.     The allegations of Paragraphs 1 through 43 are hereby incorporated herein

14

Case 4:19-cv-01066-CLM   Document 1   Filed 07/09/19   Page 15 of 18

with reference and with the same force and effect as if set forth in full below.

45.     Defendants DeLuccio and Coffey willfully deceived Plaintiff by requesting Plaintiff's proprietary documents and telling Plaintiff that they were needed for purposes furthering the parties' business relationship, when in fact DeLuccio and Coffey knew and did not disclose their plan to duplicate and use Plaintiff's documents as their own. In reliance on the contractual agreements between the parties, Plaintiff gave Defendants access to the requested documents.

46.     DeLuccio and Coffey conspired and colluded to deprive Plaintiff of assets and property rights by duplicating Plaintiff's proprietary materials and marketing them as Defendants' own program. DeLuccio and Coffey did this using Plaintiff's confidential and proprietary customer list, therefore knowingly taking away business from Plaintiff. Furthermore, they concealed their actions from Plaintiff until after Plaintiff suffered damages.

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate result of the above described conduct, Plaintiff requests that this Court:

(A)     Award all compensatory damages incurred or suffered by Plaintiff to compensate it for Defendant's fraud, conspiracy and collusion;

(B)     Award punitive damages against all Defendants;

(C)     Award all attorney's fees incurred by Plaintiff; and

(D)     Award all other damages that Plaintiff is entitled to recover under Alabama

Case 4:19-cv-01066-CLM   Document 1   Filed 07/09/19   Page 16 of 18

law.

## COUNT VI
## CONVERSION

47.     The allegations of Paragraphs 1 through 46 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

48.     Defendants took control of Plaintiffs' intellectual property and proprietary processes and sold them for profit as Defendants' own property in defiance of Plaintiffs' rights.

49.     Any profits made as a result of this unlawful conversion of Plaintiffs' property are due to be paid to Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate result of the above described conduct, Plaintiff requests that this Court:

(A)     Award all compensatory damages incurred or suffered by Plaintiff to compensate it for Defendant's conversion;

(B)     Award punitive damages against all Defendants;

(C)     Award all attorney's fees incurred by Plaintiff; and

(D)     Award all other damages that Plaintiff is entitled to recover under Alabama law.

## VERIFICATION

I hereby attest and verify under oath that the statements contained herein are true and correct and to the best of my knowledge.

C & H Management Group, LLC
Attentive Health & Wellness, LLC

By: _____

_DAVID CHAVITERS_

Title: CEO

STATE OF ALABAMA
COUNTY OF ETOWAH

Sworn to and subscribed before me by _David Chavi___ on behalf of C & H Management Group, LLC and Attentive Health & Wellness, LLC on this the __9__ day of ___July___ 2019.

NOTARY PUBLIC: _____
My commission expires: ___3/5/22___

/s/Christie D. Knowles
**Christie D. Knowles (KNO-015)**

/s/ Haley K. Tucker
**Haley K. Tucker (TUC-045)**

OF COUNSEL FOR THE PLAINTIFF:
**KNOWLES & SULLIVAN, LLC**
400 BROAD STREET, SUITE 105
GADSDEN, AL 35901
T: (256) 547-7200
F: (256) 467-6322
christie@kkslawgroup.com
haley@kkslawgroup.com

**DEFENDANTS TO BE SERVED AT:**

Jerome DeLuccio
1290 University Ave.
Rochester, NY 14607

17

David Coffey
1290 University Ave.
Rochester, NY 14607

enhancedcareMD
1290 University Ave.
Rochester, NY 14607



FILED

2019 Jul-09 PM 05:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

# AGENT/BROKER SALES AGREEMENT

# Agent/Broker Sales Agreement

This Agent/Broker Sales Agreement is made by and between C & H Management Group, LLC d/b/a Attentive Health & Wellness, an Alabama Company, located at 350 Locust Street, Gadsden, Alabama 35901 hereinafter referred to as ("AHW") and the Agent/Broker named on page 5 hereinafter referred to as ("Broker"). The effective date ("Effective Date") of this Agreement shall be the date signed by the parties on page 5. AHW and Broker may be collectively referred to, in this Agreement, as "Parties" or individually as "Party. In consideration of the mutual benefits to be derived hereunder, the parties covenant and agree as follows:

WHEREAS, AHW allows Broker to provide their clients with a unique wellness program that includes enhancedcareMDs suite of services (Broker) while providing supplemental benefits to employees and through their combined appointments and agents of record, offers a program of certain health insurance, life insurance and other supplemental benefits to qualified clients and Broker wishes to extend such program to their clients;

WHEREAS, the Parties desire to establish the terms of the business relationship between AHW and Broker whereby Broker will market the AHW program to client employers and also market the associated products to the employees of said clients.

NOW THEREFORE, in consideration of the promises and mutual covenants contained in this Agreement, the parties covenant and contract as follows:

## I. TERM

The term of this Agreement shall begin on Effective Date of this Agreement. This Agreement, together with any addenda attached hereto, shall continue until terminated by either Party pursuant to §V.Termination of this Agreement. Termination of this Agreement shall not relieve either party of any obligations that it should have performed prior to the date the Agreement is terminated.

