# EXHIBIT B

FILED

2020 Apr-21 PM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| C & H MANAGEMENT GROUP, LLC d/b/a ATTENTIVE HEALTH & WELLNESS and ATTENTIVE HEALTH & WELLNESS, LLC, ) ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | CASE NO.: 4:19-cv-01066-CLM |
| ) | |
| JEROME DELUCCIO, DAVID COFFEY, ENHANCEDCARE, INC. d/b/a ENHANCEDCAREMD, ) ) ) ) ) | |
| Defendants. ) | |

## AMENDED COMPLAINT

### I. INTRODUCTION

Plaintiffs, C & H Management Group, LLC d/b/a Attentive Health & Wellness and Attentive Health & Wellness, LLC (collectively, "Attentive"), hereby bring the following Complaint against Defendants Enhancedcare, Inc. d/b/a enhancedcareMD ("ecMD"), Jerome DeLuccio also known as Jerry DeLuccio ("DeLuccio"), and David Coffey ("Coffey") (collectively, "Defendants").

### II. PARTIES

1.     Plaintiff C & H Management Group, LLC is an Alabama Limited Liability Company with its principal place of business in Guntersville, Alabama, and

1

at all times relevant to this action, was doing business as "Attentive Health & Wellness."

2.      Plaintiff Attentive Health & Wellness, LLC, is an Alabama Limited Liability Company with its principal place of business in Guntersville, Alabama. Attentive Health & Wellness, LLC was formed in September 2018.  C & H Management Group, LLC d/b/a Attentive Health & Wellness assigned its rights under the subject contracts to Attentive Health & Wellness, LLC.

3.      Defendant Enhancedcare, Inc. d/b/a enhancedcareMD ("ecMD"), is a Delaware corporation with its principal place of business in Rochester, New York.

4.      Defendant Jerome DeLuccio is an individual over the age of 18 who is a citizen of the State of New York.

5.      Defendant David Coffey is an individual over the age of 18 who is a citizen of the State of New York.

### III.  JURISDICTION AND VENUE

6.      The jurisdiction of this Court is invoked pursuant to an "Agent/Broker Sales Agreement" entered into by the parties on June 1, 2017, wherein the Defendants submitted to the personal jurisdiction of the Courts in Etowah County, Alabama, as well as the United States District Court for the Northern District of Alabama, Middle Division. *See* Exhibit A, p. 3. In said Sales Agreement, Defendants waived any objection that it may ever have as to venue being in either Etowah

County, Alabama, or the United States District Court for the Northern District of Alabama, Middle Division, including an objection based on either court being an inconvenient forum.[1]

7.      The jurisdiction of this Court is further invoked pursuant to a "Confidentiality, Non-Competition and Non-Disclosure Agreement" entered into by the parties on June 1, 2017, wherein the parties agreed that any claim brought by one party against the other must be maintained in the Northern District of Alabama if said claim was to be maintained in a federal court. *See* Exhibit B, p. 9. The parties further consented to personal jurisdiction in the State of Alabama.

8.      This Court has original and supplemental jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. §§ 1367. The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. § 1332. This is an action for declaratory judgment, equitable relief, injunctive relief, and monetary damages which exceed the sum or value of $75,000, and each Plaintiff is a citizen of a different state from each defendant.

9.      Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1391(b)(2).

---

[1] Under the Parties' August 2018 "Addendum" to the Sales Agreement, the jurisdiction and venue provisions of the initial agreement remained in effect.

3

## IV. FACTS

10.    Attentive is in the business of self-insured group wellness and limited medical plans and related services.  Attentive offers its clients a unique wellness program that focuses on the benefits of a participatory group wellness plan with an employer-sponsored medical plan.

11.    This type of wellness program is heavily regulated in regard to how employees are taxed. Attentive's program was carefully crafted and is unique in its ability to produce the most advantageous tax results for employees while complying with all Internal Revenue Service regulations and qualifying under the Employee Retirement Income Security Act of 1974, or ERISA.

12.    Attentive's program and certain plan documents are copyrighted. On June 3, 2019, the United States Copyright Office granted Attentive Health & Wellness, LLC the following copyright registrations, attached hereto as Exhibit "C."

- Attentive Health & Wellness Self Insured Medical Expense Reimbursement Plan Basic Plan Document, Registration No. TX 8-749-520
- Adoption Agreement Self-Insured Medical Expense Reimbursement Plan (SIMERP), Registration No. TX 8-749-521
- Wellness Program Attentive Health & Wellness, Registration No. TX 8-749-522

13.    Attentive invested considerable resources to create and develop the plan documents, and its exclusive ownership of the plan documents is crucial to its business.

**The Parties' Business Relationship**

14.    On June 1, 2017, Attentive and ecMD entered into an "Agent/Broker Sales Agreement" (hereafter, "Sales Agreement") wherein ecMD would market Attentive's unique wellness program through ecMD's sales platform. *See* Exhibit "A", generally. Defendant Jerome DeLuccio signed the Sales Agreement as ecMD's CEO.

15.    Also on June 1, 2017, Jerome DeLuccio, as "President" of ecMD, executed a "Confidentiality, Non-Competition and Non-Disclosure Agreement" (the "Non-Competition Agreement") with Attentive. *See* Exhibit "B", generally.  By executing the Non-Competition Agreement, ecMD acknowledged and agreed that Attentive has a "valid and enforceable Protectable Interest." *Id*. at Section II(A). "Protectable Interest," according to the Non-Competition Agreement, "means Trade Secrets, Confidential Information, Protected Customers, Protected Agent and any substantial relationship or contact with specific prospective or existing customers, patients, vendors or clients." Exhibit "B", Section I(G).

16.    By executing the Non-Competition Agreement, ecMD agreed it would not:

> directly or indirectly transmit or disclose any Confidential Information or Trade Secrets to any Person or make use of any such Confidential Information or Trade Secrets, directly or indirectly, for his benefit without the prior written consent of [Plaintiffs] . . . [or] directly or indirectly designate, disclose, lecture on, or in any manner publish any

Confidential Information or Trade Secrets of [Plaintiffs] without [Plaintiffs]'s prior written permission.

Exhibit "B", Section II(F). ecMD further agreed to turn over all Confidential Information or Trade Secrets belonging to Attentive. *Id.*

17.    In reliance upon the executed Sales Agreement and the Non-Competition Agreement, the Defendants were provided with Attentive's confidential and proprietary, program-related documents and materials, customer lists, customer contracts, plan processes, and other confidential and proprietary information. Prior to the execution of the Sales Agreement, ecMD was not in the business of selling the type of program offered by Attentive.

18.    Approximately one year after the Parties executed the Agent-Broker Sales Agreement and Non-Compete, Defendants approached Attentive with a new software platform allegedly developed by Defendants to streamline ecMD's suite of services. Attentive contracted to use this service on a "case-by-case basis" through an Addendum to the Agent/Broker Sales Agreement, attached hereto as Exhibit "D," and a Software as a Service (SAAS) Partner Agreement, attached hereto as Exhibit "E."

**Termination of Parties' Business Relationship**

19.    Thereafter, using Attentive's customer list, Defendants successfully steered existing clients such as Loch Harbour Group, Inc., away from Attentive's

program to ecMD. Defendants brokered the primary contract between Attentive and Loch Harbour. In April 2019, Attentive inquired about the status of documents for Loch Harbour's renewal to Defendant Coffey. Coffey told Attentive that Loch Harbour had "chosen not to renew this year." Upon further investigation, Attentive learned that Defendants had solicited and contracted with Loch Harbour themselves, for their own benefit and not for the benefit of Attentive, using Attentive's proprietary program and documents obtained from Attentive and relabeled as ecMD's.

20.     Attentive was also notified by Massachusetts Mutual Life Insurance Company that Defendants had contacted them about a self-insured medical reimbursement program that ecMD was offering and solicited the company to move its program enrollment away from Attentive to the new ecMD program. The new ecMD program was actually Attentive's proprietary program, merely presented under the ecMD name.

21.     Additionally, ecMD steered the following clients from Attentive's program to ecMD:

- AJM, CPA
- Bowerbird Architects
- CNR Refrigeration
- Frontier Communities
- Gordon L. Seaman
- Novem Group

- Novem Group DMPO
- Peer Place Networks, LLC
- Perth Amboy Housing Authority
- Perth Amboy Housing Partner
- Taub Agency PA
- USHC DMPO

22.     ecMD, who remained an agent/broker for Attentive at the time, did not inform Attentive of the losses of clients. It was only when Attentive inquired as to the status of the clients did they realize their program had been usurped by Defendants and presented as ecMD's new program.

23.     Defendants solicited Attentive's existing and potential clients with materials that had been copied from the proprietary documents Attentive provided to Defendants.  Defendants had re-labelled the documents under ecMD's name. To avoid a complete dissolution of the Parties' business relationship, Attentive offered a franchise agreement to Defendants, which would have allowed them to continue the above-described actions under a new contract providing compensation to Attentive for Defendants' use of Attentive's materials and program. Defendants, however, rejected the opportunity.

24.     On April 4, 2019, Attentive notified Defendants that it was terminating the Sales Agreement. On June 6, 2019, counsel for Attentive sent a letter to Defendants demanding that they refrain from continuing to breach the Sales Agreement and Non-Competition Agreement and from violating state and federal

law through their actions, including the use of Attentive's proprietary documents. Defendants have not complied with Attentive's demands.

25.     Since the dissolution of their business relationship, Defendants have withheld Attentive's share of profits under the Sales Agreement that was due to Attentive on June 20, 2019, in the approximate amount of $15,000.00.

## COUNT I
## BREACH OF CONTRACT

26.     The allegations of Paragraphs 1 through 25 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

27.     ecMD and Attentive entered into a Sales Agreement and a Non-Competition Agreement on June 1, 2017.

28.     ecMD has breached the Sales Agreement by withholding funds that are owed to Attentive under that agreement.

29.     ecMD has breached the Sales and Non-Competition Agreements by, among other things, competing with Attentive and soliciting Attentive's customers, and by using and disclosing Attentive's confidential and proprietary information in violation of the Non-Competition Agreement.

30.     Attentive has been damaged by ecMD's numerous breaches of the Parties' Agreements.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS OR CONTRACTUAL RELATIONS

31.     The allegations of Paragraphs 1 through 25 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

32.     Defendants' conduct constitutes tortious interference with Attentive's business and/or contractual relationship with employer and employee clients as well as the potential and/or pending clients that Defendants solicited away from Attentive as described in Paragraphs 18 through 23.

33.     Attentive had an existing business relationship with the entities listed above. Defendant was aware of these relationships through its work as a broker under the Sales Agreement, but was only to act as a broker of the relationship and was not a party to the relationship between Attentive and its employer/employee clients.

34.     Defendants steered these clients from Attentive to ecMD, without right or justifiable cause, and with the unlawful purpose of causing damage and loss.

35.     Attentive has suffered actual damage and loss as a result of Defendants' actions in the form of lost sales, loss of good will, and injury to reputation.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS

36. The allegations of Paragraphs 1 through 25 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

37. One or more of the following are considered a "trade secret" as defined under applicable law: 1) Attentive's list of customers; 2) the prices customers were paying for Attentive's products and services; 3) specific technical data and documents regarding Attentive's program and plan processes; and/or 4) the level of Attentive's customer's satisfaction with its products and services.