## II. BROKER REPRESENTATIONS

A. Broker represents that they are an independent insurance agent licensed to sell AHW products and services in each state in which they intend to solicit client accounts and Broker's independent contractors/employees are not employees of AHW for the purposes of this Agreement. Broker is responsible for all fees and cost associated with the performance of their duties under this Agreement. Broker agrees to abide by all policies and procedures established by AHW concerning the wellness plan and all enrollments.

B. Broker is responsible to ensure licensing of, and legal compliance of, all persons acting under this Agreement for and on behalf of Broker.

C. Broker acknowledges that they are an independent contractor and this Agreement does not create a relationship of employer/employee, principal, agent or other similar relationship between AHW and the Broker.

D. Broker acknowledges that they have no authority to and will not: a) Bind AHW by any promise or agreement, or incur any debt, expense, or liability whatsoever in its name or account, or waive any of the provisions of policies administered by AHW; b) Waive, alter, or modify any question on any application, knowingly permit any applicant to inaccurately answer any question on any application, instruct any applicant not to disclose any particular medical condition on any application or notify an applicant that Broker has the authority to alter terms of a wellness agreement.

1 | Page

# Agent/Broker Sales Agreement

E.  No representation or warranty of the Broker contained within this Agreement, or in any other document, certificate, information, exhibit or report provided by Broker to AHW in connection with the negotiation, execution and delivery of this Agreement, or other instrument delivered by Broker hereunder, contains any material misstatement of fact or any untrue statement of material fact or omits to state a material fact or any fact necessary to make the statements contained therein not materially misleading or would impair, prohibit or otherwise adversely impact or adversely affect the Broker's ability to operate as an independent agent of AHW or perform any of Broker's other obligations under this Agreement.

F.  Broker agrees to share commissions paid based on the sale of the insurance products according to the percentages set forth on "Schedule A" attached. Broker agrees to give notice to the insurance carriers paying the commissions of Broker's commission sharing agreement and obligation to share said commissions with Employer Insurance Resources, Inc. according to "Schedule A" attached. Broker also agrees to authorize and instruct the insurance carriers to pay AHW's portion of each commission payment directly to Employer Insurance Resources, Inc. as directed on "Schedule A" attached.

G.  Broker agrees to carry E&O insurance coverage as required by carriers utilized by AHW.

## III.  ATTENTIVE HEALTH & WELLNESS REPRESENTATIONS

A.  AHW hereby authorizes Broker to solicit and procure applications and AHW Client Master Agreements for the wellness program(s) offered by and through AHW on a non-territorial, non-exclusive basis, subject to the terms and conditions of this Agreement.

B.  AHW represents that their solution is in compliance with all HIPAA and IRS regulations and is a legally derived solution.

C.  Parties are responsible for all of their own expenses incurred in performing services under this Agreement. Parties understand that they have no authority to contract in the name of or on behalf of the other party.

## IV.  COMPENSATION
Broker will be compensated as outlined below and in Schedule "A" attached.
A.  Broker and AHW agree to have all commissions paid directly to the respective party. Such commission shall be paid subject to the terms of this Agreement and Schedule "A" attached.
B.  Broker may appoint sub-brokers to offer AHW's wellness program. These sub-brokers will be under the supervision and control of the Broker and will be required to sign AHW's "Confidentiality, Non-Disclosure & Non-Compete Agreement". It will be the Broker's responsibility to compensate and explain the pay structure to said sub-broker(s).

## V.  TERMINATION

AHW and Broker each agree that this Agreement along with any addenda attached hereto, shall continue until terminated by either Party pursuant to this section:

A.  This Agreement, together with any addenda attached hereto, shall terminate:
1)      Thirty days following written notice by either Party mailed to the last known address of such Party upon a stated breach that is not cured in 30 days from receipt of that notice.
2)      Automatically without notice upon the dissolution of the Broker's company.
3)      Automatically at time of appointment renewal if Broker has not placed any new business with AHW within the last 12 months.



# Agent/Broker Sales Agreement

4) Immediately upon notice from AHW for any act of dishonesty, fraud or breach of any of the terms of this Agreement as determined at AHW's sole discretion.

5) Automatically without any notice upon revocation, should there be a termination or non-renewal of Broker's license.

6) If attempt is made by AHW to contact Broker in writing or via email at last know mailing or email address and Broker fails to reply within 60 days of receipt of such notice, in which event AHW shall have the right to retain all future commissions and fees, other than those paid directly to Broker by the respective insurance carriers, and Broker shall forfeit any and all right to such commissions and fees.

B. The indemnification and contribution provisions of this Agreement shall survive indefinitely the expiration or other termination of this Agreement.

C. Impact of termination: In cases of termination from either party, both parties will continue to supply the support and services outlined in this agreement for all existing clients until the end of the clients contract, and all compensation as outlined in "A" will apply until those client obligations are fulfilled.