38. The above-described information is used in Attentive's business and provides an advantage to Attentive over competitors in the industry. Attentive's competitors do not possess the above-described information which Attentive has taken steps to protect.

39. Defendants were in possession of the above-described trade secrets as a result of the Broker-Agent relationship between Attentive and ecMD.

40. Defendants have misappropriated Attentive's trade secrets, including as follows:

a. Attentive's customer list, pricing information, and customer satisfaction have been used by ecMD, Coffey, DeLuccio, and other ecMD employees/agents to solicit business for their own benefit and to the detriment of Attentive; and

11

b. ecMD, Coffey, and DeLuccio have pirated Attentive's carefully crafted program and related plan documents and offered them to customers as ecMD's.

41. As a result of Defendants' misappropriation of Attentive's trade secrets, Attentive has been damaged and has suffered material, irreparable injury.

### COUNT IV
### CONVERSION

42. The allegations of Paragraphs 1 through 25 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

43. Defendants took control of Attentive's intellectual property, specifically its plan documents and processes.

44. Defendants used Attentive's intellectual property for its own gain, by selling it for profit as ecMD's property in defiance of Attentive's rights.

45. Attentive has been damaged as a result of Defendants' conduct.

46. Any profits made as a result of this unlawful conversion of Attentive's property are due to be paid to Plaintiffs.

### COUNT V
### COPYRIGHT INFRINGEMENT

47. The allegations of Paragraphs 1 through 25 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

48. Attentive is the sole owner of the United State copyrights of the

Attentive materials described in Paragraph 12. Defendants have infringed on Attentive's rights by distributing and selling infriging materials in the United States of America in connection with ecMD's operations.

49.     Attentive did not authorize Defendants to reproduce, prepare derivative works based upon, distribute copies of, publicly perform, publicly display or otherwise use Attentive's materials in furtherance of ecMD's buiness.

50.     Defendants had access to the copyrighted Attentive materials through their business relationship.

51.     The Attentive materials and ecMD's materials are substantially similar. ecMD's materials contain identical content to the copyrighted Attentive materials with ecMD's name replacing Attentive's.

52.     At a minimum, Defendants acted with willful blindness to and reckless disregard of Attentive's rights.

53.     As a result of this wrongful conduct, Defendants are liable to Attentive for copyright infringement. 17 U.S.C. § 501. Attentive has suffered damages. Attentive is entitled to recover damages, which include any and all profits Defendants have made as a result of the wrongful conduct. 17 U.S.C. § 504. Alternatively, Attentive is entitled to statutory damages under 17 U.S.C. § 504(c).

54.     Defendants knew or should have known that the Attentive materials belong to Attentive and that Defendants did not have permission to reproduce,

13

prepare derivative works based upon, distribute copies of, publicly perform, publicly display or otherwise use the Attentive materials.

55.     Because Defendants' infringement has been willful, within the meaning of the Copyright Act, the award of statutory damages should be enhanced in accordance with 17 U.S.C. § 504(c)(2). Attentive is also entitled to injunctive relief pursuant to 17 U.S.C. § 502 and to an order impounding any and all infringing materials pursuant to 17 U.S.C. § 503. Attentive has no adequate remedy at law for Defendants' wrongful conduct because, among other things, (a) Defendants' infringement harms Attentive such that Attentive could not be made whole solely by any monetary award, and (b) Defendants' wrongful conduct, and the resulting damage to Attentive, is continuing.

56.     Attentive is also entitled to recover its attorneys' fees and costs of suit pursuant to 17 U.S.C. § 505.

### COUNT VI
### UNFAIR COMPETITION

57.     The allegations of Paragraphs 1 through 25 are hereby incorporated herein with reference and with the same force and effect as if set forth in full below.

58.     Attentive invested substantial time and expense in the development of its confidential and proprietary plan, processes, and documents.

59.     Through their business relationship by which ecMD was expected to

14

solicit clients for Attentive and provide a dashboard for Attentive's plan, Defendants had access to Attentive's plan, processes, and documents that they otherwise would not have had.

60. Defendants seized Attentive's plan, processes, and documents for their own use.

61. Defendants' actions were taken in bad faith and with the knowledge that their use of Attentive's plan, processes, and documents would allow Defendants to utilize Attentive's model and attract customers to compete with Attentive without investing the time and expense required to develop their own model.

62. As a result of Defendants' use and misappropriation of Attentive's plan, processes, and documents, Attentive has been damaged and has suffered material, irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate result of the above described conduct, Attentive requests that this Court:

(A) Award all compensatory damages incurred or suffered by Attentive;

(B) Award statutory damages;

(C) Enjoin Defendants from further solicitation of Attentive's potential and existing clients and use of Attentive's confidential and proprietary information and copyrighted materials;

(D)     Award punitive damages;

(E)     Award all attorney's fees and costs incurred by Attentive; and

(F)     Award all other damages that Attentive is entitled to recover under state

and/or federal law.

## VERIFICATION

I hereby attest and verify under oath that the statements contained herein are

true and correct and to the best of my knowledge.

> C & H Management Group, LLC
> Attentive Health & Wellness, LLC
>
> By: _____
>
> _David Chaviers_
> Title: CEO

STATE OF ALABAMA
COUNTY OF ETOWAH

Sworn to and subscribed before me by _Amber Richey_ on behalf of
C & H Management Group, LLC, and Attentive Health & Wellness, LLC, on this
the _21_ day of _April_ 2020.

> NOTARY PUBLIC: _Amber Richey_
> My commission expires: _3/11/24_

/s/Christie D. Knowles
Christie D. Knowles

/s/ Haley K. Tucker
Haley K. Tucker

OF COUNSEL FOR THE PLAINTIFFS:
**KNOWLES & SULLIVAN, LLC**
400 Broad Street, Suite 105
Gadsden, Al 35901
T: (256) 547-7200
F: (256) 467-6322

/s/ Alan D. Mathis
Alan D. Mathis

Alan D. Mathis
**BUTLER SNOW LLP**
1819 Fifth Avenue North, Suite 1000
Birmingham, AL 35203
D: (205) 297-2239
F: (205) 297-2201
Alan.Mathis@butlersnow.com

# CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record for the Defendants:

Clark R. Hammond (HAM012)
Ben B. Robinson (ROB181)
WALLACE JORDAN RATLIFF & BRANDT, LLC
Post Office Box 530910
Birmingham, Alabama 35253
chammond@wallacejordan.com
brobinson@wallacejordan.com


       /s/ Alan D. Mathis
       **Of counsel**


52702055.v1

Case 4:19-cv-01066-CLM   Document 21-1   Filed 04/21/20   Page 19 of 9

FILED

2020 Apr-21  PM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

Case 6:20-cv-06171-FPG-MWP   Document 16-3   Filed 07/10/20   Page 21 of 70

Case 4:19-cv-01066-CLM   Document 21-1   Filed 04/21/20   Page 19 of 9

# EXHIBIT A

# Agent/Broker Sales Agreement

This Agent/Broker Sales Agreement is made by and between C & H Management Group, LLC d/b/a Attentive Health & Wellness, an Alabama Company, located at 350 Locust Street, Gadsden, Alabama 35901 hereinafter referred to as ("AHW") and the Agent/Broker named on page 5 hereinafter referred to as ("Broker"). The effective date ("Effective Date") of this Agreement shall be the date signed by the parties on page 5. AHW and Broker may be collectively referred to, in this Agreement, as "Parties" or individually as "Party. In consideration of the mutual benefits to be derived hereunder, the parties covenant and agree as follows:

WHEREAS, AHW allows Broker to provide their clients with a unique wellness program that includes enhancedcareMDs suite of services (Broker) while providing supplemental benefits to employees and through their combined appointments and agents of record, offers a program of certain health insurance, life insurance and other supplemental benefits to qualified clients and Broker wishes to extend such program to their clients;

WHEREAS, the Parties desire to establish the terms of the business relationship between AHW and Broker whereby Broker will market the AHW program to client employers and also market the associated products to the employees of said clients.

NOW THEREFORE, in consideration of the promises and mutual covenants contained in this Agreement, the parties covenant and contract as follows:

## I. TERM

The term of this Agreement shall begin on Effective Date of this Agreement. This Agreement, together with any addenda attached hereto, shall continue until terminated by either Party pursuant to §V.Termination of this Agreement. Termination of this Agreement shall not relieve either party of any obligations that it should have performed prior to the date the Agreement is terminated.

## II. BROKER REPRESENTATIONS

A. Broker represents that they are an independent insurance agent licensed to sell AHW products and services in each state in which they intend to solicit client accounts and Broker's independent contractors/employees are not employees of AHW for the purposes of this Agreement. Broker is responsible for all fees and cost associated with the performance of their duties under this Agreement. Broker agrees to abide by all policies and procedures established by AHW concerning the wellness plan and all enrollments.

B. Broker is responsible to ensure licensing of, and legal compliance of, all persons acting under this Agreement for and on behalf of Broker.

C. Broker acknowledges that they are an independent contractor and this Agreement does not create a relationship of employer/employee, principal, agent or other similar relationship between AHW and the Broker.

D. Broker acknowledges that they have no authority to and will not: a) Bind AHW by any promise or agreement, or incur any debt, expense, or liability whatsoever in its name or account, or waive any of the provisions of policies administered by AHW; b) Waive, alter, or modify any question on any application, knowingly permit any applicant to inaccurately answer any question on any application, instruct any applicant not to disclose any particular medical condition on any application or notify an applicant that Broker has the authority to alter terms of a wellness agreement.

1 | Page



# Agent/Broker Sales Agreement

E. No representation or warranty of the Broker contained within this Agreement, or in any other document, certificate, information, exhibit or report provided by Broker to AHW in connection with the negotiation, execution and delivery of this Agreement, or other instrument delivered by Broker hereunder, contains any material misstatement of fact or any untrue statement of material fact or omits to state a material fact or any fact necessary to make the statements contained therein not materially misleading or would impair, prohibit or otherwise adversely impact or adversely affect the Broker's ability to operate as an independent agent of AHW or perform any of Broker's other obligations under this Agreement.

F. Broker agrees to share commissions paid based on the sale of the insurance products according to the percentages set forth on "Schedule A" attached. Broker agrees to give notice to the insurance carriers paying the commissions of Broker's commission sharing agreement and obligation to share said commissions with Employer Insurance Resources, Inc. according to "Schedule A" attached. Broker also agrees to authorize and instruct the insurance carriers to pay AHW's portion of each commission payment directly to Employer Insurance Resources, Inc. as directed on "Schedule A" attached.

G. Broker agrees to carry E&O insurance coverage as required by carriers utilized by AHW.

## III. ATTENTIVE HEALTH & WELLNESS REPRESENTATIONS

A. AHW hereby authorizes Broker to solicit and procure applications and AHW Client Master Agreements for the wellness program(s) offered by and through AHW on a non-territorial, non-exclusive basis, subject to the terms and conditions of this Agreement.

B. AHW represents that their solution is in compliance with all HIPAA and IRS regulations and is a legally derived solution.

C. Parties are responsible for all of their own expenses incurred in performing services under this Agreement. Parties understand that they have no authority to contract in the name of or on behalf of the other party.