## VI. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, without regard to principles of conflicts of law. Broker hereby irrevocably submits itself to the personal jurisdiction of the courts in and for Etowah County, Alabama or in the United States District Court, Northern District of Alabama, Middle Division, and Broker hereby waives, to the full extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such action in such court and any claim that any such action, suit or proceeding ("Action") has been brought in an inconvenient forum. The parties desire to have any Action filed by either of them to be tried before a judge or judicial panel without a jury, and therefore: (i) agree not to elect a trial by jury of any issue triable of right by jury, and (ii) waive any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by each of the parties hereto, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. Broker hereby certifies that no representative or agent of AHW has represented, expressly or otherwise, that AHW will not seek to enforce this waiver of right to trial by jury.

## VII. INTEGRATION

This Agreement, and any signed addendum attached hereto constitute the entire Agreement between the parties with regard to this subject matter and supersedes any and all Agreements, whether oral or written, between the parties with respect to this subject matter. Broker acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement, including but not limited to any statement made by any employee or marketing agent of AHW.

## VIII. SEVERABILITY:

Should any term, condition or provision of this Agreement be held to be unenforceable, the balance of this Agreement shall remain in force as if the unenforceable part did not exist. The captions in this Agreement are provided for convenience only and are not part of the terms and conditions of this Agreement.



# Agent/Broker Sales Agreement

## IX.  MODIFICATION:

Except as otherwise provided in this Agreement, **AHW** may amend the terms and conditions of this Agreement by giving Broker 30 days written notice. Any other modifications to this Agreement must be in writing and executed by Authorized Representatives of both parties to be enforceable.

## X.   REMEDIES NOT EXCLUSIVE:

The rights and remedies provided herein shall not be exclusive and both parties shall have rights and remedies now or hereafter provided by law in addition to those provided for in this Agreement. Institution of an action to effect collection of payment of an amount in default or the entry of a judgment in such action shall not be deemed to be an election by AHW nor shall it bar AHW from pursuing other remedies available to it at law or in equity.

## XI.  ATTORNEY'S FEES:

If either party refers a matter to a collection agency or brings other action as a result of a Breach of this Agreement, the prevailing party in such collection proceeding or action shall be entitled to reimbursement for its reasonable attorney's fees and other costs and fees incurred in such collection or action in addition to any other relief to which the party may be entitled.

## XII.  NO PARTNERSHIP OR AGENCY:

Nothing set forth herein shall be deemed to create a partnership or joint venture between Broker and AHW, and no fiduciary duty shall arise from the relationship created herein. In no event may either party act as the agent of the other party unless specifically authorized in writing to do so.

## XIII.  TRANSFERABILITY:

Broker shall not transfer or assign its rights or obligations hereunder without AHW permission, of which, this permission shall not be unreasonably withheld. The Broker can assign and transfer the rights in the specific case of the majority of their company shares being sold or transferred to another entity. AHW reserves the right to transfer its rights, duties and obligations hereunder.

## XIV.  NOTICES:

Any notices under this Agreement shall be in writing and deemed given; (i) on the delivery date if delivered personally or by local commercial delivery service or if sent by facsimile transmission with printed verification of delivery; (ii) one business day after deposit with a commercial overnight carrier, with written verification of receipt; or (iii) five business days after mailing date whether or not actually accepted by addressee, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of delivery for which a receipt is available.



# Agent/Broker Sales Agreement

Signature Page to Follow



# Agent/Broker Sales Agreement

**The signatures on behalf of AHW and Broker immediately below constitute execution of this Agreement.**

C & H Management Group. LLC d/b/a
Attentive Health & Wellness

Broker

Authorized Signature

Authorized Signature

Typed / Printed Name

Jerome DeLuccio
Typed / Printed Name

Title

CEO
Title

Date

1290 University Ave
Address

Rochester     NY     14607
City       State       ZIP

Date: 06/01/17

6 | P a g e



# Agent/Broker Sales Agreement

# Schedule "A"

**Option 1:**

(AHW Enrolls): If Broker wishes *AHW* to provide enrollers for the account; AHW will be compensated at a rate of **50**% and Broker will be compensated at a rate of **50**% of the total commissions on the sale of all products, including renewal payments. The parties will agree, in writing, to this commission split prior to enrolling the account. Unless otherwise agreed to in writing, Broker will be responsible for paying the reasonable travel costs and expenses of AHW's enrollers.

Broker will be compensated at a rate of $40 Per Employee Per Month (PEPM) on all lives sold the Attentive Health & Wellness program. Rate will continue as long as the employee is on the Attentive wellness program. When the employee terminates from the Attentive wellness program, the $40 PEPM paid the Broker for that employee will terminate as well. Payments for these services will be separately billed to AHW and pulled via ACH on the 5th of each month after the initial effective month (ex. Jan.1 effective date, ACH on Feb. 5th) and continue accordingly. ecMD reserves the right to contact the said employee to sell them a COBRA type plan to continue in the use of the services they have come to know and use. The Wellness Services provided for the Attentive plan will include 24/7 access to RN, MDs, Counselors, RX cards and Alternative Medicine providers and portals. (ecMD will include APPs for services and integration with the Wellness portal as well)

**Option 2:**

(Broker Enrolls): If Broker wishes to enroll the account; *AHW* will be compensated at a rate of **30**% and Broker will be compensated at a rate of **70**% of the total commissions on the sale of all products sold as a result of the "Wellness Reserve Account," including renewal payments. AHW receives no commission on products sold outside of the "Wellness Reserve Account." Once the Broker brings 10,000 lives onto the Attentive program, the Broker will be compensated at **80**% of the total commissions on the sale of future products sold as a result of the "Wellness Reserve Account." Including renewal payments. AHW will be compensated at a rate of **20**% of total commissions on the sale of all future products sold as a result of the "Wellness Reserve Account, including renewal payments. This 10% incentive clause applies to all members and both options.