## IV. COMPENSATION

Broker will be compensated as outlined below and in Schedule "A" attached.

A. Broker and AHW agree to have all commissions paid directly to the respective party. Such commission shall be paid subject to the terms of this Agreement and Schedule "A" attached.

B. Broker may appoint sub-brokers to offer AHW's wellness program. These sub-brokers will be under the supervision and control of the Broker and will be required to sign AHW's "Confidentiality, Non-Disclosure & Non-Compete Agreement". It will be the Broker's responsibility to compensate and explain the pay structure to said sub-broker(s).

## V. TERMINATION

AHW and Broker each agree that this Agreement along with any addenda attached hereto, shall continue until terminated by either Party pursuant to this section:

A. This Agreement, together with any addenda attached hereto, shall terminate:
1) Thirty days following written notice by either Party mailed to the last known address of such Party upon a stated breach that is not cured in 30 days from receipt of that notice.
2) Automatically without notice upon the dissolution of the Broker's company.
3) Automatically at time of appointment renewal if Broker has not placed any new business with AHW within the last 12 months.

2 | Page



# Agent/Broker Sales Agreement

4) Immediately upon notice from AHW for any act of dishonesty, fraud or breach of any of the terms of this Agreement as determined at AHW's sole discretion.

5) Automatically without any notice upon revocation, should there be a termination or non-renewal of Broker's license.

6) If attempt is made by AHW to contact Broker in writing or via email at last know mailing or email address and Broker fails to reply within 60 days of receipt of such notice, in which event AHW shall have the right to retain all future commissions and fees, other than those paid directly to Broker by the respective insurance carriers, and Broker shall forfeit any and all right to such commissions and fees.

B. The indemnification and contribution provisions of this Agreement shall survive indefinitely the expiration or other termination of this Agreement.

C. Impact of termination: In cases of termination from either party, both parties will continue to supply the support and services outlined in this agreement for all existing clients until the end of the clients contract, and all compensation as outlined in "A" will apply until those client obligations are fulfilled.

## VI. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama, without regard to principles of conflicts of law. Broker hereby irrevocably submits itself to the personal jurisdiction of the courts in and for Etowah County, Alabama or in the United States District Court, Northern District of Alabama, Middle Division, and Broker hereby waives, to the full extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any such action in such court and any claim that any such action, suit or proceeding ("Action") has been brought in an inconvenient forum. The parties desire to have any Action filed by either of them to be tried before a judge or judicial panel without a jury, and therefore: (i) agree not to elect a trial by jury of any issue triable of right by jury, and (ii) waive any right to trial by jury fully to the extent that any such right shall now or hereafter exist. This waiver of right to trial by jury is separately given, knowingly and voluntarily, by each of the parties hereto, and this waiver is intended to encompass individually each instance and each issue as to which the right to a jury trial would otherwise accrue. Broker hereby certifies that no representative or agent of AHW has represented, expressly or otherwise, that AHW will not seek to enforce this waiver of right to trial by jury.

## VII. INTEGRATION

This Agreement, and any signed addendum attached hereto constitute the entire Agreement between the parties with regard to this subject matter and supersedes any and all Agreements, whether oral or written, between the parties with respect to this subject matter. Broker acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement, including but not limited to any statement made by any employee or marketing agent of AHW.

## VIII. SEVERABILITY:

Should any term, condition or provision of this Agreement be held to be unenforceable, the balance of this Agreement shall remain in force as if the unenforceable part did not exist. The captions in this Agreement are provided for convenience only and are not part of the terms and conditions of this Agreement.



3 | Page

# Agent/Broker Sales Agreement

## IX.  MODIFICATION:

Except as otherwise provided in this Agreement, AHW may amend the terms and conditions of this Agreement by giving Broker 30 days written notice. Any other modifications to this Agreement must be in writing and executed by Authorized Representatives of both parties to be enforceable.

## X.   REMEDIES NOT EXCLUSIVE:

The rights and remedies provided herein shall not be exclusive and both parties shall have rights and remedies now or hereafter provided by law in addition to those provided for in this Agreement. Institution of an action to effect collection of payment of an amount in default or the entry of a judgment in such action shall not be deemed to be an election by AHW nor shall it bar AHW from pursuing other remedies available to it at law or in equity.

## XI.  ATTORNEY'S FEES:

If either party refers a matter to a collection agency or brings other action as a result of a Breach of this Agreement, the prevailing party in such collection proceeding or action shall be entitled to reimbursement for its reasonable attorney's fees and other costs and fees incurred in such collection or action in addition to any other relief to which the party may be entitled.

## XII.  NO PARTNERSHIP OR AGENCY:

Nothing set forth herein shall be deemed to create a partnership or joint venture between Broker and AHW, and no fiduciary duty shall arise from the relationship created herein. In no event may either party act as the agent of the other party unless specifically authorized in writing to do so.

## XIII.  TRANSFERABILITY:

Broker shall not transfer or assign its rights or obligations hereunder without AHW permission, of which, this permission shall not be unreasonably withheld. The Broker can assign and transfer the rights in the specific case of the majority of their company shares being sold or transferred to another entity. AHW reserves the right to transfer its rights, duties and obligations hereunder.

## XIV.  NOTICES:

Any notices under this Agreement shall be in writing and deemed given; (i) on the delivery date if delivered personally or by local commercial delivery service or if sent by facsimile transmission with printed verification of delivery; (ii) one business day after deposit with a commercial overnight carrier, with written verification of receipt; or (iii) five business days after mailing date whether or not actually accepted by addressee, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of delivery for which a receipt is available.



# Agent/Broker Sales Agreement

Signature Page to Follow



# Agent/Broker Sales Agreement

**The signatures on behalf of AHW and Broker immediately below constitute execution of this Agreement.**

C & H Management Group. LLC d/b/a
Attentive Health & Wellness

_____
Authorized Signature

_____
Typed / Printed Name

_____
Title

_____
Date

Broker

_____
Authorized Signature

Jerome DeLuccio
_____
Typed / Printed Name

CEO
_____
Title

1290 University Ave
_____
Address

Rochester        NY        14607
_____
City            State        ZIP

Date: 06/01/17



# Agent/Broker Sales Agreement

## Schedule "A"

**Option 1:**

(AHW Enrolls): If Broker wishes *AHW* to provide enrollers for the account; AHW will be compensated at a rate of **50**% and Broker will be compensated at a rate of **50**% of the total commissions on the sale of all products, including renewal payments. The parties will agree, in writing, to this commission split prior to enrolling the account. Unless otherwise agreed to in writing, Broker will be responsible for paying the reasonable travel costs and expenses of AHW's enrollers.

Broker will be compensated at a rate of $40 Per Employee Per Month (PEPM) on all lives sold the Attentive Health & Wellness program. Rate will continue as long as the employee is on the Attentive wellness program. When the employee terminates from the Attentive wellness program, the $40 PEPM paid the Broker for that employee will terminate as well. Payments for these services will be separately billed to AHW and pulled via ACH on the 5th of each month after the initial effective month (ex. Jan.1 effective date, ACH on Feb. 5th) and continue accordingly. ecMD reserves the right to contact the said employee to sell them a COBRA type plan to continue in the use of the services they have come to know and use. The Wellness Services provided for the Attentive plan will include 24/7 access to RN, MDs, Counselors, RX cards and Alternative Medicine providers and portals. (ecMD will include APPs for services and integration with the Wellness portal as well)

**Option 2:**

(Broker Enrolls): If Broker wishes to enroll the account; *AHW* will be compensated at a rate of **30%** and Broker will be compensated at a rate of **70%** of the total commissions on the sale of all products sold as a result of the "Wellness Reserve Account," including renewal payments. AHW receives no commission on products sold outside of the "Wellness Reserve Account." Once the Broker brings 10,000 lives onto the Attentive program, the Broker will be compensated at **80%** of the total commissions on the sale of future products sold as a result of the "Wellness Reserve Account." Including renewal payments. AHW will be compensated at a rate of **20%** of total commissions on the sale of all future products sold as a result of the "Wellness Reserve Account, including renewal payments. This 10% incentive clause applies to all members and both options.

Broker will be compensated at a rate of $40 Per Employee Per Month (PEPM) on all lives sold the Attentive Health & Wellness program. Rate will continue as long as the employee is on the Attentive wellness program. When the employee terminates from the Attentive wellness program, the $40 PEPM paid the Broker for that employee will terminate as well. Payments as above and COBRA opportunities remain as in Option 1.

Note: enhancedcareMD will negotiate billing the clients this $40 figure on day 15 ahead of the monthly billing by Attentive. If this negotiation is successful, Attentive will not be responsible in either the billing or paying that $40 to enhancedcareMD.

**\* All commissions on any insurance products sold along with \*AHW\*, as used in this Schedule "A", shall be paid to Employer Insurance Resources, Inc. Employer Insurance Resources is a sister company of Attentive Health & Wellness and a full service brokerage.\***

ecMD will also provide a "strongly recommended" wellness reserve item including Dental, Vision , Hearing discounts, plus Alternative provider discounts of (e.g. could be the following but not limited to chiropractic, acupuncture, massage therapy, physical therapy, occupational therapy, and podiatry), and also patient advocacy. These services provided through the Wellness Reserve will be provided at a rate of $25 PEPM for employees that choose the additional wellness reserve items with $5 going to the Broker, $10 to ecMD, and $10 to Attentive Health & Wellness. (The vendor(s) and services used by ecMD are subject to the approved services in each state,

7 | Page



# Agent/Broker Sales Agreement

and at times the approved marketing methods to provide services in same states. ecMD has the right to offset services for compliance reasons, and to not provide services in states that have not provided a means to market effectively)

AHW will use ecMD's RX card and pay ecMD $.40 pepm and AHW will receive $1.20 per use from ecMD. Payments to AHW will be upon receipt of usage and monthly reconciliation.

8 | Page

FILED

2020 Apr-21  PM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

# CONFIDENTIALITY, NON-COMPETITION AND NON-DISCLOSURE AGREEMENT

This Non-Competition Agreement ("Agreement") is made by and between **C & H Management Group, LLC d/b/a Attentive Health & Wellness,** located at 350 Locust Street, Suite 2-B, Gadsden, Alabama 35901 hereinafter referred to as ("disclosing Party") and the entity named on page 6 hereinafter referred to as the ("Receiving Party"). The effective date "Effective Date shall be the date signed by the parties on page 6.

## RECITALS

**WHEREAS,** Disclosing Party is actively engaged in the business of ERISA qualified self- insured group wellness and limited medical plans and related services Hereinafter referred to as ("Business"); and

**WHEREAS,** Receiving Party also has related services and pre-existing relationships in the Limited Medical and Wellness space desires to utilize its ability to market the services offered by Disclosing Party and desires for Receiving Party to market its services according to the terms and conditions hereafter set forth excluding the existing services and relationships; and

**WHEREAS,** Receiving Party desires to contract with Disclosing Party and Disclosing Party desires to contract with Receiving Party, subject to the stipulations, conditions and provisions of this Agreement.