Broker will be compensated at a rate of $40 Per Employee Per Month (PEPM) on all lives sold the Attentive Health & Wellness program. Rate will continue as long as the employee is on the Attentive wellness program. When the employee terminates from the Attentive wellness program, the $40 PEPM paid the Broker for that employee will terminate as well. Payments as above and COBRA opportunities remain as in Option 1.

Note: enhancedcareMD will negotiate billing the clients this $40 figure on day 15 ahead of the monthly billing by Attentive. If this negotiation is successful, Attentive will not be responsible in either the billing or paying that $40 to enhancedcareMD.

\* All commissions on any insurance products sold along with \*AHW\*, as used in this Schedule "A", shall be paid to Employer Insurance Resources, Inc. Employer Insurance Resources is a sister company of Attentive Health & Wellness and a full service brokerage.\*

ecMD will also provide a "strongly recommended" wellness reserve item including Dental, Vision , Hearing discounts, plus Alternative provider discounts of (e.g. could be the following but not limited to chiropractic, acupuncture, massage therapy, physical therapy, occupational therapy, and podiatry), and also patient advocacy. These services provided through the Wellness Reserve will be provided at a rate of $25 PEPM for employees that choose the additional wellness reserve items with $5 going to the Broker, $10 to ecMD, and $10 to Attentive Health & Wellness. (The vendor(s) and services used by ecMD are subject to the approved services in each state,

7 | Page



# Agent/Broker Sales Agreement

and at times the approved marketing methods to provide services in same states. ecMD has the right to offset services for compliance reasons, and to not provide services in states that have not provided a means to market effectively)

AHW will use ecMD's RX card and pay ecMD $.40 pepm and AHW will receive $1.20 per use from ecMD. Payments to AHW will be upon receipt of usage and monthly reconciliation.

Case 4:19-cv-01066-CLM   Document 12-2   Filed 07/09/19   Page 1 of 22



**FILED**

2019 Jul-09  PM 05:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

# CONFIDENTIALITY, NON-COMPETITION AND NON-

# DISCLOSURE AGREEMENT

# CONFIDENTIALITY, NON-COMPETITION AND NON-DISCLOSURE AGREEMENT

This Non-Competition Agreement ("Agreement") is made by and between **C & H Management Group, LLC d/b/a Attentive Health & Wellness,** located at 350 Locust Street, Suite 2-B, Gadsden, Alabama 35901 hereinafter referred to as ("disclosing Party") and the entity named on page 6 hereinafter referred to as the ("Receiving Party"). The effective date "Effective Date shall be the date signed by the parties on page 6.

## RECITALS

**WHEREAS,** Disclosing Party is actively engaged in the business of ERISA qualified self- insured group wellness and limited medical plans and related services Hereinafter referred to as ("Business"); and

**WHEREAS,** Receiving Party also has related services  and pre-existing relationships in the Limited Medical and Wellness space desires to utilize its ability to market the services offered by Disclosing Party and desires for Receiving Party to market its services according to the terms and conditions hereafter set forth excluding the existing services and relationships; and

**WHEREAS,** Receiving Party desires to contract with Disclosing Party and Disclosing Party desires to contract with Receiving Party, subject to the stipulations, conditions and provisions of this Agreement.

**NOW THEREFORE,** in consideration of the promises and the mutual agreements contained in this Agreement, and for other good and valuable consideration, including, without limitation, the continued contracting with Receiving Party by Disclosing Party, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## SECTION ONE DEFINITIONS

Subject to the exclusions noted in the Recitals and the mutuality of

1



the following covenants:

A.  "Competing Business" means any business engaged in or contemplating engagement in the Business. The parties acknowledge that the Disclosing Party carries on the Business in multiple States and intends to solicit clients in all 50 States and, therefore, a Competing Business necessarily includes businesses in any state in the United States that engages in or contemplates engaging in the Business.

B.  "Trade Secret" means, in addition to any information covered by any definition of "trade secret" or any equivalent term under state, local or federal law, all information pertaining to the Business, without regard to form, whether oral, in writing, in electronic or computer format, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, distribution lists, a list of actual or potential customers, or a list of actual or potential contractors, consultants or suppliers, which is not commonly known by or available to the public and which information: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. "Trade Secret" shall not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any right or privilege. Nothing in this Agreement is intended, or shall be construed, to limit the protections of the Alabama Trade Secrets Act or any other applicable law protecting trade secrets or other confidential information.