**NOW THEREFORE,** in consideration of the promises and the mutual agreements contained in this Agreement, and for other good and valuable consideration, including, without limitation, the continued contracting with Receiving Party by Disclosing Party, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## SECTION ONE DEFINITIONS

Subject to the exclusions noted in the Recitals and the mutuality of

1



the following covenants:

A.     "Competing Business" means any business engaged in or contemplating engagement in the Business. The parties acknowledge that the Disclosing Party carries on the Business in multiple States and intends to solicit clients in all 50 States and, therefore, a Competing Business necessarily includes businesses in any state in the United States that engages in or contemplates engaging in the Business.

B.     "Trade Secret" means, in addition to any information covered by any definition of "trade secret" or any equivalent term under state, local or federal law, all information pertaining to the Business, without regard to form, whether oral, in writing, in electronic or computer format, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, distribution lists, a list of actual or potential customers, or a list of actual or potential contractors, consultants or suppliers, which is not commonly known by or available to the public and which information: (i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. "Trade Secret" shall not include information that has become generally available to the public by the act of one who has the right to disclose such information without violating any right or privilege. Nothing in this Agreement is intended, or shall be construed, to limit the protections of the Alabama Trade Secrets Act or any other applicable law protecting trade secrets or other confidential information.

2

C. "Confidential Information" means any confidential or proprietary business information, other than Trade Secrets, regarding the Business that is the subject of reasonable efforts to maintain its confidentiality and that is not generally disclosed by practice or authority to persons not employed or otherwise engaged by Disclosing Party, whether oral, in writing or in electronic or computer format. Confidential Information shall include, but not be limited to, the following with respect to the Business: (i) business or operating plans, strategies, know-how, portfolios, prospects or objectives; (ii) structure, products, product development in progress as of the date hereof, technology, distribution, sales, advertising services, support and marketing plans, practices, and operations; (iii) methods of pricing, costs and details of services; (iv) financial condition and results of operations; (v) the performance of any accounts; (vi) research and development, operations or plans; (vii) lists of customers, and payors (including, without limitation, the identity of customers, addresses, and any other characteristics of such Persons); (viii) information received from third parties under confidential conditions; (ix) management organization and related information (including, without limitation, data and other information concerning the compensation and benefits paid to officers, directors, Receiving Parties and management); and (x) personnel and compensation policies. This definition shall not limit any definition of "confidential information" or any equivalent term under applicable state or federal law.

D.   "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other legal entity, or a governmental entity or any department, agency or political subdivision thereof.

E.   "Protected Customers" means any Person with which the Disclosing Party has substantial relationships or contacts, has provided services to or otherwise sold products to in the Business within twenty-four months prior to the date of this Agreement.

3

F.    "Protected Agent" means any person employed by Disclosing Party at any time during the term of this Agreement.

G.    Protectable Interest" means Trade Secrets, Confidential Information, Protected Customers, Protected Agent and any substantial relationship or contact with specific prospective or existing customers, patients, vendors or clients. All of ecMDs broker network will be protected by Attentive

H.    "Restricted Period" means that period beginning on the date of termination of this Agreement and ending on the eighteen month after the termination of Receiving Party's contract with Disclosing Party.

I. "Restricted Territory" means the geographic area of the United States of America. The parties acknowledge that the Disclosing Party carries on the Business in multiple States and intends to solicit clients in all 50 States and, therefore, a Competing Business necessarily includes businesses in any state in the United States that engages in or contemplates engaging in the Business.

## SECTION TWO

### RECEIVING PARTY'S COVENANTS

A. Receiving Party acknowledges that Receiving Party holds a position uniquely essential to the management, organization and service of the Disclosing Party and that the Disclosing Party holds a valid and enforceable Protectable Interest. As a consideration and inducement to Disclosing Party to continue the contracting of Receiving Party, Receiving Party covenants, warrants and agrees as follows:

B.    Receiving Party agrees that he or she shall not directly or indirectly, and within the Restricted Period,

    (a) Will not, directly or indirectly, knowingly solicit any

4

customer, client, employee, consultant or independent contractor of Disclosing Party who was made known during, or as a consequence of, the business relationship contemplated hereunder,

(b) Own, manage, operate, join, control or participate in the ownership, management, operation or control, of any Person engaged in a Competing Business within the Restricted Territory.

C. Receiving Party agrees not to directly or indirectly disclose or communicate to any Competing Business or any proposed competitive business any substantial relationship or contact with specific prospective or existing customers, vendors, clients or the names of past, present or future customers of Disclosing Party. Receiving Party further covenants not to utilize Disclosing Party's customer list or call on or attempt to service any of Disclosing Party's accounts.

D. Receiving Party acknowledges and agrees that valuable relationships have been established between Disclosing Party and certain customers. Receiving Party further acknowledges and agrees that the aforementioned relationships constitute a valuable asset of Disclosing Party. Accordingly, Receiving Party agrees that during the Restricted Period, neither Receiving Party nor any affiliate, director, shareholder, officer, parent or subsidiary of Receiving Party shall, without the prior written consent of Disclosing Party, directly or indirectly, solicit, divert, take away or attempt to solicit, divert or take away any Protected Customer for the purpose of selling or providing services that are similar to and competitive with the products sold or services provided by Disclosing Parties.

E. Receiving Party acknowledges and agrees that the Protected Agents are integral to the operational success of the Business. Accordingly, Receiving Party agrees that, during the Restricted Period, neither Receiving Party nor any affiliate, director, shareholder, officer, parent, subsidiary or spouse of Receiving

5

Party, shall, without the prior written consent of Disclosing Party, directly or indirectly, hire, engage or solicit any Protected Receiving Party.

F.     Receiving Party acknowledges and agrees that the Protectable Interest would enable Receiving Party to establish goodwill with the customers, potential customers, Receiving Parties, independent contractors, consultants, and suppliers who provide products and services on behalf of a Competing Business or who receive services from a Competing Business and that the Protectable Interest constitutes a valuable asset of Disclosing Party. Accordingly, Receiving Party hereby agrees as follows:  (i). Receiving Party shall not, at any time during the Restricted Period, directly or indirectly transmit or disclose any Confidential Information or Trade Secrets to any Person or make use of any such Confidential Information or Trade Secrets, directly or indirectly, for his benefit without the prior written consent of Disclosing Party.  (ii). The restrictions of this section shall apply regardless of whether the Confidential Information or Trade Secrets are in written, graphic, computer, recorded, photographic or any machine-readable form, is orally conveyed to or is otherwise known by Receiving Party.  (iii). Receiving Party agrees not to directly or indirectly designate, disclose, lecture on, or in any manner publish any Confidential Information or Trade Secrets of Disclosing Party without Disclosing Party's prior written permission. Receiving Party agrees to leave with Disclosing Party or turn over to Disclosing Party any and all records, notebooks, materials, documents or other personal property containing Confidential Information or Trade Secrets or not, including copies, whether prepared by him or others.

G.     Receiving Party acknowledges and warrants that the restrictive covenants set forth above are reasonable and valid in time and scope and in all other respects and do not impose undue hardship upon Receiving Party. Receiving Party further acknowledges that Receiving Party has read carefully the terms of this Article as well as the Agreement, understands the terms

6

of this Agreement, have had an opportunity to consult with knowledgeable counsel, and enters into this Agreement voluntarily. The covenants set forth in this Agreement shall be considered and construed as separate and independent covenants. Should any part or provision of any covenant be held invalid, void or unenforceable in any court of competent jurisdiction, such invalidity, voidness or unenforceability shall not render invalid, void or unenforceable any other part or provision of this Agreement.

H. The parties hereunder agree that it is their intention that the restrictive covenants herein be enforced in accordance with their terms to the maximum extent possible under applicable law. The parties further agree that, in the event any court of competent jurisdiction shall find that any of the foregoing provisions is invalid or unenforceable, the invalid or unreasonable term shall be redefined, or a new enforceable term provided, such that the intent of the parties in agreeing to the provisions of this Agreement will not be impaired and the provision in question shall be enforceable to the fullest extent of the applicable laws.

I. Without limiting the remedies available to Disclosing Party, the parties acknowledge that a breach of any of the covenants contained herein this Article will result in material, irreparable injury for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof by Receiving Party, Disclosing Party shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction restraining Receiving Party from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants hereof without the necessity of posting any bond.

J. Receiving Party shall be liable in connection with any breach by an affiliate, director, shareholder, officer, parent, subsidiary or spouse of Receiving Party of the terms hereof. Receiving Party

7

also specifically acknowledges and agrees that Disclosing Party shall be entitled to seek monetary damages and other remedies at law for breaches of this Agreement in addition to any injunctive or other equitable relief. The rights and remedies hereunder are cumulative and not alternative.

## SECTION THREE

## ENTIRE AGREEMENT

This Agreement contains all the terms and conditions agreed on by the parties with

respect to the transactions contemplated, and shall not be amended or modified except by a written instrument signed by each of the parties.

## SECTION FOUR

## BINDING EFFECT

This Agreement shall be binding on and inure to the benefit of the representatives, heirs, estates, successors, and assigns of the parties. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer on or give any person, firm, or corporation, other than the parties, their successors and assigns, any benefits, rights, or remedies under or by reason of this Agreement.

## SECTION FIVE

## TIME OF ESSENCE

Time is of the essence of this Agreement.

8

## SECTION SIX

### COPIES

This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

## SECTION SEVEN

### LAW GOVERNING

This Agreement shall be governed by and construed under the laws of Alabama.

## SECTION EIGHT

### CHOICE OF FORUM

The parties agree that any claim of any type brought by one against the other must be maintained only in a court sitting in Etowah County, Alabama or, if a federal court, the Northern District of Alabama. For purposes of enforcement of this Agreement, the parties consent to personal jurisdiction in the State of Alabama. In the event of litigation concerning this Agreement or the enforcement of same, the prevailing party shall be entitled to recover all costs of action and reasonable attorney fees.

## SECTION NINE

### HEADINGS

The section and other headings in this Agreement are inserted solely as a matter of convenience and for reference, and are not a part of this Agreement.

## SECTION TEN

### SEVERABILITY

Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be valid, legal, and enforceable,

9

under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable, in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceable provision will not affect any other provision, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. Without limiting the generality of the foregoing, should a court ever hold that the covenant not to compete is too broad geographically, too long in time, or too broad in scope of activity prohibited, such covenant shall never the less be given effect to the extent permitted by such court.