2

C. "Confidential Information" means any confidential or proprietary business information, other than Trade Secrets, regarding the Business that is the subject of reasonable efforts to maintain its confidentiality and that is not generally disclosed by practice or authority to persons not employed or otherwise engaged by Disclosing Party, whether oral, in writing or in electronic or computer format. Confidential Information shall include, but not be limited to, the following with respect to the Business: (i) business or operating plans, strategies, know-how, portfolios, prospects or objectives; (ii) structure, products, product development in progress as of the date hereof, technology, distribution, sales, advertising services, support and marketing plans, practices, and operations; (iii) methods of pricing, costs and details of services; (iv) financial condition and results of operations; (v) the performance of any accounts; (vi) research and development, operations or plans; (vii) lists of customers, and payors (including, without limitation, the identity of customers, addresses, and any other characteristics of such Persons); (viii) information received from third parties under confidential conditions; (ix) management organization and related information (including, without limitation, data and other information concerning the compensation and benefits paid to officers, directors, Receiving Parties and management); and (x) personnel and compensation policies. This definition shall not limit any definition of "confidential information" or any equivalent term under applicable state or federal law.

D.   "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other legal entity, or a governmental entity or any department, agency or political subdivision thereof.

E.   "Protected Customers" means any Person with which the Disclosing Party has substantial relationships or contacts, has provided services to or otherwise sold products to in the Business within twenty-four months prior to the date of this Agreement.

3

F.    "Protected Agent" means any person employed by Disclosing Party at any time during the term of this Agreement.

G.    Protectable Interest" means Trade Secrets, Confidential Information, Protected Customers, Protected Agent and any substantial relationship or contact with specific prospective or existing customers, patients, vendors or clients. All of ecMDs broker network will be protected by Attentive

H.    "Restricted Period" means that period beginning on the date of termination of this Agreement and ending on the eighteen month after the termination of Receiving Party's contract with Disclosing Party.

I. "Restricted Territory" means the geographic area of the United States of America. The parties acknowledge that the Disclosing Party carries on the Business in multiple States and intends to solicit clients in all 50 States and, therefore, a Competing Business necessarily includes businesses in any state in the United States that engages in or contemplates engaging in the Business.

## SECTION TWO

## RECEIVING PARTY'S COVENANTS

A. Receiving Party acknowledges that Receiving Party holds a position uniquely essential to the management, organization and service of the Disclosing Party and that the Disclosing Party holds a valid and enforceable Protectable Interest. As a consideration and inducement to Disclosing Party to continue the contracting of Receiving Party, Receiving Party covenants, warrants and agrees as follows:

B.    Receiving Party agrees that he or she shall not directly or indirectly, and within the Restricted Period,

.    (a) Will not, directly or indirectly, knowingly solicit any

4

customer, client, employee, consultant or independent contractor of Disclosing Party who was made known during, or as a consequence of, the business relationship contemplated hereunder,

(b) Own, manage, operate, join, control or participate in the ownership, management, operation or control, of any Person engaged in a Competing Business within the Restricted Territory.

C.   Receiving Party agrees not to directly or indirectly disclose or communicate to any Competing Business or any proposed competitive business any substantial relationship or contact with specific prospective or existing customers, vendors, clients or the names of past, present or future customers of Disclosing Party. Receiving Party further covenants not to utilize Disclosing Party's customer list or call on or attempt to service any of Disclosing Party's accounts.

D.   Receiving Party acknowledges and agrees that valuable relationships have been established between Disclosing Party and certain customers. Receiving Party further acknowledges and agrees that the aforementioned relationships constitute a valuable asset of Disclosing Party. Accordingly, Receiving Party agrees that during the Restricted Period, neither Receiving Party nor any affiliate, director, shareholder, officer, parent or subsidiary of Receiving Party shall, without the prior written consent of Disclosing Party, directly or indirectly, solicit, divert, take away or attempt to solicit, divert or take away any Protected Customer for the purpose of selling or providing services that are similar to and competitive with the products sold or services provided by Disclosing Parties.

E.   Receiving Party acknowledges and agrees that the Protected Agents are integral to the operational success of the Business. Accordingly, Receiving Party agrees that, during the Restricted Period, neither Receiving Party nor any affiliate, director, shareholder, officer, parent, subsidiary or spouse of Receiving

5

Party, shall, without the prior written consent of Disclosing Party, directly or indirectly, hire, engage or solicit any Protected Receiving Party.

F. Receiving Party acknowledges and agrees that the Protectable Interest would enable Receiving Party to establish goodwill with the customers, potential customers, Receiving Parties, independent contractors, consultants, and suppliers who provide products and services on behalf of a Competing Business or who receive services from a Competing Business and that the Protectable Interest constitutes a valuable asset of Disclosing Party. Accordingly, Receiving Party hereby agrees as follows: (i). Receiving Party shall not, at any time during the Restricted Period, directly or indirectly transmit or disclose any Confidential Information or Trade Secrets to any Person or make use of any such Confidential Information or Trade Secrets, directly or indirectly, for his benefit without the prior written consent of Disclosing Party. (ii). The restrictions of this section shall apply regardless of whether the Confidential Information or Trade Secrets are in written, graphic, computer, recorded, photographic or any machine-readable form, is orally conveyed to or is otherwise known by Receiving Party. (iii). Receiving Party agrees not to directly or indirectly designate, disclose, lecture on, or in any manner publish any Confidential Information or Trade Secrets of Disclosing Party without Disclosing Party's prior written permission. Receiving Party agrees to leave with Disclosing Party or turn over to Disclosing Party any and all records, notebooks, materials, documents or other personal property containing Confidential Information or Trade Secrets or not, including copies, whether prepared by him or others.