## SECTION ELEVEN

### NON-WAIVER

No failure or delay on the part of the parties hereto to exercise any right, power or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver; nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**The signatures immediately below constitute execution of this Agreement. Disclosing Party**

BY:_____ **AUTHORIZED**
**SIGNATURE (DISCLOSING PARTY)**

. Dr. Tommy Lamb . Printed Name

**Receiving Party**

BY:_____ **AUTHORIZED**

10

## SIGNATURE (DISCLOSING PARTY)

J DeLuccio

_____ Printed
Name

1290 University Ave Suite 6

_____
Address

Rochester NY 14472

_____
City, State, Zip

ITS: _____PRESIDENT_____

6/1/17

_____ Execution Date

ITS: _____

_____ Execution Date

**Page 6**

11

FILED

2020 Apr-21  PM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT C

EXHIBIT C

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Karyn A. Temple*

United States Register of Copyrights and Director



**Registration Number**

## TX 8-749-520

**Effective Date of Registration:**
June 03, 2019

---

## Title
_____

| | |
|---|---|
| **Title of Work:** | Attentive Health & Wellness Self-Insured Medical Expense Reimbursement Plan Basic Plan Document |

## Completion/Publication
_____

| | |
|---|---|
| **Year of Completion:** | 2018 |
| **Date of 1st Publication:** | July 01, 2018 |
| **Nation of 1st Publication:** | United States |

## Author
_____

| | |
|---|---|
| • **Author:** | Attentive Health & Wellness, LLC |
| **Author Created:** | text |
| **Work made for hire:** | Yes |
| **Domiciled in:** | United States |

## Copyright Claimant
_____

| | |
|---|---|
| **Copyright Claimant:** | Attentive Health & Wellness, LLC<br>70 Grimes Drive, Guntersville, AL, 35976, United States |

## Rights and Permissions
_____

| | |
|---|---|
| **Organization Name:** | Knowles & Sullivan, LLC |
| **Name:** | Christie Knowles |
| **Email:** | christie@kkslawgroup.com |
| **Telephone:** | (256)547-7200 |
| **Address:** | c/o Christie Knowles, 400 Broad St<br>400 Broad St<br>Gadsden, AL 35901 United States |

## Certification
_____

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karry A. Teske*

United States Register of Copyrights and Director



**Registration Number**

**TX 8-749-521**

**Effective Date of Registration:**
June 03, 2019

## Title

**Title of Work:** Adoption Agreement Self-Insured Medical Expense Reimbursement Plan
(SIMERP)

## Completion/Publication

**Year of Completion:** 2018
**Date of 1st Publication:** July 01, 2018
**Nation of 1st Publication:** United States

## Author

- **Author:** Attentive Health & Wellness, LLC
  **Author Created:** text
  **Work made for hire:** Yes
  **Domiciled in:** United States

## Copyright Claimant

**Copyright Claimant:** Attentive Health & Wellness, LLC
70 Grimes Drive, Guntersville, AL, 35976, United States

## Rights and Permissions

**Organization Name:** Knowles & Sullivan, LLC
**Name:** Christie Knowles
**Email:** christie@kkslawgroup.com
**Telephone:** (256)490-9790
**Address:** c/o Christie Knowles, 400 Broad St
400 Broad St
Gadsden, AL 35901 United States

## Certification

Page 1 of 2

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code,*
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Karyn A. Temple*

United States Register of Copyrights and Director



**Registration Number**

## TX 8-749-522

**Effective Date of Registration:**
June 03, 2019

---

## Title
_____

**Title of Work:**  Wellness Program Attentive Health & Wellness

## Completion/Publication
_____

**Year of Completion:**  2018
**Date of 1st Publication:**  July 01, 2018
**Nation of 1st Publication:**  United States

## Author
_____

- **Author:**  Attentive Health & Wellness, LLC
  **Author Created:**  text
  **Work made for hire:**  Yes
  **Domiciled in:**  United States

## Copyright Claimant
_____

**Copyright Claimant:**  Attentive Health & Wellness, LLC
70 Grimes Drive, Guntersville, AL, 35976, United States

## Rights and Permissions
_____

**Organization Name:**  Knowles & Sullivan, LLC
**Name:**  Christie Knowles
**Email:**  christie@kkslawgroup.com
**Telephone:**  (256)547-7200
**Address:**  c/o Christie Knowles, 400 Broad St
400 Broad St
Gadsden, AL 35901 United States

## Certification
_____

Page 1 of 2

FILED

2020 Apr-21  PM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT D

EXHIBIT D

# Agent/Broker Sales Agreement

## Schedule "A" Addendum to Contract Executed 6/6/2017

(Broker Enrolls): Broker will be compensated at a rate of **100%** of the total commissions on the sale of all products sold as a result of the "Wellness Reserve Account," including renewal payments.

## [ intentionally left blank ]

### Contract Addendum to Executed Contract 6/6/17

This Contract Addendum ("Memorandum") is made by and among enhancedcare, Inc. and their affiliates (enhancedcareMD), and Attentive Health & Wellness, LLC (Attentive) to complement the contract to which this addendum is attached.

WHEREAS, enhancedcareMD and Attentive wish to adapt the existing agreement in favor of a greater new relationship

WHEREAS, Attentive wishes to expand the working relationship and partnership to include the enhancedcareMD services in Wellness activity nationwide and within their SuperMEC solution

WHEREAS, enhancedcare has developed a leading edge software as a service (SAAS) platform that will be used on a case-by-case basis, with the related services for clients effective August 1, 2018.

1 | P a g e

# Agent/Broker Sales Agreement

**OPERATIONS:**

Separately, Attentive and enhancedcareMD agree to partner using the enhancedcareMD suite of services as the operating standard for the Attentive plan nationally and move to the new software as a service (SAAS) solution for named segments of the solution on a case-by-case basis. This strategic decision is designed to create both consistency and standardization nationally and to strengthen compliance for Attentive to deliver a more robust wellness plan to members. The new wellness SAAS model will be delivered to AHW by August 1, 2018.

- This addendum opens Attentive H&W accounts to the enhancedcare solutions. On new accounts sold by the non enhancedcareMD network in its current form (without the SAAS solution), enhancedcareMD will receive $28 pepm through the agreed ACH process stated in the revised MSA and $32 pepm for all **AHW MEC clients and $34 pepm for all non MEC clients** that include the new software and services (SAAS).

  In non MEC sales using the new SAAS solution enhancedcareMD will be compensated at a rate of $46.00 per month per employee (pepm) on all lives sold by enhancedcareMD's internal staff sales persons and $34 for sales from all external assigned sales staff

  Each unique wellness URL incurs an operating out of pocket cost of $250 to setup the unique platform for the Client. This includes including the client's logo, unique URL, and the standard program services. AHW and ecMD will share the setup cost equally.

  In addition, clients may wish to forge a complete general or contingent wellness program and in these cases, there will be a separate charge calculated for that client's approval. (custom tiles, challenges, rewards, fulfillment of those rewards ) and those setup charges will be billed directly to the client

- enhancedcareMD agrees to collaborate with Attentive in continuing process development and Creating and executing a selling and marketing strategy including a library of materials to share nationally. Broker Training will be coordinated exclusively by Attentive and enhancedcareMD will share training and learning organization best practices with Attentive as part of this agreement.

- Both parties agree to share subsequent marketing or sales documents to create one library for Regional and Independent Brokers to access for their use.

All other parts of the contract not specifically mentioned here remain in effect per the contract including confidentiality, termination, etc.

Signature Page to Follow

2 | P a g e

# Agent/Broker Sales Agreement

**Attentive Health & Wellness, LLC**

By: _____

Name: ____Tommy D Lamb_____

Title: ____President_____

Date: ____8/1/18____

**EnhancedcareMD**

By: _____

Name: ____Jerome V Deherera____

Title: ____CEO____

Date: ____8/01/18____

3 | Page

FILED

2020 Apr-21  PM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT E

## enhancedcareMD
## AHW Software as a Service (SAAS) PARTNER AGREEMENT

This Agreement ("Agreement") is made by and between AHW, LLC hereinafter referred to as ("AHW") with its principal place of business at 70 Grimes Drive, Guntersville, AL 35976 and enhancedcareMD with its principal place of business at 1290 University Avenue, Rochester, NY 14607 (EcMD). Each party may be referred to in this Agreement as a "Party" or collectively as "Parties."

**WHEREAS,** EcMD has created and provides a comprehensive wellness management solution. The solution is an interactive health risk assessment and health and wellness management program including medical services and extensive coaching for end user participants, which generates reports and recommended plans of action, as well as educational materials, based on information that an end user participant enters into the system. These reports can be used by the end user participant to learn more about health and wellness information, and track and monitor the end user participant's particular health situation.

**WHEREAS,** AHW wishes to partner with EcMD to make the Software as a Service (SAAS) wellness solution available to its Clients, upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for and in consideration of the foregoing, and the mutual and respective covenants and agreements of the Parties set forth herein, the Parties agree as follows:

## 1. DEFINITIONS

Except as specifically indicated, the following terms have the following meanings in this Agreement (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

a)     **"Account"** means the account established by EcMD through the Client Instance when a Participant completes an application on the form approved by EcMD and agrees to the terms of a Participation Agreement.

a)     **"Service"** means the interactive health risk assessment and health and wellness management program for end user participants which generates reports and recommended plans of action, as well as educational materials, based on information that an end user participant enters into the system. Actual care services are included as well in terms of Coaches, RNs, MDs and Counselors. It may include physical paper copies that would provide similar types of materials and information.

b)     **"Applicable Law"** means, collectively, all federal, state and local statutes, codes, ordinances, regulations, and laws, which are applicable to a Party in the performance of its obligations under this Agreement.

c)     **"AHW Content"** means the text, graphics, photographs, video, audio and all other data and information of AHW provided by AHW and its representatives to EcMD to be made available on a Client Company Instance.

-1-                                                    Ver 1.10

d)      **"Client Content"** means the text, graphics, photographs, video, audio and all other data and information of Client provided by Client to EcMD to be made available on a Client Instance.

e)      **"Client Instance"** means a website specifically for one or more Client deployments and their respective Participants, containing the Service content and functionality, with any customization provided as defined in this Agreement.

f)      **"Confidential Information"** has the meaning set forth in Section 4.1.

g)      **"Materials"** includes the materials, information and data presented to Clients and Participants in the Service.

h)      **"Participant"** means an individual that opens an Account through the Client Instance and is a member of Client's workforce or is a spouse or dependent of a member of Client's workforce.

i)      **"Term"** means the initial term of this Agreement and each renewal term, if any.

j)      **"EcMD Services"** has the meaning set forth in Section 2.2.

**2. ECMD SERVICES Licensing.** Subject to the term and restrictions set forth in this Agreement, EcMD hereby grants to AHW, during the Term of this Agreement, a non-exclusive, non-transferable license to market EcMd Services within the AHW solution. EcMD will be responsible for the development, operation, hosting and maintenance of the Service in accordance with this Agreement.

**2.2.      EcMD Services.** Subject to the terms and conditions of this Agreement, EcMD shall provide to AHW the Services set forth in **the Master Agreement between the two companies**

**2.3.      Orders and Acceptance.** AHW's orders will be made by means of work order (form) signed or forwarded by an authorized representative of AHW that is e-mailed to support@enhancedcaremd.com. This form will be provided under separate cover. No order will be binding until received by EcMD in writing, and EcMD will have no liability to AHW with respect to work orders that are not received in writing e.g. email acknowledgment.

These work orders will identify the client who needs to be loaded, anticipated go live date, and whether the client will be customized with their logo and colors. If customized, the logo and colors will need to be provided ecMD in the stated formats at the time of work order submission. In the regular course of business, ecMD needs 10 business days to turn around the work order to a completed site.

-2-                                                                                      Ver 1.10

**2.4.** **General Restrictions.** Except as otherwise explicitly provided in this Agreement or as may be expressly permitted by Applicable Law, AHW will cause itself and its employees and agents to not: (a) use or copy a Client Instance or the Service, or any of the data, algorithms and calculations, or any portion thereof (excluding any Client Content or AHW Content), except as expressly authorized in this Agreement; (b) copy, modify, or prepare derivative works based upon the Client Instance or the Service; (c) alter, remove, or obscure any copyright or other proprietary notices or labels on or in a Client Instance or the Service; (d) circumvent or disable any technological features or measures in the Service; (e) interfere with or disrupt the integrity or performance of the Service; (f) claim any rights to or ownership of (except through the rights granted under this Agreement) a Client Instance or the Service or any derivative thereof or (g) attempt to gain unauthorized access to the Service. AHW acknowledges and agrees that the Client Instance and the Service contain Confidential Information, data and trade secrets of EcMD and its licensors. AHW shall not use any deceptive means to refer Users to a Client Instance, including but not limited to misleading advertising or advertising that describes the services on the Client Instance in a manner that is materially inconsistent with the scope of services provided therein.