G. Receiving Party acknowledges and warrants that the restrictive covenants set forth above are reasonable and valid in time and scope and in all other respects and do not impose undue hardship upon Receiving Party. Receiving Party further acknowledges that Receiving Party has read carefully the terms of this Article as well as the Agreement, understands the terms

6

of this Agreement, have had an opportunity to consult with knowledgeable counsel, and enters into this Agreement voluntarily. The covenants set forth in this Agreement shall be considered and construed as separate and independent covenants. Should any part or provision of any covenant be held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability shall not render invalid, void or unenforceable any other part or provision of this Agreement.

H.    The parties hereunder agree that it is their intention that the restrictive covenants herein be enforced in accordance with their terms to the maximum extent possible under applicable law. The parties further agree that, in the event any court of competent jurisdiction shall find that any of the foregoing provisions is invalid or unenforceable, the invalid or unreasonable term shall be redefined, or a new enforceable term provided, such that the intent of the parties in agreeing to the provisions of this Agreement will not be impaired and the provision in question shall be enforceable to the fullest extent of the applicable laws.

I.    Without limiting the remedies available to Disclosing Party, the parties acknowledge that a breach of any of the covenants contained herein this Article will result in material, irreparable injury for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof by Receiving Party, Disclosing Party shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining Receiving Party from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants hereof without the necessity of posting any bond.

J.    Receiving Party shall be liable in connection with any breach by an affiliate, director, shareholder, officer, parent, subsidiary or spouse of Receiving Party of the terms hereof. Receiving Party

7

also specifically acknowledges and agrees that Disclosing Party shall be entitled to seek monetary damages and other remedies at law for breaches of this Agreement in addition to any injunctive or other equitable relief. The rights and remedies hereunder are cumulative and not alternative.

## SECTION THREE

## ENTIRE AGREEMENT

This Agreement contains all the terms and conditions agreed on by the parties with

respect to the transactions contemplated, and shall not be amended or modified except by a written instrument signed by each of the parties.

## SECTION FOUR

## BINDING EFFECT

This Agreement shall be binding on and inure to the benefit of the representatives, heirs, estates, successors, and assigns of the parties. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer on or give any person, firm, or corporation, other than the parties, their successors and assigns, any benefits, rights, or remedies under or by reason of this Agreement.

## SECTION FIVE

## TIME OF ESSENCE

Time is of the essence of this Agreement.

8

## SECTION SIX

## COPIES

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

## SECTION SEVEN

## LAW GOVERNING

This Agreement shall be governed by and construed under the laws of Alabama.

## SECTION EIGHT

## CHOICE OF FORUM

The parties agree that any claim of any type brought by one against the other must be maintained only in a court sitting in Etowah County, Alabama or, if a federal court, the Northern District of Alabama. For purposes of enforcement of this Agreement, the parties consent to personal jurisdiction in the State of Alabama. In the event of litigation concerning this Agreement or the enforcement of same, the prevailing party shall be entitled to recover all costs of action and reasonable attorney fees.

## SECTION NINE

## HEADINGS

The section and other headings in this Agreement are inserted solely as a matter of convenience and for reference, and are not a part of this Agreement.

## SECTION TEN

## SEVERABILITY

Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid, legal, and enforceable,

9

under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable, in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceable provision will not affect any other provision, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. Without limiting the generality of the foregoing, should a court ever hold that the covenant not to compete is too broad geographically, too long in time, or too broad in scope of activity prohibited, such covenant shall never the less be given effect to the extent permitted by such court.

## SECTION ELEVEN

### NON-WAIVER

No failure or delay on the part of the parties hereto to exercise any right, power or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver; nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**The signatures immediately below constitute execution of this Agreement. Disclosing Party**

BY:_____ AUTHORIZED
SIGNATURE (DISCLOSING PARTY)

. Dr. Tommy Lamb . Printed Name

**Receiving Party**

BY: _____ AUTHORIZED

10

## SIGNATURE (DISCLOSING PARTY)

J DeLUCCIO

_____ Printed
Name

1290 University Av Suite 6

_____ Address

Rochester  NY  14472

_____ City, State, Zip

ITS: ____PRESIDENT_____

_____6/1/17_____ Execution Date

ITS: _____

_____ Execution Date

**Page 6**

11

**FILED**

2019 Jul-09  PM 05:06
U.S. DISTRICT COURT
N.D. OF ALABAMA



## EXHIBIT C

## CEASE AND DESIST LETTER TO DEFENDANTS
## FROM USHC

# DeLue Law PLLC

600 Stewart St Ste 1115
Seattle, WA 98101-1242
Office: 206-508-3804
Fax: 206-508-3817
www.d3law.com
ddd@d3law.com

May 7, 2019

Mr. Jerry DeLuccio
CEO
EnhancedcareMD
1290 University Avenue
Rochester, NY 14607

RE:   USHC dba PredictiMed™ Demand for Damages
      **CEASE AND DESIST**

Dear Enhanced Care and Well Right,

By way of introduction, I represent US HealthCenter, Inc. (USHC) a Wisconsin Corporation, doing business as PredictiMed™. You entered into a licensing agreement (Agreement) on March 21, 2016. You breached this Agreement, attendant intellectual property and State law as will be explained below. This letter is a demand for compensation from you and a cease and desist to Enhanced Care (ECMD) to refrain from using any confidential information that is defined by the Agreement. With regards to the Agreement, you are in breach of the non-circumvention provision. This matter is also protected by Wisconsin law Section 134.90 (Uniform Trade Secrets Act) which protects trade secrets and prohibits the misappropriate use of confidential information which you clearly have violated as outlined in the following paragraphs.