**2.5.** **Cooperation.** For EcMD to provide the Client Instance and the Service as set forth in this Agreement, AHW and their authorized representatives must cooperate with and provide reasonable assistance to EcMD. From time to time, AHW's prompt decisions and approvals will be required, and EcMD will be entitled to rely on AHW's decisions and approvals provided in connection with this Agreement. The services provided by EcMD under this Agreement are dependent upon the accuracy and timely provision of the information provided by authorized representatives and AHW. AHW understands that to the extent such information is inaccurate or not provided in a timely manner, the services to be provided under this Agreement may be negatively affected.

**2.6.** **AHW Obligations.** AHW will (a) use commercially reasonable efforts to represent and sell the Service as part of their comprehensive Wellness Solution and the EcMD Services into the market; (b) not defame, denigrate or otherwise discourage Clients and potential Clients in any manner regarding the Service and the EcMD Services; c) not (i) retain or distribute any other copies of any Materials without the express written permission of EcMD, (ii) modify or make derivative works of the Materials, or (iii) incorporate the Materials in any other Web page. All right, title, and interest in and to the Materials and all intellectual property rights therein will remain with EcMD and its licensors and no ownership interest is transferred to AHW by virtue of the Materials being available through the Service and the EcMD Services.

**2.7.** **Reporting.** EcMD will provide AHW with super Admin Access to generate reports for any client within the system. .

-3-                                                                                      Ver 1.10

**2.8.** **WARRANTIES AND DISCLAIMER OF WARRANTIES EcMD Warranties. EcMD represents and warrants that: (a) this Agreement has been duly executed and delivered and constitutes a valid and binding agreement enforceable against EcMD in accordance with its terms; (b) no authorization or approval from any third party is required in connection with EcMD's execution, delivery, or performance of this Agreement; (c) the execution, delivery, and performance of this Agreement does not violate the laws of any jurisdiction or the terms or conditions of any other agreement to which EcMD is a party or by which it is otherwise bound; and (d) EcMD's business and operations, including any operations conducted through third parties, are conducted in compliance with Applicable Law.**

**2.9.** **AHW Warranties.** AHW represents and warrants that: (a) this Agreement has been duly executed and delivered and constitutes a valid and binding agreement enforceable against AHW in accordance with its terms; (b) no authorization or approval from any third party is required in connection with AHW's execution, delivery, or performance of this Agreement; (c) the execution, delivery, and performance of this Agreement does not violate the laws of any jurisdiction or the terms or conditions of any other agreement to which AHW is a party or by which it is otherwise bound; and (d) AHW's business and operations, including any operations conducted through third parties, are conducted in compliance with Applicable Law.

**2.10.** **WARRANTY DISCLAIMER.** EXCEPT FOR THE EXPRESS WARRANTIES PROVIDED IN THIS SECTION 2, NEITHER PARTY MAKES ANY ADDITIONAL REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW), OR STATUTORY, AS TO ANY MATTER WHATSOEVER. EACH PARTY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, AND TITLE, AND ALL DELIVERABLES HEREUNDER ARE ACKNOWLEDGED TO BE "AS IS" AND "WHERE IS". THE CLIENT INSTANCE AND THE SERVICE MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS AS WELL AS THE USE OR MISUSE OF THE PARTICIPANT. ECMD IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS. AHW WILL NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF ECMD TO ANY PARTICIPANT OR OTHER THIRD PARTY.

**3.** **PRIVACY AND DATA SECURITY**

**3.1.** **Privacy and HIPAA Assurances**

a) **Protected Health Information.** EcMD and AHW are committed to protect the privacy of personal health information attached to Participants (and their employers and family members) that may be collected through the performance of this Agreement ("Protected Health Information"). To the extent that AHW is a "Business Associate" (as defined at 45 C.F.R. § 160.103) of its Client(s), related to the Service provided to such Clients, the Parties agree to the terms of this agreement.

-4-

Ver 1.10

b)     **De-Identified Data.**    Notwithstanding the provisions of this Section, EcMD and its subcontractors have a perpetual, irrevocable right to use and disclose non-personally identifiable information <u>provided</u> that the disclosed information does not include a key or other mechanism that would enable the information to be re-identified.

**3.2.**    **HIPAA Policy:**  EcMD maintains a HIPAA Privacy and Security Compliance Program. EcMD will, as part of the policy, review and update that policy as required by relevant federal, state and local laws and regulations.

## 4.    CONFIDENTIALITY

**4.1.**    **Definition of Confidential Information relative to the SAAS agreement.**  "Confidential Information" means any and all information and material disclosed by one Party ("Discloser") to the other Party ("Recipient") or its Representatives (as defined below) (before or after the signing of this Agreement, and whether in writing, or in oral, graphic, electronic or any other form) that is (a) marked in writing as or provided under circumstances reasonably indicating it is confidential or proprietary, or if disclosed orally or in other intangible form or in any form that is not so marked, that is identified as confidential at the time of such disclosure; or (b) not generally known to the public or other third parties who could derive economic value from its use or disclosure. Confidential Information, includes, without limitation, any (i) secret, know-how, idea, invention, process, technique, algorithm, program (whether in source code or object code form), hardware, device, design, schematic, drawing, formula, data, plan, strategy and forecast of, and (ii) proprietary technical, engineering, manufacturing, product, marketing, customer, servicing, financial, personnel and other proprietary information and materials of, Discloser and its employees, consultants, investors, affiliates, licensors, suppliers, partners, customers, clients and other persons and entities. For purposes of this Agreement, "Representatives" refers to any person, its directors, officers, employees, agents and advisors (including, without limitation, consultants, clients, customers, partners, financial advisors, banks and other financing sources, attorneys, accountants and their respective Representatives).  To the extent applicable, all references in this agreement to EcMD, AHW, Recipient or Discloser, shall also be deemed to be references to each of their respective Representatives.

-5-

Ver 1.10

**4.2.** **Nondisclosure and Permitted Use.** Recipient shall hold all Confidential Information in strict confidence and shall not disclose or distribute any Confidential Information to any third party other than to its employees and agents who need to know such information and who are bound in writing by restrictions regarding disclosure and use of such information comparable to and no less restrictive than those set forth herein and provided that Recipient shall be responsible for the conduct of all such employees and agents. Recipient shall not use any Confidential Information for the benefit of itself or any third party or for any purpose other than to perform its obligations under this Agreement. Recipient shall take the same degree of care that it uses to protect its own confidential and proprietary information and materials of similar nature and importance (but in no event less than reasonable care) to protect the confidentiality and avoid the unauthorized use, disclosure, publication or dissemination of the Confidential Information. Recipient shall not make any copies of the Confidential Information except to the extent reasonably necessary to carry out its obligations under this Agreement, or unless otherwise approved in writing in advance by Discloser. Any such copies made shall be identified as the property of Discloser and marked "confidential," "proprietary" or with a similar legend. The obligations of this Section 4.2 with respect to any item of Confidential Information shall survive any termination or expiration of this Agreement and continue for five years from the date of Recipient's receipt of such Confidential Information.

**4.3.** **Scope.** The obligations of this Section, including the restrictions on disclosure and use, shall not apply with respect to any Confidential Information to the extent such Confidential Information: (a) is or becomes publicly known through no act or omission of Recipient; (b) was rightfully known by Recipient before receipt from Discloser, as evidenced by Recipient's contemporaneous written records; (c) becomes rightfully known to Recipient without confidential or proprietary restriction from a source other than Discloser that does not owe a duty of confidentiality to Discloser with respect to such Confidential Information; or (d) was independently developed by Recipient without the use of or reference to the Confidential Information of Discloser, as evidenced by Recipient's contemporaneous written records. In addition, Recipient may use or disclose Confidential Information to the extent (i) approved by Discloser or (ii) Recipient is legally compelled to disclose such Confidential Information, provided, however, that prior to any such compelled disclosure, Recipient shall give Discloser reasonable advance notice of any such disclosure and shall cooperate with Discloser in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of such disclosure and/or use of the Confidential Information.

**4.4.** **Remedies.** Due to the unique nature of each Party's Confidential Information, the unauthorized disclosure or use of Discloser's Confidential Information will cause irreparable harm and significant injury to Discloser, the extent of which will be difficult to ascertain and for which there may be no adequate remedy at law. Accordingly, Discloser, in addition to any other available remedies, shall have the right to an immediate injunction and other equitable relief enjoining any breach or threatened breach of this Section 4.4 without the necessity of posting any bond or other security. The Recipient shall notify Discloser in writing immediately upon Recipient becoming aware of any such breach or threatened breach.

-6-

Ver 1.10

**4.5.** **Confidentiality of Agreement.** Neither party to this Agreement will disclose the terms of this Agreement to any third party without the written consent of the other party, except as required by securities or other applicable laws. Notwithstanding the above provisions, each party may disclose the terms of this Agreement (a) in connection with the requirements of a public offering or securities filing; (b) in confidence, to accountants, banks, and financing sources and their advisors; (c) in confidence, in connection with the enforcement of this Agreement or rights under this Agreement; or (d) in confidence, in connection with a merger or acquisition or proposed merger or acquisition, or the like.

**4.6.** **Return of Materials.** Upon the termination or expiration of this Agreement, or upon earlier request, each Party will deliver to the other all Confidential Information (including all copies thereof) that it may have in its possession or control. Notwithstanding the foregoing, neither Party will be required to return materials that it must retain in order to receive the benefits of this Agreement or properly perform in accordance with this Agreement provided that any retain Confidential Information shall remain subject to the terms hereof.

## 5.    INDEMNIFICATION BY ECMD

**5.1.** **Defense by EcMD.** Except for claims subject to Section 4, EcMD will defend AHW and its owners, directors, officers, employees and agents (together with its and their affiliates, successors and assigns, the "AHW Indemnitees") from any actual or threatened third party claim: (a) that the Client Instance or the Service infringes or misappropriates any U.S. patent issued as of the Effective Date or any copyright or trade secret of any third party; (b) resulting from any grossly negligent or willful misconduct of EcMD in rendering or performing any of the Services contemplated in this Agreement to be performed by EcMD; or (c) resulting from any violation or breach caused by EcMD of any federal, state or local law, regulation or rule. AHW shall give EcMD prompt written notice of any such claim, give EcMD full and complete control over the defense and settlement of the claim, provide assistance in connection with the defense and settlement of the claim as EcMD may reasonably request, and comply with any settlement or court order made in connection with the claim (e.g., relating to the future use of any infringing materials).

**5.2.** **Infringement Indemnification.** EcMD will indemnify the AHW Indemnitees against: (a) all damages and costs finally awarded against AHW Indemnitees in any proceeding under Section 4.1; (b) all out-of-pocket costs (including reasonable attorneys' fees) reasonably incurred by AHW in connection with the defense of such proceeding (other than attorneys' fees and costs incurred without EcMD's consent after EcMD has accepted defense of such claim); and (c) if any proceeding arising under Section 4.1 is settled, all amounts paid to any third party as agreed to by EcMD in settlement of any such claims.