We direct your attention to the Agreement which states:

A. Restrictions on Use. Customer agrees: (a) not to copy, create or attempt to create, by reverse engineering, disassembly, decompilation or otherwise, the Program from any object code or information that may be made available to it, or aid, abet or permit others to do so; (b) not to remove, modify or obscure the Program, Documentation or Services identification or proprietary or restrictive rights notices from the Program, Documentation or Services or any support material; and (c) not to develop methods to enable unauthorized parties to use the Program, Documentation or Services without the permission of PREDICTIMED.

ECMD breached this provision by sending an email to Attentive proposing to use that technology when it stated: "ECMD will provide the WELLNESS SUITE as the Attentive

Case 6:20-cv-01066-CLM  Document 1-3-2 Filed 07/09/19 Page 390 of 43

CEASE AND DESIST
May 7, 2019
Page 2 of 4

solution nationwide." You worked to build a Personal Health Dashboard though it is copyrighted and trademarked and belongs under the license within the Agreement to PredictiMed™. You did this in concert with Well Right who acted to build this platform with you in violation of the Agreement. We have pulled sections of Well Right's website and understand it was built at and with the help of ECMD in order to attempt to steal both intellectual property and clients such as Attentive. ECMD must immediately take down all reference to the term "Personal Health Desktop" from any of its materials and or websites it has built and/or helped build.

Furthermore, the Agreement contained a non-circumvention clause under Paragraph 17:

> **NON-CIRCUMVENTION.** Unless agreed to under separate Agreement, at any time prior to the expiration of three years from the date of this agreement, it is expressly agreed that the identities of any individual or entity and any other third parties (including, without limitation, suppliers, customers, financial sources, vendors and consultants) discussed and made available by the Disclosing Party in respect of the Purpose and any related business opportunity shall constitute Confidential Information and the Recipient or any Group company or associated entity or individual shall not (without the prior written consent of, or having entered into a commission agreement with, the Disclosing Party): directly or indirectly initiate, solicit, negotiate, contract or enter into any business transactions, agreements or undertakings with any such third party identified or introduced by the Disclosing Party; or seek to by-pass, compete, avoid or circumvent the Disclosing Party from any business opportunity that relates to the Purpose by utilizing any Confidential Information or by otherwise exploiting or deriving any benefit from the Confidential Information.

The Agreement also contains a confidentiality clause in Paragraph 14 (copied below) which obligates you to protect all PredictiMed™ information and to refrain from revealing or disclosing it to any third party without PredictiMed's consent. Thus, the Agreement unequivocally prohibits you or anyone acting on your behalf from interfering with PredictiMed's business contracts and business relationships. Furthermore, you have breached this Agreement by sharing Confidential Information contained in PredictiMed's marketing materials, contracts or website and other material gained from the business relationship.

> **CONFIDENTIALITY.** PREDICTIMED and Customer, as defined above, as agreed in previously executed Mutual Confidentiality Agreement, the ("Parties") shall protect each other's Confidential Information from unauthorized dissemination and shall use the same degree of care that the Parties uses to protect the Parties own like information, but in no event less than a reasonable degree of care. The Parties shall not disclose to third parties the Confidential Information without the prior written consent of the other

Party. The Parties shall use the Confidential Information only for purposes of performing their obligations or exercising their rights under this Agreement. Notwithstanding the foregoing, the Parties may use or disclose the Confidential Information to the extent either Party is legally compelled to do so, provided, however, prior to any such compelled disclosure, the Party provides notice and fully cooperates with the other Party in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of such disclosure and/or use of the Confidential Information. The Parties agree that any breach of this Section would cause irreparable harm for which monetary damages would not be adequate and, therefore, the Parties agree that, in the event of a breach of this Section, the non-breaching Party shall be entitled to equitable relief in addition to any remedies it may have hereunder or at law.

Thus, PredictiMed™ is aware that you are in engaging in competing activities in violation of Paragraph 14 and 17 by having attempted to work both with Attentive and its customers subject to the Attentive-PredictiMed™ Distributor Agreement totaling loss of profit to PredictiMed™ a minimum of $24,624.

The purpose of this letter is to formally advise you that unless you immediately and completely cease and desist these activities, PredictiMed™ will initiate legal action to enforce its rights under the Agreement and under Wisconsin law, including seeking injunctive relief, damages, costs and attorneys' fees. PredictiMed™ will pursue this legal action against you and all individuals participating and assisting you in these breaches of contract.