-7-                                                                                      Ver 1.10

**5.3.** **Mitigation of Infringement Action.** If permitted use of the Client Instance or the Service is, or in EcMD's reasonable opinion is likely to become, enjoined or materially diminished as a result of a proceeding arising under Section 4.1, then EcMD will either at its discretion: (a) procure the continuing right to use of the Client Instance or the Service; (b) replace or modify the Client Instance or the Service in a functionally equivalent manner so that it no longer infringes; or if, despite its commercially reasonable efforts, EcMD is unable to do either (a) or (b), EcMD will (c) terminate the licenses and services with respect to the Client Instance or the Service subject to the infringement claim and refund to AHW a pro-rated portion of all unused Fees pre-paid by AHW for the terminated licenses and services (if any) and this Agreement and any future obligations of EcMD will terminate.

**5.4.** **Exceptions.** EcMD will have no obligation under this Section for any third party claim to the extent that it arises out of or is based upon (a) unauthorized use of the Client Instance or the Service; (b) any non-standard aspect of the Client Instance or the Service that is provided to comply with a specific design, requirement, or specifications specifically required by or provided by AHW; (c) failure to use the Client Instance or the Service in accordance with instructions provided by EcMD; or (d) any modification of the Client Instance or the Service not made or authorized in writing by EcMD. AHW is responsible for any costs or damages that result from these actions.

**5.5.** **Exclusive Remedy.** This Section states EcMD's sole and exclusive liability, and AHW's sole and exclusive remedy, for the actual or alleged infringement or misappropriation of any third party intellectual property right by the Client Instance or the Service.

## 6.      INDEMNIFICATION BY AHW AND CLIENT

**6.1.** **Defense of Claims.** AHW will defend EcMD and its owners, directors, officers, employees and agents (together with its and their affiliates, successors and assigns, the "EcMD Indemnitees") from any actual or threatened third party claim: (a) arising out of or based upon EcMD's authorized use of AHW's or Client's trademarks or any other materials provided by AHW to EcMD under this Agreement; (b) resulting from any grossly negligent or willful misconduct of AHW or Client; or (c) resulting from any violation or breach caused by AHW or Client of any federal, state or local law, regulation or rule. EcMD will give AHW prompt written notice of any such claims, grant AHW full and complete control over the defense and settlement of the claim, assist AHW with the defense and settlement of the claim as AHW may reasonably request and at AHW 's expense, and (d) comply with any settlement or court order made in connection with the claim.

**6.2.** **Indemnification.** AHW will indemnify the EcMD Indemnitees against: (a) all damages and costs finally awarded against EcMD Indemnitees in any proceeding under Section 6.1; (b) all out-of-pocket costs (including reasonable attorneys' fees) reasonably incurred by EcMD in connection with the defense of such proceeding (other than attorneys' fees and costs incurred without AHW 's consent after AHW has accepted defense of such claim); and (c) if any proceeding arising under Section 6 is settled, AHW will pay any amounts to any third party agreed to by AHW in settlement of any such claims.

-8-

Ver 1.10

**6.3.** **Mitigation of Infringement Action.** If permitted use of AHW's trademarks or any other materials provided by AHW to EcMD under this Agreement are, or in AHW 's reasonable opinion is likely to become, enjoined or materially diminished as a result of a proceeding arising under Section 6, then AHW will either: (a) procure the continuing right to use the trademarks or other materials provided by AHW; or (b) replace or modify the trademarks or materials provided by AHW so that they no longer infringe.

**6.4.** **Exceptions.** AHW will have no obligation under this Section 6 for any third party claim to the extent that it arises out of or is based upon (a) unauthorized use of AHW trademarks or any other materials provided by AHW to EcMD under this Agreement; (b) failure to use AHW trademarks or any other materials provided by AHW to EcMD under this Agreement in accordance with instructions provided by EcMD; or (c) any modification to AHW trademarks or any other materials provided by AHW to EcMD under this Agreement not made or authorized in writing by AHW. EcMD is responsible for any costs or damages that result from these actions.

**6.5.** **Exclusive Remedy.** This Section states AHW's sole and exclusive liability, and EcMD's sole and exclusive remedy, for the actual or alleged infringement or misappropriation of any third party intellectual property right by AHW's trademarks or any other materials provided by AHW to EcMD under this Agreement.

-9-

Ver 1.10

## 7. LIMITATION OF LIABILITY

**7.1. Disclaimer of Indirect Damages.** NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, NEITHER PARTY WILL, UNDER ANY CIRCUMSTANCES, BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOST PROFITS OR LOSS OF BUSINESS, EVEN IF THE PARTY IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING. ALL ACTIONS AND CLAIMS WHICH ONE PARTY MAY HAVE AGAINST THE OTHER SHALL BE BROUGHT PROMPTLY AFTER DISCOVERY AND IN NO EVENT AFTER ONE YEAR AFTER DISCOVERY OR SHALL THEREAFTER BE BARRED.

**7.2. Cap on Liability.** EXCEPT FOR A BREACH OF ARTICLE 3 OR 5, EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY UNDER THIS AGREEMENT SHALL NOT EXCEED THE FEES OWED BY CLIENT TO ECMD IN THE TWELVE MONTH PERIOD IMMEDIATELY PRECEDING THE ACCRUAL OF ANY CLAIM, REGARDLESS OF THE FORUM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, OR OTHERWISE.

**7.3. Independent Allocations of Risk.** EACH PROVISION OF THIS AGREEMENT THAT PROVIDES FOR A LIMITATION OF LIABLITY, DISCLAIMER OF WARRANTY, OR EXCLUSION OF DAMAGES IS TO ALLOCATE THE RISKS OF THIS AGREEMENT BETWEEN THE PARTIES. THIS ALLOCATION IS REFLECTED IN THE PRICING OFFERED BY ECMD TO AHW AND IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES. EACH OF THESE PROVISIONS IS SEVERABLE AND INDEPENDENT OF ALL OTHER PROVISIONS OF THIS AGREEMENT, AND EACH OF THESE PROVISIONS WILL APPLY EVEN IF THE REMEDIES IN THIS AGREEMENT HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

## 8. GENERAL PROVISIONS

**8.1. Independent Contractors.** The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement should be construed to give either Party the power to (a) act as an agent or (b) direct or control the day-to-day activities of the other. Financial and other obligations associated with each Party's business are the sole responsibility of that Party. EcMD may utilize one or more subcontractors or other third parties to perform its duties under this Agreement so long as EcMD remains responsible for all of its obligations under this Agreement.

-10-

Ver 1.10

**8.2.** **Assignability.** AHW may not assign its right, duties, or obligations under this Agreement without the other Party's prior written consent, except to a successor-in-interest in connection with a merger, acquisition, or sale of all or substantially all assets or a company restructuring without changing the ultimate controlling ownership of the company, if consent is given, this Agreement will bind the Party's successors and assigns. Any attempt by a Party to transfer its rights, duties, or obligations under this Agreement except as expressly provided in this Agreement is void.

**8.3.** **Non-solicitation and Non-compete.** During the term of this Agreement and for a period of one year thereafter, neither party will, directly or indirectly, employ, engage, hire or solicit or accept the employment or services of an employee or independent contractor of the other party without the prior written consent of the other party. AHW will not seek to reverse, rewrite or copy the software as a service solution for commercial reasons to replace or compete with enhancedcare during the term of this agreement and for one year thereafter. This excludes the use of any software presently in place or available in the marketplace.

**8.4.** **Notices.** Any notice required or permitted to be given in accordance with this Agreement will be effective if it is in writing and sent by certified or registered mail, or insured courier, return receipt requested, to the appropriate Party at the address set forth below and with the appropriate postage affixed. Either Party may change its address for receipt of notice by notice to the other Party in accordance with this Section 8.4. Notices are deemed given two business days following the date of mailing or one business day following delivery to a courier or sent by facsimile or e-mail:

-11-

Ver 1.10

To AHW:

      70 Grimes Drive

      Guntersville, Ala 35976

      Att: Dr T. Lamb

To EcMD:

      EcMD
      enhancedcareMD
      1290 University Ave,#G
      Rochester, NY 14607
      Att: Mr. J. DeLuccio

**8.5.** **Force Majeure.** Neither party will be liable for, or be considered to be in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any cause or condition beyond the party's reasonable control, so long as the party uses commercially reasonable efforts to avoid or remove such causes of non-performance.

**8.6.** **Publicity.** With Prior written consent, EcMD may advertise and publish its business relationship with AHW, including the fact that it is providing services relating to this Agreement.

**8.7.** **Governing Law and Venue.** This Agreement will be interpreted, construed, and enforced in all respects in accordance with the local laws of the State of NY, Monroe County, without reference to its choice of law rules. All actions brought to interpret or enforce this Agreement shall be brought in the exclusive forum of the courts located in Rochester, NY and all parties agree not to assert any defenses based on lack of personal jurisdiction, forum, non conveniens or inappropriate venue. All service of process may be furnished by mail to the party's last known personal or business residence. This Agreement and all related agreements between the Parties are personal and unique to each Party and each Party agrees that it will not directly or indirectly attempt to form, aid or abet, or certify a class action or similar group of plaintiffs whether or not constituting a class against the other Party.

**8.8.** **Waiver.** The waiver by either Party of any breach of any provision of this Agreement does not waive any other breach. The failure of any Party to insist on strict performance of any covenant or obligation in accordance with this Agreement will not be a waiver of such Party's right to demand strict compliance in the future, nor will the same be construed as a novation of this Agreement.

**8.9.** **Severability.** If any part of this Agreement is found to be illegal, unenforceable, or invalid, the remaining portions of this Agreement will remain in full force and effect. If any material limitation or restriction on the grant of any rights to AHW under this Agreement is found to be illegal, unenforceable, or invalid, the right granted will immediately terminate.

-12-                                        Ver 1.10

**8.10. Counterparts.** This Agreement may be executed in any number of identical counterparts, notwithstanding that the Parties have not signed the same counterpart, with the same effect as if the Parties had signed the same document. All counterparts will be construed as and constitute the same agreement. This Agreement may also be executed and delivered by facsimile or pdf and such execution and delivery will have the same force and effect of an original document with original signatures.

**8.11. Entire Agreement.** This Agreement, including all exhibits, is the final and complete expression of the SAAS agreement between these Parties regarding the Client Instance. This Agreement supersedes, and the terms of this Agreement govern, all previous oral and written communications regarding these matters, all of which are merged into this Agreement. No employee, agent, or other representative of EcMD has any authority to bind EcMD with respect to any statement, representation, warranty, or other expression unless the same is specifically set forth in this Agreement. No usage of trade or other regular practice or method of dealing between the Parties will be used to modify, interpret, supplement, or alter the terms of this Agreement. This Agreement may be changed only by a written agreement signed by an authorized agent of the Party against whom enforcement is sought.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

-13-

Ver 1.10

**IN WITNESS WHEREOF**, this Agreement is executed by the Parties' authorized officers and shall be effective as of the date first above written.