Furthermore, under federal law, your actions also constitute an unfair trade practice and violations of relevant copyright and trademark laws. Wisconsin law Section 134.90 (Uniform Trade Secrets Act) specifies that customer lists are also trade secrets and prohibits misappropriation which you clearly have done:

(2) MISAPPROPRIATION. No person, including the state, may misappropriate or threaten to misappropriate a trade secret by doing any of the following:
(a) Acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means.
(b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:

This entitles PredictiMed™ to injunctive relief and damages including the actual loss and punitive damages:

Case 4:19-cv-01066-CLM   Document 1-3-2   Filed 07/03/19   Page 39 of 5

CEASE AND DESIST
May 7, 2019
Page 4 of 4

    **(b)** If a violation of sub. (2) is willful and malicious, the court may award punitive damages in an amount not exceeding twice any award under par. (a).

    PredictiMed™ will pursue these legal remedies vigorously to the full extent of the law unless you immediately cease all competitive activity, divest from utilizing the license and customer lists and refrain from contacting or soliciting PredictiMed™ customers. In order to avoid litigation, you will need to confirm in writing you agree to such terms.

    To date, the damages in converted profit total $24,624.00. We anticipate that damages will be greater than this amount because of the relevant laws cited above. We also believe Well Right had reason to know it was utilizing PredictiMed™ Trade Secrets such that your conduct has exposed them to potential damages as well. You have twenty days to confirm you will cease and desist from the above described conduct or a lawsuit will be filed.

Very truly yours,

**DeLue Law PLLC**

Daniel D. DeLue

Case 4:19-cv-01066-CLM   Document 14-2   Filed 07/09/19   Page 191 of

**FILED**
2019 Jul-09  PM 05:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT D

## CEASE AND DESIST LETTER TO DEFENDANTS FROM PLAINTIFF



# KNOWLES & SULLIVAN LLC

## ATTORNEYS AT LAW

Christie D. Knowles
Jason E. Knowles
Joshua B. Sullivan
Haley E. Tucker
Scott D. Waldrup

400 Broad Street  |  Suite 105  |  Gadsden, AL 35901

KKSLawGroup.com
Tel: 256.547.7200
Tel: 256.543.9790
Fax: 256.467.6322

June 6, 2019

**Via:** email (jdeluccio@enhancedcaremd.com) and certified mail
return receipt requested

Jerry Deluccio
EnhancedcareMD
1290 University Ave.
Rochester, NY 14607

### Re: Dearmond - DR 18-900305.01

Dear Mr. Deluccio:

This firm represents C&H Management Group d/b/a Attentive Health & Wellness, LLC ("Attentive").

As a broker for Attentive, you were provided with Attentive's confidential and proprietary documents, processes and information. All these disclosures were subject to a Confidentiality, Nondisclosure and Non-Competition Agreement you agreed to and signed June 1, 2017. Relying on your promise not to disclose, use or misappropriate its confidential and proprietary information, Attentive provided you its proprietary documents, customer lists and processes for its self insured medical expense reimbursement program (SIMERP ™).

In violation of this Agreement as well as the Alabama Trade Secrets Act (the "Act"), you knowingly disclosed and appropriated for your own financial benefit Attentive's confidential and proprietary documents and processes, customer lists and SIMERP ™ tradename.

Attentive's existing and potential clients have notified them that you have contacted them; told them that you now offer a self-insured medical reimbursement program in addition to your EnhancedCare wellness software platform and; solicited them to move their program enrollment away from Attentive and to the EnhancedCare program. Further investigation revealed that the EnhancedCare program is actually the Attentive SIMERP ™ that you copied from the proprietary documents Attentive provided to you when you were an Attentive broker. You took Attentive's proprietary documents, copied them, labelled them with EnhancedCare's name and then used Attentive's proprietary customer list to

solicit your pirated program to Attentive's existing and potential clients. You are even using Attentive's tradename, SIMERP ™, in your misappropriated documents.

These actions are outrageous, constitute fraud and intentional interference with Attentive's business and contractual relations, violate the Agreement and the Act and also infringe upon Attentive's copyright on its SIMERP ™ program documents. You must **immediately cease and desist**:

-Using the SIMERP ™ tradename;
-Disclosing or using for your benefit or any other purpose any Attentive documents, processes, models or other proprietary information;
-Soliciting any existing or potential client of Attentive;
-Developing, marketing or creating a self insured medical reimbursement program which is similar to, competes with or models that of Attentive;
-Interfering with Attentive's removal of its clients from EnhancedCare's wellness software platform;
-Disparaging or interfering with Attentive's business, tradenames, copyrights, program models, marketing or clients;
-Any other action which violates the Agreement or the Act; infringes on Attentive's copyright, tradenames or other intellectual property or; amounts to fraud and intentional interference with Attentive's contractual rights, business or clients.

Attentive also demands your immediate payment of all profits made from your misappropriation of Attentive's SIMERP ™ name and program. Any such profits were made as the result of your conversion and taking of Attentive's intellectual property and proprietary processes and they are due to be paid to Attentive.

Your failure to immediately cease and desist as set forth in this letter and to repay all profits you have wrongfully pocketed will be met with swift and aggressive legal action being taken against you, your company and any other person or entity who engaged in these activities. You are required to affirm, in writing, that you agree to these terms within ten (10) days of the date of this letter to avoid all appropriate legal action being taken against you.

Sincerely,

Christie Knowles

CDK/thg