**Attentive Health & Wellness, LLC**

By: David Chaviers

Its: CEO

Date:

**enhancedcareMD**

By: Jerome j deluccio

Its: CEO

Date: 8/1/18

-14-

Ver 1.10

## Exhibit A

### BUSINESS ASSOCIATE ADDENDUM

To the extent AHW meets the definition of a "Business Associate" (as those terms are defined in 45 C.F.R. § 160.103) to its Clients, the services provided by EcMD ("partner") may involve the use and disclosure of health information that is protected by federal law as defined below ("PHI"). Therefore, Partner and AHW wish to agree to the terms of this **BUSINESS ASSOCIATE ADDENDUM** ("Addendum") in order to set forth the obligations regarding PHI.

1.    Definitions.

- Breach. "Breach" shall have the meaning set forth at 45 C.F.R. § 164.402.

- Electronic Health Record. "Electronic Health Record" shall mean an electronic record of health-related information on an Individual that is created, gathered, managed, and consulted by authorized health care clinicians and staff.

- Electronic PHI. "Electronic PHI" shall have the same meaning as the term "electronic protected health information" at 45 C.F.R. § 160.103, limited to the information created or received by Partner from or on behalf of AHW or its Clients.

- HIPAA. "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended, and the implementation regulations thereunder, including without limitation the HITECH Standards (as defined below), and all future regulations promulgated thereunder.

- HIPAA Rules. "HIPAA Rules" means the Privacy Rule (as defined below) and the Security Rule (as defined below).

- HITECH Standards. "HITECH Standards" means Subtitle D of the Health Information Technology for Economic and Clinical Health Act ("HITECH"), found at Title XIII of the American Recovery and Reinvestment Act of 2009, and any regulations promulgated thereunder, including all amendments to the HIPAA Rules.

- Individual. "Individual" shall have the same meaning as the term "individual" at 45 C.F.R. § 160.103, and any amendments thereto, and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

- Privacy Rule. "Privacy Rule" means the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164.

- Protected Health Information. "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" at 45 C.F.R. § 160.103, and any amendments thereto, limited to the information created or received by Partner from or on behalf of AHW or its Clients.

-15-    Ver 1.10

- Required By Law. "Required By Law" shall have the same meaning as the term "required by law" at 45 C.F.R. § 164.103.

- Secretary. "Secretary" shall mean the Secretary of the United States Department of Health and Human Services or his/her designee.

- Security Incident. "Security Incident" shall have the same meaning as the term "security incident" at 45 C.F.R. § 164.304.

- Security Rule. "Security Rule" shall mean the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Part 160, 162, and 164.

- Unsecured PHI. "Unsecured PHI" means PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the Secretary in accordance with the HITECH Standards.

- Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in the Privacy Rule, the Security Rule, the HITECH Standards or any future regulations promulgated or guidance issued by the Secretary thereunder.

2. Obligations and Activities of Partner.

a) Partner agrees to not use or disclose PHI other than as permitted or required by this Addendum, the Agreement or any other underlying agreement between the Parties or as Required By Law.

b) Partner will make reasonable efforts to the extent practicable, to limit requests for and the use and disclosure of PHI to a Limited Data Set (as defined in 45 C.F.R. § 164.514(e)(2)) or, if needed by Partner, to the minimum necessary PHI to accomplish the intended purpose of such use, disclosure or request, and as applicable, in accordance with the regulations and guidance issued by the Secretary on what constitutes the minimum necessary for Partner to perform its obligations to AHW under this Addendum or as Required By Law.

c) Partner agrees to use appropriate safeguards to prevent use or disclosure of the PHI other than as provided for by this Addendum, including the implementation of administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of Electronic PHI that it creates, receives, maintains or transmits on behalf of AHW. Partner shall abide by the Security Standards for the Protection of Electronic PHI at 45 C.F.R. Part 164, Subpart C, including the Administrative Safeguards at 45 C.F.R. § 164.308, the Physical Safeguards at 45 C.F.R. § 164.310, the Technical Safeguards at 45 C.F.R. § 164.312, and the policies and procedures and documentation requirements at 45 C.F.R. § 164.316, to the same extent such provisions apply to AHW and its Clients.

-16-

Ver 1.10

d)      Partner agrees to mitigate, to the extent practicable, any harmful effect that is known to Partner of a use or disclosure of PHI by Partner in violation of the requirements of this Addendum.

e)      Partner agrees to report to AHW any use or disclosure of the PHI not provided for by this Addendum of which it becomes aware. To the extent that Partner creates, receives, maintains or transmits Electronic PHI, Partner agrees to report promptly to AHW any Security Incident, as determined by Partner, involving PHI of which Partner becomes aware. Partner hereby notifies AHW of the ongoing existence and occurrence of attempted but unsuccessful Security Incidents and AHW acknowledges and agrees that no additional notification to AHW of such unsuccessful Security Incidents is required.

f)      Following Partner's discovery of a use or disclosure of Unsecured PHI that is not provided for by this Addendum, Partner shall promptly perform a risk assessment to determine whether the use or disclosure qualifies as a Breach. Following such risk assessment, Partner shall notify AHW of the Breach without unreasonable delay, and in no event later than five (5) calendar days after Partner, or any of its employees or agents, discovered the Breach. Such notification shall include, to the extent possible, the identification of each Individual whose Unsecured PHI has been, or is reasonably believed by Partner to have been, accessed, acquired, used, or disclosed during the Breach and any other information available to Partner about the Breach which is required to be included in the notification of the Breach provided to the Individual in accordance with 45 C.F.R. §164.404(c). A Breach of Unsecured PHI shall be treated as discovered as of the first day on which such Breach is known to Partner or should have be known to Partner by exercising reasonable diligence.

g)      Partner agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Partner on behalf of AHW, agrees in writing to the same restrictions and conditions that apply through this Addendum to Partner with respect to such information. Moreover, Partner agrees to ensure any such agent or subcontractor agrees to implement reasonable and appropriate safeguards to protect Electronic PHI.

h)      Partner agrees to provide access, at the request of AHW or a Client, and in a time and manner mutually acceptable to Partner, the Client, and AHW to PHI in a Designated Record Set, to AHW or its Client, or as directed by AHW or its Client, to an Individual in order to meet the requirements under 45 C.F.R. § 164.524.

i)      Partner agrees to make any amendment(s) to PHI in its possession contained in a Designated Record Set that AHW or its Client directs or agrees to pursuant to 45 C.F.R. § 164.526 at the request of AHW or its Client, and in the time and manner mutually acceptable to Partner, and AHW, and the Client.

j)      Partner agrees to document such disclosures of PHI and information related to such disclosures as would be required for a Client and AHW to respond to a request by an

-17-      Ver 1.10

Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528.

k) Within ten (10) business days (or such other date that Partner and AHW may reasonably agree upon) of receiving written notice from AHW or a Client that Client has received a request for an accounting of disclosures of PHI from an Individual, Partner agrees to provide to AHW or the Client information collected to permit Client to make the accounting required in accordance with 45 C.F.R. § 164.528.

l) Partner agrees to make its internal practices, books, and records, including policies and procedures, relating to the use and disclosure of PHI received from, or created or received by Partner on behalf of, a Client, available to the Secretary for purposes of determining the Client's, AHW's, and Partner's compliance with the Privacy Rule.

m) To the extent Partner is delegated to carry out a Client's obligations under the Privacy Rule, Partner shall comply with the requirements of the Privacy Rule that apply to Client in the performance of such delegated obligations.

n) The Parties agree that the HITECH Standards that are applicable to AHW shall also be applicable to Partner and are hereby incorporated herein by reference. In the event the Secretary issues regulations that require specific modifications to this Addendum related to these provisions, the Parties agree to take such action as is necessary to amend this Addendum to meet such requirements

3. General Use and Disclosure Provisions.

Except as otherwise limited in this Addendum,

a) Partner reserves the right to **use** PHI for the proper management and administration of Partner, to carry out the legal responsibilities of Partner, or to provide data aggregation services relating to the health care operations of a Client.

b) Partner may **use or disclose** PHI to perform functions, activities, or services for, or on behalf of, AHW provided that such use or disclosure would not violate the Privacy Rule if done by AHW or a Client.

c) Partner may **disclose** PHI in its possession for the proper management and administration of Partner, provided that disclosures are Required by Law, or Partner obtains reasonable assurances from the third party to whom the information is disclosed that such PHI will be held confidentially and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the third party, and the third party notifies Partner of any instances of which it is aware in which the confidentiality of the PHI has been breached.

4. Term and Termination.

a) Term. The term of this Addendum shall commence on the Effective Date and shall terminate automatically upon termination of the Agreement unless terminated earlier,

-18-                                              Ver 1.10

as provided below, or unless the terms of this Addendum are extended in writing by the Parties.

b) <u>Termination for Cause</u>. Upon either party's knowledge of a material breach by the other party of this Addendum, the non-breaching party shall either:

    i) Provide an opportunity for the breaching party to cure the breach or end the violation and terminate this Addendum if the breaching party does not cure the breach or end the violation within the time specified by the non-breaching party; or

    ii) Immediately terminate this Addendum if the non breaching party has breached a material term of this Addendum and cure is not possible.

c) <u>Effect of Termination</u>.

    i) Except as provided in paragraph (ii) of this Section, upon termination of this Addendum, for any reason, Partner shall return or destroy all PHI received from AHW or a Client, or created or received by Partner on behalf of AHW or a Client. This provision shall apply to PHI that is in the possession of subcontractors or agents of Partner. Partner shall not retain copies of the PHI.

    ii) In the event that returning or destroying the PHI is not feasible, Partner shall provide to AHW or the Client notification of the conditions that make return or destruction not feasible. Upon determination that return or destruction of PHI is not feasible, Partner shall extend the protections of this Addendum to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction not feasible, for so long as Partner maintains such PHI.

5. <u>Miscellaneous</u>.

a) <u>Regulatory References</u>. A reference in this Addendum to a section in the Privacy Rule or the Security Rule means the section as in effect or as amended, and for which compliance is required.

b) <u>Amendment</u>. No change, amendment, or modification of this Addendum shall be valid unless set forth in writing and agreed to by both Parties. Notwithstanding the foregoing, the Parties acknowledge that state and federal laws relating to electronic data security and privacy are rapidly evolving and that amendment of this Addendum may be required to ensure compliance with such developments. The Parties specifically agree to take such action as may be necessary from time to time as is necessary for the Parties to comply with the requirements of HIPAA.

c) <u>Survival</u>. The respective rights and obligations of Partner under Section 4 of this Addendum shall survive the termination of this Addendum, unless expressly stated otherwise.

-19-

Ver 1.10

d) <u>Interpretation</u>. Any ambiguity in this Addendum shall be resolved to permit Partner, AHW, and its Clients to comply with HIPAA. To the extent any term of this Addendum conflicts with or is contrary to a term in the Agreement, this Addendum shall govern.

e) <u>Notice</u>. Any notice, report or other communication required under this Addendum shall be made in accordance with the Agreement.

f) <u>Governing Law</u>. Notwithstanding any provision of the Agreement, the rights, duties and obligations of the Parties to this Addendum and the validity, interpretation, performance and legal effect of this Addendum shall be governed and determined by applicable federal law with respect to the Privacy Rule and the Security Rule and otherwise by the laws of the State of New York.

-20-

Ver 1.10