# EXHIBIT C

FILED

2019 Aug-05  PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **C & H MANAGEMENT GROUP, LLC, and ATTENTIVE HEALTH & WELLNESS, LLC,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CASE NO.:  4:19-cv-01066-CLM** |
| **v.** | ) ) ) | |
| **JEROME DELUCCIO, DAVID COFFEY, and ENHANCEDCAREMD,** | ) ) ) ) | |
| **Defendants.** | ) | |

## DEFENDANTS' JOINT MOTION FOR PARTIAL DISMISSAL OF PLAINTIFFS' COMPLAINT

COME NOW Defendants Jerome ("Jerry") Deluccio, David Coffey, and EnhancedcareMD (collectively "Defendants") and, pursuant to Federal Rule of Civil Procedure 12(b)(6), move to dismiss Plaintiffs' C & H Management Group, LLC and Attentive Health & Wellness, LLC's Verified Complaint for Injunctive Relief and Damages in part.  In support of their motion, Defendants state as follows:

### Background

Plaintiff Attentive Health & Wellness, LLC ("AHW") and C&H Management Group. LLC ("C&H") (AHW and C&H are collectively referred to in the Complaint as "Attentive") contend that they are entitled to injunctive relief to "enjoin

1

Defendants from competing with Attentive, soliciting Attentive's customers, and disclosing Attentive's confidential information."  Doc. 1 at Introduction.

### *Plaintiffs' Purportedly Confidential or Proprietary Information*

Plaintiffs claim they offer customers, participating in their employer-sponsored medical plans, a "unique" wellness program which "has enjoyed success" because Attentive is "the only company in the Business with the right documents to allow the wellness program to produce favorable tax results for employees while still being in compliance with all [IRS] regulations and qualifying with [ERISA]." (Doc. 1 at ¶ 10.)

Plaintiffs claim to have provided Defendants with its confidential and proprietary "documents and materials, customer lists, customer contracts, plan processes – including the processes for SIMERP™ – and other confidential and proprietary information."  (Doc. 1 at ¶ 18.)  SIMERP™ is not defined in the Complaint, but is denoted by Plaintiffs as a trademark.  SIMERP™ is allegedly the property of Attentive.  (Doc. 1 at ¶ 21.)  It is also alleged to be trademarked.  (Doc. 1 at ¶ 10.)[1]

---

[1] However, SIMERP was and is not a registered trademark of Plaintiffs or anyone.  "SIMERP" is an industry-wide term for "Self-Insured Medical Expense Reimbursement Plan."  AHW only recently sought to trademark "SIMERP" on May 31, 2019 and that application is still under review. The fact that the terms is used industry wide, it is highly unlike AHW will be successful in its attempt to trademark the phrase.

*The Agreements Plaintiffs Seek to Enforce*

The Complaint alleges that "the parties" entered an "Agent/Broker Sales Agreement," attached to Plaintiffs' Complaint as Exhibit A, on June 1, 2017 (Doc. 1-1 ¶¶ 6; 12.) ("Sales Contract"). The parties to the Sales Contract are "C & H Management Group, LLC d/b/a Attentive Health & Wellness" and "Broker." (Doc. 1-1, Ex. A at 1.)  The Broker is later identified as enhancedcareMD, and Jerome DeLuccio signed the Sales Contract as "CEO" for Broker.  (Doc. 1-1 Ex. A at 6.)  Defendant David Coffey is not a signatory of that Agreement, nor is there any mention that EnhancedcareMD is a partnership. The "Agent/Broker Sales Agreement" allowed EnhancedcareMD to market C&H's wellness program through EnhancedcareMD'S sales platform.  (Doc. 1-1 ¶ 12.)

The Complaint also claims that "the parties" entered a "Confidentiality, Non-Competition, and Non-Disclosure Agreement," attached to Plaintiffs' Complaint as Exhibit B, on June 1, 2017 (Doc. ¶¶ 7, 13.) ("NDA"). The NDA attached to the Complaint as Exhibit B is between "C & H Management Group, LLC d/b/a Attentive Health & Wellness" and "the *entity* named on page 6…."  (Doc. 1-2 Ex. B at 1 (emphasis added).)  At page 6, "J. Deluccio," signs as "President" of the "Disclosing Party."   Defendant David Coffey is not a signatory. Additionally, Plaintiffs conveniently neglected to attach the "Addendum to Executed Contract 6/6/17," which is attached hereto as Exhibit A. ("Addendum").  As with the Sales Contract,

3

Mr. Deluccio signed on behalf of EnhancedcareMD as its CEO. *Id.* What becomes patently clear is that this Addendum discloses that the true party to the contracts is enhancedcare, Inc. And what is important from the Court's viewpoint is the fact that Plaintiffs were the ones that drafted the agreements and the Addendum. The use of the term "enhancecareMD" as the identifier in the Addendum for enhancedcare, Inc. negates any argument by Plaintiffs that they entered an agreement with a partnership or certain individuals.

Although not emphasized by Plaintiffs, Plaintiffs understood when they entered the NDA with EnhancedcareMD, that [EnhancedcareMD] "ha[d] related services and pre-existing relationships in the Limited Medical and Wellness space" and that the parties understood that EnhancedcareMD would "market its services according to the terms and conditions hereafter set for excluding the [EnhancedcareMD] existing services and relationships." (Doc. 1-2 Ex. B, RECITALS Paragraph 2.)

### The Allegations against Defendants

Plaintiffs claim that Defendants – including two individual officers of EnhancedcareMD, Jerry Deluccio and David Coffey, are brokers of "related services" who, through their preexisting relationships in the same industry, offered wellness programs like Plaintiffs' through EnhancedcareMD's software suite along with additional benefits. (Doc. 1 ¶ 11.)

Plaintiffs' wellness program was formerly accessible through a website portal belonging to non-party U.S. HealthCenter, Inc. ("USHC") and its associated platform. (Doc. 1 at ¶ 12.) Plaintiffs assert they chose to move the wellness program from USHC to EnhancedcareMD's new, streamlined, software platform and entered a contract with "Defendants" to use EnhancedcareMD's platform "on a case-by-case basis" through the Addendum. (Doc. 1 ¶ 19.) However, the Addendum is not the document that gave either Plaintiff the ability to use the platform on a case-by-case basis. The Software as a Service (SAAS) Partner Agreement executed on August 1, 2018 is the operative document, which was not attached to the Complaint. See, Exhibit B attached hereto.

Plaintiffs claim that, after they were committed to using EnhancedcareMD's new platform, they were informed by existing and potential/pending clients that Defendants were contacting them and soliciting them to move to EnhancedcareMD's own competing SIMERP program. (Doc. 1 at ¶ 20.) According to Plaintiffs, Defendants successfully redirected these actual and prospective clients away from Plaintiffs, but none of these clients are named. (*Id.*) Further, Plaintiffs' claim not to have had knowledge of the loss of these unnamed clients. Nowhere, within the four corners of the Complaint, do Plaintiffs recite the who, what, where or when of the alleged actions purportedly taken by Defendants.

Plaintiffs say that they also investigated and discovered that Plaintiffs' program was being offered as EnhancedcareMD's program.   (Doc. 1 at ¶ 21.) Plaintiffs allege that their proprietary documents had been re-labelled as the material of EnhancedcareMD and that the "name SIMERP" was misappropriated by EnhancedcareMD. (*Id.*)  Again, other than conclusory statements, Plaintiffs do not recite the who, what, where or when of the alleged actions.

Plaintiffs also assert that Defendants have allegedly withheld profits due to be shared with Plaintiffs in the amount of approximately $15,000.  Doc. 1 at ¶ 25.

### *Summary of Counts I-VI of the Complaint*

In Count I, Plaintiffs seek injunctive relief pursuant to Rule 65, although no separate motion has been submitted to the Court requesting a temporary restraining order or a preliminary injunction.

In Count II, Plaintiffs request damages for breach of contract based upon Defendants' alleged breach of the Sales Contract and the NDA by competing with Plaintiffs and soliciting Plaintiffs' customers during the parties "active business relationship," disclosing and/or using Plaintiffs' confidential information, and not paying funds owed to Plaintiffs.

In Count III, Plaintiffs seek damages for Defendants' tortious interference with Plaintiff's (singular – which Plaintiff?) contractual relationship with employer

and employer clients, as well as the potential and/or pending clients Defendants allegedly solicited away from Plaintiff (singular).

In Count IV, Plaintiffs seek damages for Defendants' alleged violation of the Alabama Trade Secrets Act ("ATSA"). The claimed trade secrets that Defendants allegedly misappropriated, divulged, and disclosed to Plaintiffs' competitors are (1) Plaintiff's (singular) customer list; (2) the prices the customers were paying for Plaintiff's products and services; (3) the specific technical data regarding Plaintiff's program and plan processes; and (4) the Plaintiff's customers' level of satisfaction with Plaintiff's products and services.

In Count V, Plaintiffs claim damages for fraud, conspiracy, and collusion. Specifically, Plaintiffs assert that, DeLuccio and Coffey (hereinafter "the Individual Defendants"), willfully deceived Plaintiff by requesting proprietary documents for the stated purpose of furthering the parties' business relationship with the actual intention of duplicating and using the documents as Defendants' own documents, diverting business from Plaintiff. Such Count sounds as if Plaintiffs are claiming that they were fraudulently induced to enter into the alleged agreements.

In Count VI, Plaintiffs seek damages for Defendants' alleged conversion of Plaintiffs' (this time, plural) intellectual property and proprietary processes and sold the property for profit as Defendants' own property. Nowhere do Plaintiffs identify the tangible property that Defendants are alleged to have taken possession of or

converted. Indeed, the Complaint is devoid of any specific information as to the particular "intellectual property" that was converted, but only makes conclusory statements about unidentifiable property.

### Standards of Review

Federal Rule of Civil Procedure 8(a)(2) requires that a plaintiff plead "a short and plain statement of the claim showing that [it] is entitled to relief." But "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

The court may dismiss a complaint where the plaintiff fails to state a claim upon which relief can be granted. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks, citations, and alterations omitted)). The "factual allegations [in the complaint] must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quoting *Twombly*, 550 U.S. at 555) (alteration omitted). The "plausible" standard

of *Twombly* "'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim." *Id.* (citing *Twombly*, 550 U.S. at 556).

If the court considers materials outside of the complaint when reviewing a motion to dismiss, a district court generally must convert the motion to dismiss into a summary judgment motion. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). The exception to this general rule is that "the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Id.* (citing *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005)).

## Argument

### I.  *Count I - Injunctive Relief*

In Count I, Plaintiffs seek injunctive relief pursuant to Rule 65, although no separate motion has been submitted to the Court requesting a temporary restraining order or a preliminary injunction. Moreover, this Count is improperly titled "Injunctive Relief" when the real requested relief is an injunction. In order to prevail on Count I, Plaintiffs must establish that they are entitled to injunctive relief based on proof of an irreparable injury to their legal rights for which damages are inadequate, a showing that the injunction is proper after considering the balance of hardships between plaintiffs and defendants, and a demonstration that the public

9

interest would not be disserved if the injunction issues. *See Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F. 3d 1200, 1208 (11th Cir. 2008).

Plaintiffs are unprepared (and unable) to meet these requirements. And as shown below, Plaintiffs' substantive claims are defective for one or more reasons. First. AHW – i.e., Attentive Health & Wellness, LLC – is not a party to the agreements attached to and referenced throughout the complaint. Second, Defendants are not the real parties in interest, and Plaintiffs, one or more, have failed to sue the proper party to the extent they truly desire to pursue injunctive relief.

Critically, without admissions, evidence, or a request for an evidentiary hearing, there is nothing on which to base relief. *See Citizens Concerned About Our Children v. Sch. Bd. of Broward Cnty.*, 193 F.3d 1285, 1289–90 (11th Cir. 1999) (explaining that the failure to request a hearing on preliminary injunctive relief undermines any conclusion that irreparable harm has been shown); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998) (holding that where the necessary facts are contested and credibility determinations must be made, relief cannot be granted without an evidentiary hearing).

Since no motion or request for an evidentiary hearing has been made by the Plaintiffs, Count I of the Complaint is due to be dismissed.

10

**II.    Count II – Breach of Contract:**

> **A.    AHW is not a party to any agreement with EnhancedcareMD, Coffey, or DeLuccio and it therefore lacks standing to sue as plaintiff.**

Although the Complaint is rife with reference to the rights and property of "Attentive," the contracts attached to Plaintiffs' Complaint as Exhibit A and B clearly identify the contracting party as only "C & H Management Group, LLC d/b/a Attentive Health & Wellness."   When the agreements were entered, "Attentive Health & Wellness" was a mere "d/b/a" but not a legal entity.  On information, Plaintiff Attentive Health & Wellness, LLC was later incorporated in Alabama on September 14, 2018, well after the execution of the original agreements and the Addendum attached hereto as Exhibit A.  The real party in interest must prosecute the complaint, *see* Fed. R. Civ. P. 17(a)(1), and in this case, Plaintiff C & H is the only possible real party in interest, even though its claims must also fail against the Defendants because it has not sued the real party in interest, enhancedcare, Inc. Accordingly, every claim raised on behalf of AHW is due to be dismissed since it was not even in existence at the time of the contracts made the basis of this lawsuit and because those contracts were entered into between C&H and enhancedcare, Inc.

> **B.    Defendants are not parties to any contract on which Plaintiffs base their claims for relief.**

The contracts, upon which Plaintiffs are suing, do not name or involve David Coffey whatsoever.  (*See* Docs. 1-1 & 1-2, Exhibits A & B.)  The contracts identify

11

Jerry DeLuccio only in his capacity as an officer signing as "CEO" of EnhancedcareMD, the "Broker" (Exhibit A), and as "President" on behalf of EnhancedcareMD, "the entity" acting as the "Receiving Party" of the confidential information (Exhibit B).[2]   Black's Law Dictionary defines "entity" as "[a]n organization (such as a business or a governmental unit) that has a legal identity apart from its members or owners."  Black's Law Dictionary (11th ed. 2019).  The contracts clearly contemplate that the corporate entity, EnhancedcareMD, is the contracting party – not Jerry DeLuccio individually.

As mentioned above, the Addendum to the Sales Contract specifically names enhancedcare, Inc. as the other party to the Contract and reflects that Jerry DeLuccio executed the agreement again as CEO.  Nowhere in any of the agreements is there any indication that Plaintiffs were contracting with a partnership or the Individual Defendants.  In fact, the overwhelming evidence reflects that Plaintiffs were fully aware that enhancedcare, Inc. was the real party to the agreements since C&H drafted the agreements.

For the foregoing reasons, Count II of the Complaint is due to be dismissed.

---

[2] Additionally, the Addendum attached hereto as Exhibit A specifically names enhancedcare, Inc. as the other party to the Contract and reflects that Jerry DeLuccio signed again as CEO.

## III.   *Count III - Tortious Interference*

In Alabama, to prove that a defendant tortiously interfered with a business or contractual relationship, the plaintiff must show "(1) the existence of a protectable business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009).

Plaintiffs' sole allegation as to the Defendants' interference is found in paragraph 37 of the Complaint, to wit:

> 37. Plaintiff avers that Defendants' conduct constitutes tortious interference with Plaintiff's contractual relationship with employer and employee clients as well as the potential and/or pending clients that Defendants solicited away from Plaintiff.

Plaintiffs also attach a letter purportedly from C&H (not AHW) to Defendants, but addressed only to Jerry DeLuccio at enhancecareMD, where C&H makes only conclusory statements without any identifying any existing clients or customers or the contracts.  Plaintiffs have failed to sufficiently assert a claim for intentional interference because no identifiable customers, who were strangers to Defendants and who were in a business relationship with Plaintiffs, are named in the Complaint.  *See Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273–74 (S.D. Fla. 2010) (dismissing counterclaimant's Florida state law claim for tortious interference of a business relationship because the pleader's "bare allegation in its counterclaim lacks any specificity and is an example of 'threadbare

13

recitals of the elements of a cause of action, supported by mere conclusory statements, which do not suffice." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration omitted)).

Further, the complaint does not state that Plaintiffs have suffered any damage, and damages are required.  *White Sands Grp., L.L.C.*, 32 So. 3d at 14; *see also Hensley v. Poole*, 910 So. 2d 96, 106 (Ala. 2005) (affirming denial of counterclaim where there was no evidence that the defendant "did any more than *attempt* to entice customers away from" the counterclaimant); *Gelber v. Bd. of Trustees of Univ. of Alabama Sys.*, No. 2:15-CV-00571-MHH, 2017 WL 992145, at *5 (N.D. Ala. Mar. 15, 2017) (ordering plaintiff to show cause why claim should not be dismissed when the plaintiff did not allege directly or inferentially that defendants were strangers to a contract).

For the foregoing reasons, Count III of the Complaint is due to be dismissed.

## IV.  *Count IV – Violation of Alabama Trade Secrets Act*

In Count IV, Plaintiffs seek damages for Defendants' alleged violation of the Alabama Trade Secrets Act ("ATSA").  The claimed trade secrets that Defendants allegedly misappropriated, divulged, and disclosed to Plaintiffs' competitors are (1) Plaintiff's (singular) customer list; (2) the prices the customers were paying for Plaintiff's products and services; (3) specific technical data regarding Plaintiff's

program and plan processes; and (4) the Plaintiff's customers' level of satisfaction with Plaintiff's products and services.  (Doc. 1 ¶ 41.)

Section 8-27-2(1), Ala. Code 1975, a part of the Alabama Trade Secrets Act, defines a "trade secret" as information that

   a.  [i]s used or intended for use in a trade or business;

   b.  [i]s included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;

   c.  [i]s not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;

   d.  [c]annot be readily ascertained or derived from publicly available information;

   e.  [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy; ***and***

   f.  [h]as significant economic value.

(Emphasis added).  By using the conjunctive "and" to separate its subsections, § 8-27-2(1) requires that, in order to be considered a trade secret, the information at issue must satisfy all of the subsections—a through f.  *See Bell Aerospace Servs., Inc. v. U.S. Aero Servs.*, Inc., 690 F. Supp. 2d 1267, 1273 (M.D. Ala. 2010) ("[The party asserting the trade secret] has the burden of establishing each element [of § 8-27-2(1), Ala. Code 1975,] for the information in question to be considered a trade secret."); *Public Sys., Inc. v. Towry*, 587 So. 2d 969, 971 (Ala. 1991) ("The

15

burden is on the one asserting the trade secret . . . to show that it is included or embodied in the categories listed in § 8-27-2(1).").

Moreover, in order to survive a motion to dismiss, Plaintiffs were required to state their ATSA claim with plausible facts, such as the "trade secret" that Defendants allegedly disclosed and how and to whom it was divulged. It is not enough that Plaintiffs state what trade secrets Plaintiffs contend Defendants possess (Doc. 1 ¶ 41), but also that Defendants obtained such information in a manner that required Defendants to protect the information from disclosure and that Defendants, in fact, disclosed the information to a particular person or entity without authority to do so. *See* Doc. 1 ¶ 42 (making the vague and conclusory allegation that "[o]ne of [sic] more of these trade secrets were disclosed and divulged by Defendants, without a privilege to do so, to Plaintiff's competitors. . . ."). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Here, common sense advises that Plaintiffs should have particular facts to support a claim for violation of the ATSA. Nowhere in the four corners of the Complaint do Plaintiffs identify the information that constitutes a trade secret, how Defendants wrongfully disclosed that information, and to whom specifically the information was disclosed. Instead, Plaintiffs serve the "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements," which the Supreme Court has said "do not suffice" to state a claim. *Iqbal*, 556 U.S. at 678.

Additionally, it is unclear from the Complaint, not only what information constitutes a trade secret, but also which Plaintiff contends that it possessed the right to seek protection from the disclosure of such information. Specifically, Plaintiff C&H entered into agreements with enhancedcare, Inc. at a time when AHW did not exist.

For the foregoing reasons, Count IV of the Complaint is due to be dismissed.

## V. *Count V – Fraud, Conspiracy and Collusion*

In Count V, Plaintiffs seek damages for alleged fraudulent conduct by the Defendants. As shown below, Plaintiffs have failed to properly allege a fraud by the Defendants.

Fraud is "(1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation." *Deng v. Scroggins*, 169 So. 3d 1015 (Ala. 2014). "If fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive." *Id.* Fraud requires the plaintiff's reasonable reliance. *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997).

In the Complaint, Plaintiffs allege that Plaintiffs relied upon the contractual agreements between the parties when they acquiesced to Defendants' request for "Plaintiffs' proprietary documents" which Defendants claimed they needed to further for the parties' business relationship, while DeLuccio and Coffey allegedly "knew and did not disclose their plan to duplicate Plaintiff's documents and use them as their own." (Doc. 1 at ¶ 45.)

"[U]nder Rule 9(b), [plaintiffs] must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997). Stated differently, Plaintiffs must "set forth specific allegations as to each defendant that will fulfill the 'who, what, when, where and how' pertaining to the underlying fraud." *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1361 (S.D. Fla. 2015) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)). Notably, Plaintiffs do not allege the specific "proprietary documents" of Plaintiffs which Defendants are alleged to have duplicated and used; or the time or place where Defendants' alleged misrepresentations were made.

Additionally, it is unclear from the allegations of the Complaint, if Plaintiffs are alleging that they were fraudulently induced to enter into the purported

18

agreements by the Defendants.  Under Alabama law, fraudulent inducement consists of one party's "misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action."  *Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 994 (11th Cir. 2012) (citation omitted); *Anderson v. Amberson*, 905 So. 2d 811, 815 (Ala. Civ. App. 2004). "[T]he representee must have been deceived by and relied upon the representation as an inducement to his action or non-action." *Anderson*, 905 So. 2d at 816 (citation omitted).   Moreover, to prevail on such a claim, Plaintiffs must prove:  "(1) [Plaintiff] had a duty to speak the truth; (2) [Plaintiff] made a false representation of material fact; (3) [Plaintiff] justifiably relied upon the false representation; and (4) as a proximate result, [Defendant] suffered loss, harm, or damage."  *Wells Fargo Bank, N.A. v. Trotman*, 940 F. Supp. 2d 1359 (M.D. Ala 2013) (citing *McGriff v. Minnesota Mut. Life Ins. Co.*, 127 F.3d 1410, 1414 (11th Cir. 1997)).

Again, the Complaint is devoid of any of the necessary allegations to fulfill the who, what, when, where and how pertaining to the underlying fraudulent inducement.  Additionally, as noted above, Plaintiff AHW cannot possibly assert a claim for fraud, regardless of the type, because it was not in existence at the time the purported agreements were entered into and it is still unclear what if any rights it has

19

or may have to the purported information and documents that are at the center of this litigation.

Consequently, Count V of the Complaint is due to be dismissed as to the fraud claim.

In Count V, Plaintiffs also purport to assert claim for Conspiracy; however, Plaintiffs cannot establish a conspiracy because they cannot prevail on any of the other causes of action. To establish such a claim, Plaintiffs must prove "(1) concerted action by two or more persons (2) to achieve an unlawful purpose or a lawful purpose by unlawful means." *Ex parte Alamo Title Co.*, 128 So. 3d 700, 713 (Ala. 2013). "[L]iability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying wrong provides no cause of action, then neither does the conspiracy." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008) (citation omitted). The "underlying wrong" must sound in tort – not contract. *Ponder v. Lake Forest Prop. Owners Ass'n*, 214 So. 3d 339, 347 (Ala. Civ. App. 2015). As demonstrated herein, Plaintiffs have failed to properly assert an underlying tort (tortious interference, fraud, or conversion –the three alleged underlying wrongs, (*see* Doc. 1, Counts III, V and VI)) upon which Plaintiffs may base a conspiracy claim. Without such an underlying wrong, Plaintiffs' claims for conspiracy and collusion fail as a matter of law.

Additionally, Rule 9 requires that a conspiracy to commit a fraud also be pleaded with particularity. "It is necessary to plead fraudulent conspiracy with sufficient particularity to inform the multiple defendants of the facts forming the basis of the conspiracy." *Carlson v. Armstrong World Indus., Inc.*, 693 F. Supp. 1073, 1078 (S.D. Fla. 1987) (citing *Fullman v. Graddick*, 739 F.2d 553 (11th Cir. 1984)). Here, the two individual defendants are entitled to a pleading that gives each of them notice of these facts.

Consequently, Count V of the Complaint is also due to be dismissed as to the conspiracy and collusion claims.

## VI.    *Count VI – Conversion*

In Count VI, Plaintiffs also assert a claim for conversion of "Plaintiffs' intellectual property and proprietary processes." (Doc. 1, Count VI). A claim for conversion requires "a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Crown Life Ins. Co. v. Smith*, 657 So. 2d 821, 823 (Ala. 1994). And while, under certain circumstances, conversion can encompass the "wrongful taking of intangible property," the allegations set forth in the Complaint fail to reach the threshold requirement to state a claim. *Alfa Mut. Ins. Co. v. Veal*, 622 So. 2d 1292, 1296 (Ala. 1993).

Indeed, Courts from other states that have addressed this type of conversion have concluded that the appropriate claim is for a misappropriation of a trade secret and not conversion. *See Marley Co. v. FE Petro, Inc.*, 38 F. Supp. 2d 1070 (S.D. Iowa 1998) (applying Iowa law); *Soundvision Technologies, LLC v. Templeton Group Ltd.*, 929 F. Supp. 2d 1174 (D. Utah 2013) (applying Utah law) (Under Utah law, a conversion claim for intangible intellectual property is not allowed, and a claim for conversion is preempted to the extent that it is based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information).

Consequently, regardless of whether Alabama would recognize a claim for conversion in this instance, Plaintiffs have failed to state sufficient facts to demonstrate they are entitled to assert a claim for conversion.

## Conclusion

In summary, Defendants assert that the complaint and all claims asserted therein are due to be dismissed for the reasons set forth above.

Respectfully submitted this the 5th day of August, 2019.

/s/ Clark R. Hammond
Clark R. Hammond (HAM012)
Ben B. Robinson (ROB181)
chammond@wallacejordan.com
brobinson@wallacejordan.com
*Attorneys for Defendants*

22

**OF COUNSEL**:
WALLACE JORDAN RATLIFF & BRANDT, LLC
Post Office Box 530910
Birmingham, Alabama  35253
Telephone:   (205)870-0555
Facsimile:   (205)871-7534

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Christie D. Knowles (KNO-015)
Haley K. Tucker (TUC-045)
KNOWLES & SULLIVAN, LLC
400 Broad Street, Suite 105
Gadsden, AL  35901
christie@kkslawgroup.com
haley@kkslawgroup.com

/s/ Clark R. Hammond
Clark R. Hammond

23

FILED

2019 Aug-05  PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

# Agent/Broker Sales Agreement

## Schedule "A" Addendum to Contract Executed 6/6/2017

(Broker Enrolls): Broker will be compensated at a rate of **100%** of the total commissions on the sale of all products sold as a result of the "Wellness Reserve Account," including renewal payments.

## [ intentionally left blank ]

## Contract Addendum to Executed Contract 6/6/17

This Contract Addendum ("Memorandum") is made by and among enhancedcare, Inc. and their affiliates (enhancedcareMD), and Attentive Health & Wellness, LLC (Attentive) to complement the contract to which this addendum is attached.

WHEREAS, enhancedcareMD and Attentive wish to adapt the existing agreement in favor of a greater new relationship

WHEREAS, Attentive wishes to expand the working relationship and partnership to include the enhancedcareMD services in Wellness activity nationwide and within their SuperMEC solution

WHEREAS, enhancedcare has developed a leading edge software as a service (SAAS) platform that will be used on a case-by-case basis, with the related services for clients effective August 1, 2018.

1 | Page

# Agent/Broker Sales Agreement

**OPERATIONS:**

Separately, Attentive and enhancedcareMD agree to partner using the enhancedcareMD suite of services as the operating standard for the Attentive plan nationally and move to the new software as a service (SAAS) solution for named segments of the solution on a case-by-case basis. This strategic decision is designed to create both consistency and standardization nationally and to strengthen compliance for Attentive to deliver a more robust wellness plan to members. The new wellness SAAS model will be delivered to AHW by August 1, 2018.

- This addendum opens Attentive H&W accounts to the enhancedcare solutions. On new accounts sold by the non enhancedcareMD network in its current form (without the SAAS solution), enhancedcareMD will receive $28 pepm through the agreed ACH process stated in the revised MSA and $32 pepm for all **AHW MEC clients and $34 pepm for all non MEC clients** that include the new software and services (SAAS).

  In non MEC sales using the new SAAS solution enhancedcareMD will be compensated at a rate of $46.00 per month per employee (pepm) on all lives sold by enhancedcareMD's internal staff sales persons and $34 for sales from all external assigned sales staff

  Each unique wellness URL incurs an operating out of pocket cost of $250 to setup the unique platform for the Client. This includes including the client's logo, unique URL, and the standard program services. AHW and ecMD will share the setup cost equally.

  In addition, clients may wish to forge a complete general or contingent wellness program and in these cases, there will be a separate charge calculated for that client's approval. (custom tiles, challenges, rewards, fulfillment of those rewards ) and those setup charges will be billed directly to the client

- enhancedcareMD agrees to collaborate with Attentive in continuing process development and Creating and executing a selling and marketing strategy including a library of materials to share nationally. Broker Training will be coordinated exclusively by Attentive and enhancedcareMD will share training and learning organization best practices with Attentive as part of this agreement.

- Both parties agree to share subsequent marketing or sales documents to create one library for Regional and Independent Brokers to access for their use.

All other parts of the contract not specifically mentioned here remain in effect per the contract including confidentiality, termination, etc.

Signature Page to Follow

# Agent/Broker Sales Agreement

**Attentive Health & Wellness, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**EnhancedcareMD**

By: _____

Name: _____

Title: _____

Date: _____

FILED
2019 Aug-05  PM 03:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit B

**enhancedcareMD**
**AHW Software as a Service (SAAS) PARTNER AGREEMENT**

This Agreement ("Agreement") is made by and between AHW, LLC hereinafter referred to as ("AHW") with its principal place of business at 70 Grimes Drive, Guntersville, AL 35976 and enhancedcareMD with its principal place of business at 1290 University Avenue, Rochester, NY 14607 (EcMD). Each party may be referred to in this Agreement as a "Party" or collectively as "Parties."

WHEREAS, EcMD has created and provides a comprehensive wellness management solution. The solution is an interactive health risk assessment and health and wellness management program including medical services and extensive coaching for end user participants, which generates reports and recommended plans of action, as well as educational materials, based on information that an end user participant enters into the system. These reports can be used by the end user participant to learn more about health and wellness information, and track and monitor the end user participant's particular health situation.

WHEREAS, AHW wishes to partner with EcMD to make the Software as a Service (SAAS) wellness solution available to its Clients, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the foregoing, and the mutual and respective covenants and agreements of the Parties set forth herein, the Parties agree as follows:

## 1. DEFINITIONS

Except as specifically indicated, the following terms have the following meanings in this Agreement (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

a)      **"Account"** means the account established by EcMD through the Client Instance when a Participant completes an application on the form approved by EcMD and agrees to the terms of a Participation Agreement.

a)      **"Service"** means the interactive health risk assessment and health and wellness management program for end user participants which generates reports and recommended plans of action, as well as educational materials, based on information that an end user participant enters into the system. Actual care services are included as well in terms of Coaches, RNs, MDs and Counselors. It may include physical paper copies that would provide similar types of materials and information.

b)      **"Applicable Law"** means, collectively, all federal, state and local statutes, codes, ordinances, regulations, and laws, which are applicable to a Party in the performance of its obligations under this Agreement.

c)      **"AHW Content"** means the text, graphics, photographs, video, audio and all other data and information of AHW provided by AHW and its representatives to EcMD to be made available on a Client Company Instance.

-1-                                                               Ver 1.10

d)      **"Client Content"** means the text, graphics, photographs, video, audio and all other data and information of Client provided by Client to EcMD to be made available on a Client Instance.

e)      **"Client Instance"** means a website specifically for one or more Client deployments and their respective Participants, containing the Service content and functionality, with any customization provided as defined in this Agreement.

f)      **"Confidential Information"** has the meaning set forth in Section 4.1.

g)      **"Materials"** includes the materials, information and data presented to Clients and Participants in the Service.

h)      **"Participant"** means an individual that opens an Account through the Client Instance and is a member of Client's workforce or is a spouse or dependent of a member of Client's workforce.

i)      **"Term"** means the initial term of this Agreement and each renewal term, if any.

j)      **"EcMD Services"** has the meaning set forth in Section 2.2.

**2.  ECMD SERVICES Licensing.** Subject to the term and restrictions set forth in this Agreement, EcMD hereby grants to AHW, during the Term of this Agreement, a non-exclusive, non-transferable license to market EcMd Services within the AHW solution. EcMD will be responsible for the development, operation, hosting and maintenance of the Service in accordance with this Agreement.

**2.2.    EcMD Services.** Subject to the terms and conditions of this Agreement, EcMD shall provide to AHW the Services set forth in **the Master Agreement between the two companies**

**2.3.    Orders and Acceptance.** AHW's orders will be made by means of work order (form) signed or forwarded by an authorized representative of AHW that is e-mailed to support@enhancedcaremd.com. This form will be provided under separate cover. No order will be binding until received by EcMD in writing, and EcMD will have no liability to AHW with respect to work orders that are not received in writing e.g. email acknowledgment.

These work orders will identify the client who needs to be loaded, anticipated go live date, and whether the client will be customized with their logo and colors. If customized, the logo and colors will need to be provided ecMD in the stated formats at the time of work order submission. In the regular course of business, ecMD needs 10 business days to turn around the work order to a completed site.

-2-

Ver 1.10

**2.4.    General Restrictions.** Except as otherwise explicitly provided in this Agreement or as may be expressly permitted by Applicable Law, AHW will cause itself and its employees and agents to not: (a) use or copy a Client Instance or the Service, or any of the data, algorithms and calculations, or any portion thereof (excluding any Client Content or AHW Content), except as expressly authorized in this Agreement; (b) copy, modify, or prepare derivative works based upon the Client Instance or the Service; (c) alter, remove, or obscure any copyright or other proprietary notices or labels on or in a Client Instance or the Service; (d) circumvent or disable any technological features or measures in the Service; (e) interfere with or disrupt the integrity or performance of the Service; (f) claim any rights to or ownership of (except through the rights granted under this Agreement) a Client Instance or the Service or any derivative thereof or (g) attempt to gain unauthorized access to the Service.   AHW acknowledges and agrees that the Client Instance and the Service contain Confidential Information, data and trade secrets of EcMD and its licensors.  AHW shall not use any deceptive means to refer Users to a Client Instance, including but not limited to misleading advertising or advertising that describes the services on the Client Instance in a manner that is materially inconsistent with the scope of services provided therein.

**2.5.    Cooperation.** For EcMD to provide the Client Instance and the Service as set forth in this Agreement, AHW and their authorized representatives must cooperate with and provide reasonable assistance to EcMD.  From time to time, AHW's prompt decisions and approvals will be required, and EcMD will be entitled to rely on AHW's decisions and approvals provided in connection with this Agreement.  The services provided by EcMD under this Agreement are dependent upon the accuracy and timely provision of the information provided by authorized representatives and AHW. AHW understands that to the extent such information is inaccurate or not provided in a timely manner, the services to be provided under this Agreement may be negatively affected.

**2.6.    AHW Obligations.** AHW will (a) use commercially reasonable efforts to represent and sell the Service as part of their comprehensive Wellness Solution and the EcMD Services into the market; (b) not defame, denigrate or otherwise discourage Clients and potential Clients in any manner regarding the Service and the EcMD Services; c) not (i) retain or distribute any other copies of any Materials without the express written permission of EcMD, (ii) modify or make derivative works of the Materials, or (iii) incorporate the Materials in any other Web page.  All right, title, and interest in and to the Materials and all intellectual property rights therein will remain with EcMD and its licensors and no ownership interest is transferred to AHW by virtue of the Materials being available through the Service and the EcMD Services.

**2.7.    Reporting.** EcMD will provide AHW with super Admin Access to generate reports for any client within the system. .

Ver 1.10

**2.8. WARRANTIES AND DISCLAIMER OF WARRANTIES EcMD Warranties.** EcMD represents and warrants that: (a) this Agreement has been duly executed and delivered and constitutes a valid and binding agreement enforceable against EcMD in accordance with its terms; (b) no authorization or approval from any third party is required in connection with EcMD's execution, delivery, or performance of this Agreement; (c) the execution, delivery, and performance of this Agreement does not violate the laws of any jurisdiction or the terms or conditions of any other agreement to which EcMD is a party or by which it is otherwise bound; and (d) EcMD's business and operations, including any operations conducted through third parties, are conducted in compliance with Applicable Law.

**2.9. AHW Warranties.** AHW represents and warrants that: (a) this Agreement has been duly executed and delivered and constitutes a valid and binding agreement enforceable against AHW in accordance with its terms; (b) no authorization or approval from any third party is required in connection with AHW's execution, delivery, or performance of this Agreement; (c) the execution, delivery, and performance of this Agreement does not violate the laws of any jurisdiction or the terms or conditions of any other agreement to which AHW is a party or by which it is otherwise bound; and (d) AHW's business and operations, including any operations conducted through third parties, are conducted in compliance with Applicable Law.

**2.10. WARRANTY DISCLAIMER.** EXCEPT FOR THE EXPRESS WARRANTIES PROVIDED IN THIS SECTION 2, NEITHER PARTY MAKES ANY ADDITIONAL REPRESENTATION OR WARRANTY OF ANY KIND WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW), OR STATUTORY, AS TO ANY MATTER WHATSOEVER. EACH PARTY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, AND TITLE, AND ALL DELIVERABLES HEREUNDER ARE ACKNOWLEDGED TO BE "AS IS" AND "WHERE IS". THE CLIENT INSTANCE AND THE SERVICE MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS AS WELL AS THE USE OR MISUSE OF THE PARTICIPANT. ECMD IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS. AHW WILL NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF ECMD TO ANY PARTICIPANT OR OTHER THIRD PARTY.

**3. PRIVACY AND DATA SECURITY**

**3.1. Privacy and HIPAA Assurances**

a) **Protected Health Information.** EcMD and AHW are committed to protect the privacy of personal health information attached to Participants (and their employers and family members) that may be collected through the performance of this Agreement ("Protected Health Information"). To the extent that AHW is a "Business Associate" (as defined at 45 C.F.R. § 160.103) of its Client(s), related to the Service provided to such Clients, the Parties agree to the terms of this agreement.

-4-

Ver 1.10

b)      **De-Identified Data.**   Notwithstanding the provisions of this Section, EcMD and its subcontractors have a perpetual, irrevocable right to use and disclose non-personally identifiable information provided that the disclosed information does not include a key or other mechanism that would enable the information to be re-identified.

**3.2.**   **HIPAA Policy:**   EcMD maintains a HIPAA Privacy and Security Compliance Program. EcMD will, as part of the policy, review and update that policy as required by relevant federal, state and local laws and regulations.

## 4.      CONFIDENTIALITY

**4.1.**   **Definition of Confidential Information relative to the SAAS agreement.**   "Confidential Information" means any and all information and material disclosed by one Party ("Discloser") to the other Party ("Recipient") or its Representatives (as defined below) (before or after the signing of this Agreement, and whether in writing, or in oral, graphic, electronic or any other form) that is (a) marked in writing as or provided under circumstances reasonably indicating it is confidential or proprietary, or if disclosed orally or in other intangible form or in any form that is not so marked, that is identified as confidential at the time of such disclosure; or (b) not generally known to the public or other third parties who could derive economic value from its use or disclosure. Confidential Information, includes, without limitation, any (i) secret, know-how, idea, invention, process, technique, algorithm, program (whether in source code or object code form), hardware, device, design, schematic, drawing, formula, data, plan, strategy and forecast of, and (ii) proprietary technical, engineering, manufacturing, product, marketing, customer, servicing, financial, personnel and other proprietary information and materials of, Discloser and its employees, consultants, investors, affiliates, licensors, suppliers, partners, customers, clients and other persons and entities. For purposes of this Agreement, "Representatives" refers to any person, its directors, officers, employees, agents and advisors (including, without limitation, consultants, clients, customers, partners, financial advisors, banks and other financing sources, attorneys, accountants and their respective Representatives).  To the extent applicable, all references in this agreement to EcMD, AHW, Recipient or Discloser, shall also be deemed to be references to each of their respective Representatives.

-5-

Ver 1.10

**4.2.    Nondisclosure and Permitted Use.**  Recipient shall hold all Confidential Information in strict confidence and shall not disclose or distribute any Confidential Information to any third party other than to its employees and agents who need to know such information and who are bound in writing by restrictions regarding disclosure and use of such information comparable to and no less restrictive than those set forth herein and provided that Recipient shall be responsible for the conduct of all such employees and agents.  Recipient shall not use any Confidential Information for the benefit of itself or any third party or for any purpose other than to perform its obligations under this Agreement.  Recipient shall take the same degree of care that it uses to protect its own confidential and proprietary information and materials of similar nature and importance (but in no event less than reasonable care) to protect the confidentiality and avoid the unauthorized use, disclosure, publication or dissemination of the Confidential Information.  Recipient shall not make any copies of the Confidential Information except to the extent reasonably necessary to carry out its obligations under this Agreement, or unless otherwise approved in writing in advance by Discloser.  Any such copies made shall be identified as the property of Discloser and marked "confidential," "proprietary" or with a similar legend.  The obligations of this Section 4.2 with respect to any item of Confidential Information shall survive any termination or expiration of this Agreement and continue for five years from the date of Recipient's receipt of such Confidential Information.

**4.3.    Scope.**  The obligations of this Section, including the restrictions on disclosure and use, shall not apply with respect to any Confidential Information to the extent such Confidential Information: (a) is or becomes publicly known through no act or omission of Recipient; (b) was rightfully known by Recipient before receipt from Discloser, as evidenced by Recipient's contemporaneous written records; (c) becomes rightfully known to Recipient without confidential or proprietary restriction from a source other than Discloser that does not owe a duty of confidentiality to Discloser with respect to such Confidential Information; or (d) was independently developed by Recipient without the use of or reference to the Confidential Information of Discloser, as evidenced by Recipient's contemporaneous written records.   In addition, Recipient may use or disclose Confidential Information to the extent (i) approved by Discloser or (ii) Recipient is legally compelled to disclose such Confidential Information, provided, however, that prior to any such compelled disclosure, Recipient shall give Discloser reasonable advance notice of any such disclosure and shall cooperate with Discloser in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of such disclosure and/or use of the Confidential Information.

**4.4.    Remedies.**  Due to the unique nature of each Party's Confidential Information, the unauthorized disclosure or use of Discloser's Confidential Information will cause irreparable harm and significant injury to Discloser, the extent of which will be difficult to ascertain and for which there may be no adequate remedy at law.  Accordingly, Discloser, in addition to any other available remedies, shall have the right to an immediate injunction and other equitable relief enjoining any breach or threatened breach of this Section 4.4 without the necessity of posting any bond or other security.  The Recipient shall notify Discloser in writing immediately upon Recipient becoming aware of any such breach or threatened breach.

-6-                                                                   Ver 1.10

**4.5.** **Confidentiality of Agreement.** Neither party to this Agreement will disclose the terms of this Agreement to any third party without the written consent of the other party, except as required by securities or other applicable laws. Notwithstanding the above provisions, each party may disclose the terms of this Agreement (a) in connection with the requirements of a public offering or securities filing; (b) in confidence, to accountants, banks, and financing sources and their advisors; (c) in confidence, in connection with the enforcement of this Agreement or rights under this Agreement; or (d) in confidence, in connection with a merger or acquisition or proposed merger or acquisition, or the like.

**4.6.** **Return of Materials.** Upon the termination or expiration of this Agreement, or upon earlier request, each Party will deliver to the other all Confidential Information (including all copies thereof) that it may have in its possession or control. Notwithstanding the foregoing, neither Party will be required to return materials that it must retain in order to receive the benefits of this Agreement or properly perform in accordance with this Agreement provided that any retain Confidential Information shall remain subject to the terms hereof.

## 5. INDEMNIFICATION BY ECMD

**5.1.** **Defense by EcMD.** Except for claims subject to Section 4, EcMD will defend AHW and its owners, directors, officers, employees and agents (together with its and their affiliates, successors and assigns, the "AHW Indemnitees") from any actual or threatened third party claim: (a) that the Client Instance or the Service infringes or misappropriates any U.S. patent issued as of the Effective Date or any copyright or trade secret of any third party; (b) resulting from any grossly negligent or willful misconduct of EcMD in rendering or performing any of the Services contemplated in this Agreement to be performed by EcMD; or (c) resulting from any violation or breach caused by EcMD of any federal, state or local law, regulation or rule. AHW shall give EcMD prompt written notice of any such claim, give EcMD full and complete control over the defense and settlement of the claim, provide assistance in connection with the defense and settlement of the claim as EcMD may reasonably request, and comply with any settlement or court order made in connection with the claim (e.g., relating to the future use of any infringing materials).

**5.2.** **Infringement Indemnification.** EcMD will indemnify the AHW Indemnitees against: (a) all damages and costs finally awarded against AHW Indemnitees in any proceeding under Section 4.1; (b) all out-of-pocket costs (including reasonable attorneys' fees) reasonably incurred by AHW in connection with the defense of such proceeding (other than attorneys' fees and costs incurred without EcMD's consent after EcMD has accepted defense of such claim); and (c) if any proceeding arising under Section 4.1 is settled, all amounts paid to any third party as agreed to by EcMD in settlement of any such claims.

-7-                                                    Ver 1.10

**5.3.    Mitigation of Infringement Action.**  If permitted use of the Client Instance or the Service is, or in EcMD's reasonable opinion is likely to become, enjoined or materially diminished as a result of a proceeding arising under Section 4.1, then EcMD will either at its discretion: (a) procure the continuing right to use of the Client Instance or the Service; (b) replace or modify the Client Instance or the Service in a functionally equivalent manner so that it no longer infringes; or if, despite its commercially reasonable efforts, EcMD is unable to do either (a) or (b), EcMD will (c) terminate the licenses and services with respect to the Client Instance or the Service subject to the infringement claim and refund to AHW a pro-rated portion of all unused Fees pre-paid by AHW for the terminated licenses and services (if any) and this Agreement and any future obligations of EcMD will terminate.

**5.4.    Exceptions.**  EcMD will have no obligation under this Section for any third party claim to the extent that it arises out of or is based upon (a) unauthorized use of the Client Instance or the Service; (b) any non-standard aspect of the Client Instance or the Service that is provided to comply with a specific design, requirement, or specifications specifically required by or provided by AHW; (c) failure to use the Client Instance or the Service in accordance with instructions provided by EcMD; or (d) any modification of the Client Instance or the Service not made or authorized in writing by EcMD.  AHW is responsible for any costs or damages that result from these actions.

**5.5.    Exclusive Remedy.**  This Section states EcMD's sole and exclusive liability, and AHW's sole and exclusive remedy, for the actual or alleged infringement or misappropriation of any third party intellectual property right by the Client Instance or the Service.

**6.    INDEMNIFICATION BY AHW AND CLIENT**

**6.1.    Defense of Claims.**  AHW will defend EcMD and its owners, directors, officers, employees and agents (together with its and their affiliates, successors and assigns, the "EcMD Indemnitees") from any actual or threatened third party claim: (a) arising out of or based upon EcMD's authorized use of AHW's or Client's trademarks or any other materials provided by AHW to EcMD under this Agreement; (b) resulting from any grossly negligent or willful misconduct of AHW or Client; or (c) resulting from any violation or breach caused by AHW or Client of any federal, state or local law, regulation or rule.  EcMD will give AHW prompt written notice of any such claims, grant AHW full and complete control over the defense and settlement of the claim, assist AHW with the defense and settlement of the claim as AHW may reasonably request and at AHW 's expense, and (d) comply with any settlement or court order made in connection with the claim.

**6.2.    Indemnification.**  AHW will indemnify the EcMD Indemnitees against: (a) all damages and costs finally awarded against EcMD Indemnitees in any proceeding under Section 6.1; (b) all out-of-pocket costs (including reasonable attorneys' fees) reasonably incurred by EcMD in connection with the defense of such proceeding (other than attorneys' fees and costs incurred without AHW 's consent after AHW has accepted defense of such claim); and (c) if any proceeding arising under Section 6 is settled, AHW will pay any amounts to any third party agreed to by AHW in settlement of any such claims.

-8-

Ver 1.10

**6.3.    Mitigation of Infringement Action.**  If permitted use of AHW's trademarks or any other materials provided by AHW to EcMD under this Agreement are, or in AHW 's reasonable opinion is likely to become, enjoined or materially diminished as a result of a proceeding arising under Section 6, then AHW will either: (a) procure the continuing right to use the trademarks or other materials provided by AHW; or (b) replace or modify the trademarks or materials provided by AHW so that they no longer infringe.

**6.4.    Exceptions.**  AHW will have no obligation under this Section 6 for any third party claim to the extent that it arises out of or is based upon (a) unauthorized use of AHW trademarks or any other materials provided by AHW to EcMD under this Agreement; (b) failure to use AHW trademarks or any other materials provided by AHW to EcMD under this Agreement in accordance with instructions provided by EcMD; or (c) any modification to AHW trademarks or any other materials provided by AHW to EcMD under this Agreement not made or authorized in writing by AHW. EcMD is responsible for any costs or damages that result from these actions.

**6.5.    Exclusive Remedy.**  This Section states AHW's sole and exclusive liability, and EcMD's sole and exclusive remedy, for the actual or alleged infringement or misappropriation of any third party intellectual property right by AHW's trademarks or any other materials provided by AHW to EcMD under this Agreement.

-9-                                    Ver 1.10

## 7.    LIMITATION OF LIABILITY

**7.1.    Disclaimer of Indirect Damages.**   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, NEITHER PARTY WILL, UNDER ANY CIRCUMSTANCES, BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE TRANSACTION CONTEMPLATED UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO LOST PROFITS OR LOSS OF BUSINESS, EVEN IF THE PARTY IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING. ALL ACTIONS AND CLAIMS WHICH ONE PARTY MAY HAVE AGAINST THE OTHER SHALL BE BROUGHT PROMPTLY AFTER DISCOVERY AND IN NO EVENT AFTER ONE YEAR AFTER DISCOVERY OR SHALL THEREAFTER BE BARRED.

**7.2.    Cap on Liability.**   EXCEPT FOR A BREACH OF ARTICLE 3 OR 5, EACH PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY UNDER THIS AGREEMENT SHALL NOT EXCEED THE FEES OWED BY CLIENT TO ECMD IN THE TWELVE MONTH PERIOD IMMEDIATELY PRECEDING THE ACCRUAL OF ANY CLAIM, REGARDLESS OF THE FORUM AND REGARDLESS OF WHETHER ANY ACTION OR CLAIM IS BASED ON CONTRACT, TORT, OR OTHERWISE.

**7.3.    Independent Allocations of Risk.**   EACH PROVISION OF THIS AGREEMENT THAT PROVIDES FOR A LIMITATION OF LIABLITY, DISCLAIMER OF WARRANTY, OR EXCLUSION OF DAMAGES IS TO ALLOCATE THE RISKS OF THIS AGREEMENT BETWEEN THE PARTIES. THIS ALLOCATION IS REFLECTED IN THE PRICING OFFERED BY ECMD TO AHW AND IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES.   EACH OF THESE PROVISIONS IS SEVERABLE AND INDEPENDENT OF ALL OTHER PROVISIONS OF THIS AGREEMENT, AND EACH OF THESE PROVISIONS WILL APPLY EVEN IF THE REMEDIES IN THIS AGREEMENT HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

## 8.    GENERAL PROVISIONS

**8.1.    Independent Contractors.**   The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement should be construed to give either Party the power to (a) act as an agent or (b) direct or control the day-to-day activities of the other.   Financial and other obligations associated with each Party's business are the sole responsibility of that Party.   EcMD may utilize one or more subcontractors or other third parties to perform its duties under this Agreement so long as EcMD remains responsible for all of its obligations under this Agreement.

-10-                                                                                         Ver 1.10

**8.2.    Assignability.** AHW may not assign its right, duties, or obligations under this Agreement without the other Party's prior written consent, except to a successor-in-interest in connection with a merger, acquisition, or sale of all or substantially all assets or a company restructuring without changing the ultimate controlling ownership of the company, if consent is given, this Agreement will bind the Party's successors and assigns.  Any attempt by a Party to transfer its rights, duties, or obligations under this Agreement except as expressly provided in this Agreement is void.

**8.3.    Non-solicitation and Non-compete.** During the term of this Agreement and for a period of one year thereafter, neither party will, directly or indirectly, employ, engage, hire or solicit or accept the employment or services of an employee or independent contractor of the other party without the prior written consent of the other party.  AHW will not seek to reverse, rewrite or copy the software as a service solution for commercial reasons to replace or compete with enhancedcare during the term of this agreement and for one year thereafter.  This excludes the use of any software presently in place or available in the marketplace.

**8.4.    Notices.** Any notice required or permitted to be given in accordance with this Agreement will be effective if it is in writing and sent by certified or registered mail, or insured courier, return receipt requested, to the appropriate Party at the address set forth below and with the appropriate postage affixed. Either Party may change its address for receipt of notice by notice to the other Party in accordance with this Section 8.4. Notices are deemed given two business days following the date of mailing or one business day following delivery to a courier or sent by facsimile or e-mail:

-11-                                                                                  Ver 1.10

To AHW:

> 70 Grimes Drive
>
> Guntersville, Ala 35976
>
> Att:  Dr T. Lamb

To EcMD:

> EcMD
> enhancedcareMD
> 1290 University Ave,#G
> Rochester, NY 14607
> Att: Mr. J. DeLuccio

**8.5.**    **Force Majeure.**  Neither party will be liable for, or be considered to be in breach of or default under this Agreement on account of, any delay or failure to perform as required by this Agreement as a result of any cause or condition beyond the party's reasonable control, so long as the party uses commercially reasonable efforts to avoid or remove such causes of non-performance.

**8.6.**    **Publicity.**   With Prior written consent, EcMD may advertise and publish its business relationship with AHW, including the fact that it is providing services relating to this Agreement.

**8.7.**    **Governing Law and Venue.**  This Agreement will be interpreted, construed, and enforced in all respects in accordance with the local laws of the State of NY, Monroe County, without reference to its choice of law rules. All actions brought to interpret or enforce this Agreement shall be brought in the exclusive forum of the courts located in Rochester, NY and all parties agree not to assert any defenses based on lack of personal jurisdiction, forum, non conveniens or inappropriate venue. All service of process may be furnished by mail to the party's last known personal or business residence. This Agreement and all related agreements between the Parties are personal and unique to each Party and each Party agrees that it will not directly or indirectly attempt to form, aid or abet, or certify a class action or similar group of plaintiffs whether or not constituting a class against the other Party.

**8.8.**    **Waiver.**  The waiver by either Party of any breach of any provision of this Agreement does not waive any other breach.  The failure of any Party to insist on strict performance of any covenant or obligation in accordance with this Agreement will not be a waiver of such Party's right to demand strict compliance in the future, nor will the same be construed as a novation of this Agreement.

**8.9.**    **Severability.**  If any part of this Agreement is found to be illegal, unenforceable, or invalid, the remaining portions of this Agreement will remain in full force and effect.  If any material limitation or restriction on the grant of any rights to AHW under this Agreement is found to be illegal, unenforceable, or invalid, the right granted will immediately terminate.

-12-

Ver 1.10

**8.10. Counterparts.** This Agreement may be executed in any number of identical counterparts, notwithstanding that the Parties have not signed the same counterpart, with the same effect as if the Parties had signed the same document. All counterparts will be construed as and constitute the same agreement. This Agreement may also be executed and delivered by facsimile or pdf and such execution and delivery will have the same force and effect of an original document with original signatures.

**8.11. Entire Agreement.** This Agreement, including all exhibits, is the final and complete expression of the SAAS agreement between these Parties regarding the Client Instance. This Agreement supersedes, and the terms of this Agreement govern, all previous oral and written communications regarding these matters, all of which are merged into this Agreement. No employee, agent, or other representative of EcMD has any authority to bind EcMD with respect to any statement, representation, warranty, or other expression unless the same is specifically set forth in this Agreement. No usage of trade or other regular practice or method of dealing between the Parties will be used to modify, interpret, supplement, or alter the terms of this Agreement. This Agreement may be changed only by a written agreement signed by an authorized agent of the Party against whom enforcement is sought.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

-13-

Ver 1.10

**IN WITNESS WHEREOF**, this Agreement is executed by the Parties' authorized officers and shall be effective as of the date first above written.

**Attentive Health & Wellness, LLC**

By: David Chaviers

Its: CEO

Date:

**enhancedcareMD**

By: Jerome j deluccio

Its: CEO

Date: 8/1/18

-14-

Ver 1.10

## Exhibit A

### BUSINESS ASSOCIATE ADDENDUM

To the extent AHW meets the definition of a "Business Associate" (as those terms are defined in 45 C.F.R. § 160.103) to its Clients, the services provided by EcMD ("partner") may involve the use and disclosure of health information that is protected by federal law as defined below ("PHI"). Therefore, Partner and AHW wish to agree to the terms of this **BUSINESS ASSOCIATE ADDENDUM** ("Addendum") in order to set forth the obligations regarding PHI.

1. Definitions.

- Breach. "Breach" shall have the meaning set forth at 45 C.F.R. § 164.402.

- Electronic Health Record. "Electronic Health Record" shall mean an electronic record of health-related information on an Individual that is created, gathered, managed, and consulted by authorized health care clinicians and staff.

- Electronic PHI. "Electronic PHI" shall have the same meaning as the term "electronic protected health information" at 45 C.F.R. § 160.103, limited to the information created or received by Partner from or on behalf of AHW or its Clients.

- HIPAA. "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended, and the implementation regulations thereunder, including without limitation the HITECH Standards (as defined below), and all future regulations promulgated thereunder.

- HIPAA Rules. "HIPAA Rules" means the Privacy Rule (as defined below) and the Security Rule (as defined below).

- HITECH Standards. "HITECH Standards" means Subtitle D of the Health Information Technology for Economic and Clinical Health Act ("HITECH"), found at Title XIII of the American Recovery and Reinvestment Act of 2009, and any regulations promulgated thereunder, including all amendments to the HIPAA Rules.

- Individual. "Individual" shall have the same meaning as the term "individual" at 45 C.F.R. § 160.103, and any amendments thereto, and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

- Privacy Rule. "Privacy Rule" means the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164.

- Protected Health Information. "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" at 45 C.F.R. § 160.103, and any amendments thereto, limited to the information created or received by Partner from or on behalf of AHW or its Clients.

-15-

Ver 1.10

- Required By Law. "Required By Law" shall have the same meaning as the term "required by law" at 45 C.F.R. § 164.103.

- Secretary. "Secretary" shall mean the Secretary of the United States Department of Health and Human Services or his/her designee.

- Security Incident. "Security Incident" shall have the same meaning as the term "security incident" at 45 C.F.R. § 164.304.

- Security Rule. "Security Rule" shall mean the Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Part 160, 162, and 164.

- Unsecured PHI. "Unsecured PHI" means PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the Secretary in accordance with the HITECH Standards.

- Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in the Privacy Rule, the Security Rule, the HITECH Standards or any future regulations promulgated or guidance issued by the Secretary thereunder.

2.   Obligations and Activities of Partner.

a)   Partner agrees to not use or disclose PHI other than as permitted or required by this Addendum, the Agreement or any other underlying agreement between the Parties or as Required By Law.

b)   Partner will make reasonable efforts to the extent practicable, to limit requests for and the use and disclosure of PHI to a Limited Data Set (as defined in 45 C.F.R. § 164.514(e)(2)) or, if needed by Partner, to the minimum necessary PHI to accomplish the intended purpose of such use, disclosure or request, and as applicable, in accordance with the regulations and guidance issued by the Secretary on what constitutes the minimum necessary for Partner to perform its obligations to AHW under this Addendum or as Required By Law.

c)   Partner agrees to use appropriate safeguards to prevent use or disclosure of the PHI other than as provided for by this Addendum, including the implementation of administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of Electronic PHI that it creates, receives, maintains or transmits on behalf of AHW. Partner shall abide by the Security Standards for the Protection of Electronic PHI at 45 C.F.R. Part 164, Subpart C, including the Administrative Safeguards at 45 C.F.R. § 164.308, the Physical Safeguards at 45 C.F.R. § 164.310, the Technical Safeguards at 45 C.F.R. § 164.312, and the policies and procedures and documentation requirements at 45 C.F.R. § 164.316, to the same extent such provisions apply to AHW and its Clients.

-16-                                                Ver 1.10

d)   Partner agrees to mitigate, to the extent practicable, any harmful effect that is known to Partner of a use or disclosure of PHI by Partner in violation of the requirements of this Addendum.

e)   Partner agrees to report to AHW any use or disclosure of the PHI not provided for by this Addendum of which it becomes aware. To the extent that Partner creates, receives, maintains or transmits Electronic PHI, Partner agrees to report promptly to AHW any Security Incident, as determined by Partner, involving PHI of which Partner becomes aware. Partner hereby notifies AHW of the ongoing existence and occurrence of attempted but unsuccessful Security Incidents and AHW acknowledges and agrees that no additional notification to AHW of such unsuccessful Security Incidents is required.

f)   Following Partner's discovery of a use or disclosure of Unsecured PHI that is not provided for by this Addendum, Partner shall promptly perform a risk assessment to determine whether the use or disclosure qualifies as a Breach. Following such risk assessment, Partner shall notify AHW of the Breach without unreasonable delay, and in no event later than five (5) calendar days after Partner, or any of its employees or agents, discovered the Breach. Such notification shall include, to the extent possible, the identification of each Individual whose Unsecured PHI has been, or is reasonably believed by Partner to have been, accessed, acquired, used, or disclosed during the Breach and any other information available to Partner about the Breach which is required to be included in the notification of the Breach provided to the Individual in accordance with 45 C.F.R. §164.404(c). A Breach of Unsecured PHI shall be treated as discovered as of the first day on which such Breach is known to Partner or should have be known to Partner by exercising reasonable diligence.

g)   Partner agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Partner on behalf of AHW, agrees in writing to the same restrictions and conditions that apply through this Addendum to Partner with respect to such information. Moreover, Partner agrees to ensure any such agent or subcontractor agrees to implement reasonable and appropriate safeguards to protect Electronic PHI.

h)   Partner agrees to provide access, at the request of AHW or a Client, and in a time and manner mutually acceptable to Partner, the Client, and AHW to PHI in a Designated Record Set, to AHW or its Client, or as directed by AHW or its Client, to an Individual in order to meet the requirements under 45 C.F.R. § 164.524.

i)   Partner agrees to make any amendment(s) to PHI in its possession contained in a Designated Record Set that AHW or its Client directs or agrees to pursuant to 45 C.F.R. § 164.526 at the request of AHW or its Client, and in the time and manner mutually acceptable to Partner, and AHW, and the Client.

j)   Partner agrees to document such disclosures of PHI and information related to such disclosures as would be required for a Client and AHW to respond to a request by an

-17-                                                                Ver 1.10

Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528.

k)   Within ten (10) business days (or such other date that Partner and AHW may reasonably agree upon) of receiving written notice from AHW or a Client that Client has received a request for an accounting of disclosures of PHI from an Individual, Partner agrees to provide to AHW or the Client information collected to permit Client to make the accounting required in accordance with 45 C.F.R. § 164.528.

l)   Partner agrees to make its internal practices, books, and records, including policies and procedures, relating to the use and disclosure of PHI received from, or created or received by Partner on behalf of, a Client, available to the Secretary for purposes of determining the Client's, AHW's, and Partner's compliance with the Privacy Rule.

m)   To the extent Partner is delegated to carry out a Client's obligations under the Privacy Rule, Partner shall comply with the requirements of the Privacy Rule that apply to Client in the performance of such delegated obligations.

n)   The Parties agree that the HITECH Standards that are applicable to AHW shall also be applicable to Partner and are hereby incorporated herein by reference. In the event the Secretary issues regulations that require specific modifications to this Addendum related to these provisions, the Parties agree to take such action as is necessary to amend this Addendum to meet such requirements

3.   General Use and Disclosure Provisions.

Except as otherwise limited in this Addendum,

a)   Partner reserves the right to **use** PHI for the proper management and administration of Partner, to carry out the legal responsibilities of Partner, or to provide data aggregation services relating to the health care operations of a Client.

b)   Partner may **use or disclose** PHI to perform functions, activities, or services for, or on behalf of, AHW provided that such use or disclosure would not violate the Privacy Rule if done by AHW or a Client.

c)   Partner may **disclose** PHI in its possession for the proper management and administration of Partner, provided that disclosures are Required by Law, or Partner obtains reasonable assurances from the third party to whom the information is disclosed that such PHI will be held confidentially and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the third party, and the third party notifies Partner of any instances of which it is aware in which the confidentiality of the PHI has been breached.

4.   Term and Termination.

a)   Term. The term of this Addendum shall commence on the Effective Date and shall terminate automatically upon termination of the Agreement unless terminated earlier,

-18-   Ver 1.10

as provided below, or unless the terms of this Addendum are extended in writing by the Parties.

b) <u>Termination for Cause</u>. Upon either party's knowledge of a material breach by the other party of this Addendum, the non-breaching party shall either:

i) Provide an opportunity for the breaching party to cure the breach or end the violation and terminate this Addendum if the breaching party does not cure the breach or end the violation within the time specified by the non-breaching party; or

ii) Immediately terminate this Addendum if the non breaching party has breached a material term of this Addendum and cure is not possible.

c) <u>Effect of Termination</u>.

i) Except as provided in paragraph (ii) of this Section, upon termination of this Addendum, for any reason, Partner shall return or destroy all PHI received from AHW or a Client, or created or received by Partner on behalf of AHW or a Client. This provision shall apply to PHI that is in the possession of subcontractors or agents of Partner. Partner shall not retain copies of the PHI.

ii) In the event that returning or destroying the PHI is not feasible, Partner shall provide to AHW or the Client notification of the conditions that make return or destruction not feasible. Upon determination that return or destruction of PHI is not feasible, Partner shall extend the protections of this Addendum to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction not feasible, for so long as Partner maintains such PHI.

5. <u>Miscellaneous</u>.

a) <u>Regulatory References</u>. A reference in this Addendum to a section in the Privacy Rule or the Security Rule means the section as in effect or as amended, and for which compliance is required.

b) <u>Amendment</u>. No change, amendment, or modification of this Addendum shall be valid unless set forth in writing and agreed to by both Parties. Notwithstanding the foregoing, the Parties acknowledge that state and federal laws relating to electronic data security and privacy are rapidly evolving and that amendment of this Addendum may be required to ensure compliance with such developments. The Parties specifically agree to take such action as may be necessary from time to time as is necessary for the Parties to comply with the requirements of HIPAA.

c) <u>Survival</u>. The respective rights and obligations of Partner under Section 4 of this Addendum shall survive the termination of this Addendum, unless expressly stated otherwise.

-19-                                                   Ver 1.10

    d)      <u>Interpretation</u>. Any ambiguity in this Addendum shall be resolved to permit Partner, AHW, and its Clients to comply with HIPAA. To the extent any term of this Addendum conflicts with or is contrary to a term in the Agreement, this Addendum shall govern.

    e)      <u>Notice</u>. Any notice, report or other communication required under this Addendum shall be made in accordance with the Agreement.

f)      <u>Governing Law</u>. Notwithstanding any provision of the Agreement, the rights, duties and obligations of the Parties to this Addendum and the validity, interpretation, performance and legal effect of this Addendum shall be governed and determined by applicable federal law with respect to the Privacy Rule and the Security Rule and otherwise by the laws of the State of New York.

-20-

Ver 1.10

FILED
2019 Aug-23 PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| C & H MANAGEMENT GROUP, LLC, and ATTENTIVE HEALTH & WELLNESS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CASE NO.: 4:19-cv-01066-CLM |
| JEROME DELUCCIO, DAVID COFFEY, and ENHANCEDCAREMD, | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT MOTION
FOR PARTIAL DISMISSAL OF PLAINTIFF'S COMPLAINT**

COME NOW Plaintiffs C & H Management Group, LLC ("C&H"), and Attentive Health & Wellness, LLC ("Attentive") (hereafter collectively referred to as "Plaintiffs"), and hereby submit their response to the Motion for Partial Dismissal filed by Defendants Jerome DeLuccio, David Coffey, and enhancedcareMD (hereafter, "ecMD") (collectively, the "Defendants"). The Plaintiffs assert that the Defendants' motion is without merit and due to be denied.

When evaluating a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the

1

light most favorable to the plaintiff. *Weeks v. Wyeth, Inc.*, 120 F. Supp. 3d 1278, 1279 (M.D. Ala. 2015). Plaintiffs respond to the Defendants' Motion as follows:

## I.   Plaintiff is entitled to injunctive relief according to the parties' Confidentiality, Non-Competition, and Non-Disclosure Agreement.

Plaintiffs should not be required to seek an evidentiary hearing when the Defendants have already stipulated that Plaintiffs are entitled to injunctive relief. When DeLuccio executed the Confidentiality, Non-Competition, and Non-Disclosure Agreement (the "NDA") in order for ecMD to conduct business with Plaintiffs, ecMD specifically agreed to the following:

> Without limiting the remedies available to [Plaintiffs], the parties acknowledge that a breach of any of the covenants contained herein this Article will result in material, irreparable injury for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a *breach or threat thereof* by [Defendants], [Plaintiffs] *shall be entitled to obtain a temporary restraining order and/ or a preliminary or permanent injunction* restraining [Defendants] from engaging in activities prohibited by this Agreement or such other relief as may be required to specifically enforce any of the covenants hereof without the necessity of posting any bond.

(Doc. 1, Ex. B, Sect. II(I))(emphasis added). The Complaint, not to mention the Plaintiffs' Cease and Desist Letter, raises the issue that there exists a breach or threat of breach of the parties' NDA caused by Defendants. As outlined in Plaintiffs' Complaint, such breach exists and/or has been threatened, entitling

2

Case 4:19-cv-01006-CEM Document 5 Filed 08/23/19 Page 3 of 23

Plaintiffs' to a temporary restraining order and/ or a preliminary or permanent injunction. Furthermore, Plaintiff's delay of a motion for a hearing on injunctive relief does not constitute a waiver on the Plaintiffs' part to exercise their right for injunctive relief under the NDA, as specifically stated on Page 10, Section 11 therein. Therefore, Plaintiffs' claim for injunctive relief is due to be preserved.

## II.   Plaintiffs correctly named the parties to this action in their Complaint.

### A.   Attentive and C&H are both parties in interest to this action.

The original Broker Agreement and NDA were executed C & H Management Group, LLC d/b/a Attentive Health & Wellness  and Jerry Deluccio individually. Exhibits A and B to Plaintiff's Complaint.   The owners of C&H Management Group, LLC later formed "Attentive Health & Wellness, LLC" and transferred its rights in the at-issue agreements to this new LLC as can be seen by the Addendum which names Attentive Health & Wellness, LLC as a party.

Rule 17(a)(1) as cited by the Defendants applies when a party in interest is not properly named. *In re Engle Cases*, 767 F.3d 1082, 1109 (11th Cir. 2014) citing Fed. R. Civ. P. 17, Advisory Comm. Notes, 1966 Amend. (Rule 17(a)(1) is intended to prevent forfeiture when a determination of the proper party to sue is difficult or when an understandable mistake has been made.). Attentive, which is mentioned throughout each contract, attained its own certification as an Alabama Limited Liability Company and was assigned the business dealings with Defendants by C & H, making it difficult to conclude

3

that Attentive is not a party in interest. Therefore, when viewed in a light most favorable to Attentive, Attentive should remain a party to this action. *See Weeks v. Wyeth, Inc.*, 120 F. Supp. 3d 1278, 1279 (M.D. Ala. 2015) (When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party). Nevertheless, if this Court disagrees with Plaintiffs' contention that Attentive Health and Wellness, LLC, is a party in interest, Plaintiffs

**B.    DeLuccio, Coffey, and enhancedcareMD are the proper Defendants to this action.**

As evidenced by the contracts presented by Plaintiffs and by Defendants (Exhibits A and B to the Plaintiff's Complaint), the corporation "enhancedcare, Inc." was not the contracting party. The contracting parties were either Deluccio individually or "enhancedcareMD".   The addendum cited by Defendants as Defendants' Exhibit A (the "Addendum") does mention the corporation as an "affiliate" of enhancedcareMD, but clearly states that "enhancedcareMD" is an affiliate of enhancedcare, Inc.   In fact, the assertion that the corporation is an "affiliate" of enhancedcareMD is evidence that the corporation and the partnership are no not one in the same, but rather is a separate and distinct "affiliates" of each other.   Therefore the addition of enhancedcare, Inc., to the Addendum **adds** the corporation as a party, in addition to "enhancedcareMD" the partnership to the

4

agreement.  The reference in the Addendum that enhancedcare, Inc., as an affiliate of enhancedcareMD does not substitute the corporation party as the contracting party as the Defendants allege.

Even Defendants' counsel recognized that their client was enhancedcareMD.  After Plaintiffs' counsel issued its cease-and-desist letter (Doc. 1-1 Exhibit D) to Defendants, the response in two separate letters issued by Defendants' counsel Clark Hammond and Michael Ostrander   both   state that their client is "enhancedcareMD." No reference is made to enhancedcare, Inc. by either of Defendants' attorneys.  *See* Exhibits "A" and "B" attached hereto.

As alleged in the Complaint, it appears that enhancedcareMD is a partnership between Jerry DeLuccio and David Coffey.  Discovery will reveal that emails, correspondence and other documents from DeLuccio and Coffey do not reference enhancedcare, Inc. but indicate they are acting on behalf of enhancedcareMD for which both DeLuccio and Coffey are making decisions, conducting business and binding themselves.

When faced with naming parties to a lawsuit, it is obvious that Plaintiffs had to name the contracting parties, and here those were Deluccio and the partnership.  By virtue of their partnership, Jerry DeLuccio and David Coffey are jointly and severally liable and necessary parties.  As a result, Plaintiffs did not err in naming

5

the parties to this lawsuit, and Defendants' Motion for Partial Dismissal should be denied.

### III.   Tortious interference is evident when Defendants, who were hired as brokers to garner business for Plaintiffs, developed "their own" wellness program and stole customers away from Plaintiffs.

As stated in the Complaint, Defendants developed a competing wellness program using Plaintiffs' proprietary materials and solicited existing customers from Plaintiffs. Although Plaintiffs provided sufficient details to this claim in the Complaint so as to survive a motion to dismiss , Plaintiffs refrained from naming specific customers until further discovery could occur. Plaintiffs are nevertheless able to show the elements of tortious interference, namely (1) the existence of a protectible business relationship; (2) of which the Defendants knew; (3) to which the Defendants were a stranger; (4) with which the Defendants intentionally interfered; and (5) damage. *White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 8 (Ala. 2009).

Defendants were hired as brokers to connect Plaintiffs with more customers in the market for a program such as Plaintiffs' SIMERP. As a result, Defendants were aware of numerous business relationships the Plaintiffs had formed, protectable by contracts between Plaintiffs and customers, to which Defendants were not a party but only the broker. Nevertheless, out of an abundance of caution,

6

Plaintiffs are willing to amend their Complaint to provide specific examples of business relationships that were damaged as a result of Defendants' interference. However, Plaintiffs assert that at this motion to dismiss stage, their Complaint is adequate and further amendment should be properly made after discovery is completed. One such business relationship is that between Plaintiffs and Loch Harbour Group, Inc. ("Loch Harbour"). Loch Harbour contracted with Plaintiffs in order to provide its employees and/or consumers with Plaintiffs' SIMERP which is a unique wellness program. Although Defendants were perhaps initially not a stranger to Loch Harbour and Plaintiffs' business relationship, "a party to a tripartite relationship is nevertheless a stranger to that relationship where its conduct is not 'appropriate under its contract with the other two parties.'" *Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co.*, 875 So. 2d 1143, 1155 (Ala. 2003), citing *Colonial Bank v. Patterson*, 788 So. 2d 134, 138 (Ala. 2000). In *Waddell* and *Colonial Bank*, the Court determined that conduct allowed under a contract was not considered to be "inappropriate," but conduct beyond the parties' contract and thus done in bad faith would act to make the third party a "stranger" to the primary contract between the first and second parties. Id..

Defendants brokered the primary contract between Plaintiffs and Loch Harbour. In April 2019, Plaintiffs inquired about the status of documents for Loch

Harbour's renewal to Defendant Coffey. Coffey told Plaintiffs that Loch Harbour had "chosen not to renew this year." Upon further investigation, Plaintiffs learned that Defendants had solicited and contracted with Loch Harbour themselves, for their own benefit and not for the benefit of Plaintiffs, using the proprietary SIMERP program and documents obtained from Plaintiffs and relabeled as enhancedcareMD's. Clearly, such conduct of the Defendants was not allowed under the Plaintiffs' Confidentiality, Non-Competition, and Non-Disclosure Agreement executed by Defendant in 2018. (Doc. 1, Exhibit B). Defendants' actions were inappropriate, intentional, and damaging to the Plaintiffs' business relationship, and thus tortious interference is present.

Another example of Defendants' tortious interference can be found with Defendants' solicitation of Massachusetts Mutual Life Insurance Company ("MassMutual"), a company that Plaintiffs' were endeavoring to contract with before learning that Defendants signed MassMutual up for Defendants' own program--which was, in fact, Plaintiffs' program--knowing that Plaintiffs were actively trying to gain MassMutual as a customer.

In Alabama, "protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking.'" *Ex parte Alabama Dep't of Transp.*, 764 So. 2d 1263, 1270 (citing

8

Case 4:19-cv-01000-CLM   Document 9-4   Filed 08/23/19   Page 9 of 23

Restatement (Second) of Torts § 766 cmt. c [*15]  (1979)). Even though MassMutual did not yet have a contract with Plaintiffs, Plaintiffs were actively pursuing a contract with them when they learned of Defendants' bad-faith actions which cost Plaintiffs the contract. Therefore, once again, Defendants' actions were inappropriate, intentional, and damaging to the Plaintiffs' business relationship, and Plaintiffs' claims of tortious interference are established.

**IV.   Defendants' unauthorized use of Plaintiffs' trade secrets for purposes outside the scope of their contracts is a clear violation of the Alabama Trade Secrets Act.**

In their Motion for Partial Dismissal, Defendants boldly attempt to make the argument that trade secrets were not obtained and misused by Defendants. As Defendants point out, the Alabama Trade Secrets Act (the "Act") defines "trade secret" as information that:

> a. Is used or intended for use in a trade or business;
> b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
> c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
> d. Cannot be readily ascertained or derived from publicly available information;
> e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and
> f. Has significant economic value.

Ala. Code § 8-27-2(1). Each of the items cited by Plaintiffs in their Complaint has

9

Case 4:13-cv-01060-CLM   Document 9-6   Filed 08/23/13   Page 10 of 23

value as a trade secret--especially, but not limited to, the specific technical data regarding Plaintiffs' program and plan processes--hence the basis for Plaintiffs requiring Defendants to execute the Confidentiality, Non-Competition, and Non-Disclosure Agreement at the beginning of their relationship. The Plaintiffs' provide enough facts in their Complaint to establish the elements of Ala. Code § 8-27-2(1). More documents are available in support of these assertions but without a protective order, Plaintiff is unable to produce them at this stage in the litigation since many contain proprietary information.

The Defendants are well aware of the value of these trade secrets and how hard the Plaintiffs worked to develop them and keep them confidential. Although there exists a competitive market for wellness programs, Plaintiffs' program and tailored documents for the program are set apart from the rest. Defendants engaged in countless communications with Plaintiffs to obtain the details of Plaintiffs' unique wellness program under the cloak of learning more about the program in order to better market it to potential customers. In reliance on their contracts, Plaintiffs provided the information requested; nevertheless, Plaintiffs consistently made it known that certain elements of their program were secrets not to be divulged or used by Defendants other than as allowed in the contracts. In one communication to DeLuccio, David Chaviers, the CEO of Attentive, explained

10

how Plaintiffs' wellness program worked and highlighted its "secret sauce," using those exact words.

Plaintiffs' explanations proved enough to enable the Defendants to pirate the SIMERP program and sell it as their own, inherently damaging the Plaintiffs. A party is liable for misappropriation of trade secrets if said party *uses* the trade secret of another, without a privilege to do so, and said party's use constitutes a breach of confidence reposed in that party by the other. Ala. Code § 8-27-3(2) (emphasis added). Defendants' actions were beyond the scope of their contractual position with Plaintiffs and constitute a breach of confidence and thus a violation of the Act.

There is also the matter of the effort taken by Plaintiffs to trademark "SIMERP" which was taken and relabeled by Defendants as their own material. The Defendants did keep using the word "SIMERP" on those materials and even on their website, although that has been removed since Plaintiff issued its cease-and-desist letter. Regardless of the outcome with the U.S. Patent and Trademark Office, the Defendants' blatant use of Plaintiffs' materials and SIMERP only furthers the argument of misappropriation against Defendants, and their Motion for Partial Dismissal is due to be denied as to violation of the Act.

## V.    The elements of fraud were met in Plaintiffs' Complaint.

The facts and allegations contained in the Plaintiffs' Complaint demonstrate fraud on the part of the Defendants before and after entering into contracts with the Plaintiffs. The elements of fraud consist of "(1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation." *Deng v. Scroggins*, 169 So. 3d 1015, 1024 (Ala. 2014).

In the NDA, Defendants represented that neither they nor any affiliate of theirs would solicit Plaintiff's customers, compete against the Plaintiffs, or breach the confidentiality of Plaintiffs' business. (Doc. 1, Ex. B). Later, Defendants urged Plaintiffs to tell every trade secret, hand over ever proprietary document, and give explanations as to how each process worked. All the while, Defendants were converting Plaintiff's materials and information, all subject to the NDA, into a product for the Defendants. Plaintiffs reasonably relied on the representations made by Defendants. Given the short amount of time between the parties' original contracts and Defendants' tortious conduct,  it is evident that Defendants had these intentions to deceive before and after the start of the parties' business relationship, and misrepresented their intentions accordingly. Plaintiffs' reliance on Defendants' representations resulted in loss to Plaintiffs' product and loss of customers.

As stated previously herein, Defendants--specifically DeLuccio and Coffey--

12

engaged in countless communications with Plaintiffs to obtain the details of Plaintiffs' unique wellness program under the misrepresentations of learning more about the program in order to better market it to potential customers.. Included in those communications were specific requests for Plaintiffs' proprietary documents--such as wellness-plan contracts between Plaintiffs and employer and plans sponsors (customers), SIMERP documents, and contact lists and information. Many requests were made for editable versions of the Plaintiffs' documents, which Plaintiffs now can see only made it easier for Defendants' to proceed with their unauthorized duplication of materials.

What the Defendants gained from the fraud is clear in that they acquired a unique product with better benefits that they knew was marketable and lucrative, and with Plaintiffs' client lists, they knew exactly who to target. Accordingly, Plaintiffs' claim of fraud against Defendants should not be dismissed.

## VI.   Plaintiffs properly established a valid claim for conversion under Alabama law.

The allegations made in the Complaint support a strong case for Plaintiffs' claim of conversion of intangible, intellectual property under Alabama law. Unlike the Defendants' sources from Iowa and Utah, Alabama law allows claims for the conversion of intangible property. *See ALFA Mut. Ins. Co. v. Veal*, 622 So. 2d 1292,

13

1296 (Ala. 1993); *see also Jackson v. LSI Indus., infra.* To prevail on a claim of conversion, Plaintiffs must show either a "wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property." *Jackson v. LSI Indus.*, No. 2:03-cv-313-F, 2005 U.S. Dist. LEXIS 49254, at *12 (M.D. Ala. June 9, 2005), citing *Crown Life Ins. Co. v. Smith*, 657 So. 2d 821, 822 (Ala. 1994).

In *Jackson*, the Court found that the Plaintiff's intangible product design was a protectable property interest, but his claim of conversion failed because the taking of his property did not violate any contract or agreement with the Defendant--indeed, there was no contract between them. 2005 U.S. Dist. LEXIS 49254, at *12. The Court in *Jackson* went on to say that for the taking of the Plaintiffs' property to have been wrongful, the Plaintiffs must show that they disclosed the protectable property interest in confidence or that its use violated some duty or agreement between the parties. *Id.* (citations omitted).

In the present case, Plaintiffs allege in their Complaint that they had protectable intellectual property interests to which the Defendants specifically stipulated in the contracts; that they disclosed said property interests to Defendants under a confidentiality agreement; and that Defendants assumed ownership and control of Plaintiffs' property and sold it as their own in blatant violation of their

14

contract with Plaintiffs. Accordingly, Plaintiffs have properly alleged conversion in the Complaint and no dismissal of said claim is warranted under Alabama law.

## VII. The Defendants' conspiracy and collusion are clear in the Complaint.

Plaintiffs' Complaint shows that the Defendants' conspired and colluded to commit fraud, tortious interference and conversion. Defendants' point out that a claim of conspiracy requires a showing that two or more persons concertedly acted to achieve an unlawful purpose or even a lawful purpose by unlawful means. (Doc. 5, p. 20 § 3) citing *Ex parte Alamo Title Co.*, 128 So. 3d 700, 713 (Ala. 2013). Plaintiffs' claimed that Defendants DeLuccio, Coffey, and ecMD as the partnership between the two, jointly carried out a scheme of deception in order to obtain and convert Plaintiffs' trade secrets into a business of their own. While their actions were in breach of the parties' contracts, the actions themselves amount to fraud, tortious interference and conversion, which Plaintiffs specified in their Complaint. Therefore, there are no grounds for dismissing Plaintiffs' claim that Defendants conspired and colluded against them.

## Conclusion

In conclusion, for the reasons stated above, the allegations presented in the Complaint and each resulting claim are enough to raise a right to relief, especially when viewed in a light most favorable to the Plaintiff. *See Wyeth, supra.*

15

Accordingly, Plaintiffs' claims should not be dismissed in whole or in part.

Respectfully submitted this 23nd day of August 2019.

/s/ Haley K. Tucker
Haley K. Tucker (TUC-045)

/s/Christie D. Knowles
Christie D. Knowles (KNO-015)

OF COUNSEL FOR PLAINTIFFS:
**KNOWLES & SULLIVAN, LLC**
400 BROAD STREET, SUITE 105
GADSDEN, ALABAMA 35901
T: (256) 547-7200
F: (256) 467-6322
christie@kkslawgroup.com
haley@kkslawgroup.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 23, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Clark R. Hammond (HAM012)
Ben B. Robinson (ROB181)
WALLACE JORDAN RATLIFF & BRANDT, LLC
Post Office Box 530910
Birmingham, Alabama 35253
chammond@wallacejordan.com
brobinson@wallacejordan.com

/s/ Christie D. Knowles
Christie D. Knowles

16

Case 4:13-cv-01060-CLM   Document 9   Filed 08/23/13   Page 17 of 25

# EXHIBIT A

# LETTER FROM DEFENDANTS' ATTORNEY HAMMOND



# WALLACE JORDAN

### WALLACE, JORDAN, RATLIFF & BRANDT, LLC

Clark R. Hammond
chammond@wallacejordan.com

ATTORNEYS & COUNSELORS

Sender Direct Dial: 205.874.0331
Sender Direct Fax: 205.874.3240

June 6, 2019

Via Email: christie@kkslawgroup.com

Christie D. Knowles, Esq.
Knowles & Sullivan, LLC
400 Broad Street
Gadsden, Al 35901

Re:     Disputes regarding Agreements between EnhancedcareMD and C&H
Management Group, LLC d/b/a Attentive Health & Wellness

Dear Ms. Knowles,

Our firm has been engaged by EnhancecaredMD ("EcMD") to represent it in connection
with its disputes with C&H Management Group, LLC d/b/a Attentive Health & Wellness
("Attentive"). This letter is written in response to your client's emails of May 30 and June 4,
2019 and your letter of today.

First, the proposed franchise opportunity proposed by your client is not a good faith offer
and is rejected out of hand. Second, as EcMD has communicated to your client last year and in
which it responded, Attentive is in breach of one or more of the various Agreements (identified
below). Specifically, the documents comprising the contractual relationship between EcMD and
Attentive are:

(A) Agent/Broker Sales Agreement between C&H Management Group, LLC d/b/a
Attentive Health & Wellness dated June 6, 2017 ("June 2017 Agent Agreement");

(B) Confidentiality, Non-Competition and Non-Disclosure Agreement between C&H
Management Group, LLC d/b/a Attentive Health & Wellness, as "Disclosing Party,"
and "the entity named on page 6" thereafter referred to as the "Receiving Party,"
dated June 1, 2017 ("June 2017 Non-Compete");

(C) Agent/Broker/Sales Agreement, Schedule "A" Addendum to Contract Executed
June 6, 2017 and Contract Addendum to Executed Contract 6/6/17 between
Enhancedcare, Inc. and its affiliates and Attentive Health & Wellness, LLC dated
August 1, 2018 ("2018 Addendum"); and

First Commercial Bank Building  *  800 Shades Creek Parkway, Suite 400  *  Birmingham, AL 35209
Post Office Box 530910  *  Birmingham, AL 35253  *  Phone 205.870.0555  *  Fax 205.871.7534
www.wallacejordan.com

June 6, 2019
Page 2

(D) AHW Software as a Service (SAAS) Partner Agreement between AHW, LLC and ECMD, dated August 1, 2018 ("2018 Partner Agreement").

Items A-D are sometimes collectively referred to as the "Agreements."

As you may be aware, Attentive partnered with EcMD and asked it to provide a suite of services that Attentive was not receiving from USHC or otherwise using on Attentive's platform. In response, our client created medical and preventive services, marketing and selling materials, multimedia presentations and videos for employee education and employee/employer compliance as well as enrollment training among other things leading to the Partner Agreement signed August, 2018.

Last December, Attentive unilaterally transferred certain clients to USHC in clear violation of the Partnership Agreement Section 2.6(b) supported by emails from Attentive to these clients. Attentive also acknowledged to EcMD that in the course of some following discussions that it advised USHC of the added services EcMD was providing for them to take the business away from EcMD. Damages are accruing by that direct action at $11,000 per month. In addition, Attentive has breached the 2018 Addendum by failing to make the payments required thereunder. Specifically, the 2018 Addendum provides, in pertinent part:

> On new accounts sold, the non-enhancedcareMD network ... enhancedcareMD will receive $28 pepm through the agreed ACH process ... and $32 pepm for all AHW MEC clients and $34 pepm for all non MEC client that include the new software and services (SAAS).

Since that time of breach, EcMD has incurred damages at the rate of $28.00 per person/per month or approximately $11,000 per month ($77,000 as of June 2019) for which it intends to seek payment for Attentive's violation of the disruption clause in the Agreement. As the 2018 Addendum requires Attentive to pay "$28 pepm" for new accounts sold by the non-EcMD network, we anticipate post discovery the damages will increase as USHC's platform (or other non-EcMD platforms) is used.

Now, Attentive has again made a unilateral decision to transfer additional clients to USHC, with whom our client has current relationships including the EcMD platform, which is another breach of the Agreements. As you may be aware, EcMD is billed in advance by our providers and vendors and thus has already incurred the cost for providing the suite of services to Attentive's clients for the month of June. We were made aware yesterday that Attentive has already sought to cancel our ACH to at least one client. As a result of this action, our client will be damaged $34 per person/per month or approximately another $7,700 per month of damages for the continued breach.

Moreover, as you reference in your letter, we contacted the clients Attentive listed in its most recent email in order to confirm their desire to terminate our services and transition them smoothly so that the clients are not negatively impacted. Based on your letter, we will disable our system as directed immediately. It will be your client's responsibility to ensure that they are properly transitioned and all reporting requirements are in place.

June 6, 2019
Page 3

_____

We can only assume by your client's hostile actions in disrupting our client's customers in clear breach of the Partner Agreement, refusing to allow EcMD any new business or even threatening EcMD's ability to conduct business, and limiting any negotiations to non-good faith efforts as seen by your demand in the franchise agreement in your recent letter, that there is no future together.

Please consider this correspondence to be EcMD's notice of breach and demand for cure under the June 2017 Agent Agreement, the 2018 Partner agreement and 2018 Addendum.

This letter is written without waiver of or prejudice to my client's rights or remedies, all of which are expressly reserved.

Sincerely,

Clark R. H——

cc:     client
        F. Michael Ostrander, Esq.

Case 4:13-cv-01066-CLM   Document 9   Filed 08/23/13   Page 21 of 23

**EXHIBIT B**

**LETTER FROM F. MICHAEL OSTRANDER, ESQ.**

18



**WOODS OVIATT GILMAN** LLP

ATTORNEYS
woodsoviatt.com

1900 Bausch & Lomb Place
Rochester, New York 14604

P 585.987.2800    F 585.454.3968

*Writer's Direct Dial Number: 585.987.2816*
*Writer's Direct Fax Number: 585.445.2316*
*Email: mostrander@woodsoviatt.com*

1900 Main Place Tower
Buffalo, New York 14202

P 716.248.3200    F 716.854.5100

June 6, 2019

**VIA EMAIL AND FEDERAL EXPRESS**

Christie Knowles, Esq.
Knowles & Sullivan LLC
400 Broad Street, Suite 105
Gadsden, Alabama 35901

> **Re:    Breaches of Software as a Service (SAAS) Partner Agreement Immediate Cease and Desist**

Dear Ms. Knowles:

This office represents EnhancedcareMD ("ECMD") with regard to, among other things, that certain Software As A Service ("SAAS") Partner Agreement between Attentive Health & Wellness, LLC ("Attentive") and ECMD dated August 1, 2018 ("Agreement"). A copy of the Agreement is enclosed herewith for your review. It is my understanding that your office represents Attentive.

I write to inform you of Attentive's repeated breaches of the Agreement as well as to demand that Attentive *immediately cease and desist* from any further breaches of the Agreement and immediately take those actions that are necessary to cure its breaches.

In pertinent part, Agreement Section 2.6 provides as follows:

> "[Attentive] will (a) use commercially reasonable efforts to represent and sell the Service as part of their comprehensive Wellness Solution and the ECMD Services into the market; (b) *not defame, denigrate or otherwise discourage Clients and potential Clients in any manner regarding the Service and the ECMD Service....*" (Emphasis added).

Attentive has repeatedly breached the above-quoted provision. For example, in December of 2018, Attentive unilaterally transferred certain clients away from ECMD to US Healthcenter, Inc. ("USHC"). It has come to our attention that Attentive has recently breached this provision again by contacting additional clients and attempting to transfer them to USHC. Attentive's repeated breaches of the Agreement have caused, and will continue to cause, serious and irreparable injury to ECMD including, without limitation, injuring ECMD's goodwill and client relationships. In addition to that serious irreparable injury, Attentive's breaches are inflicting monetary injury upon ECMD in the

*The art of representing people®*

{7361611: }

June 6, 2019
Page 2

approximate amount of $11,000 per month dating back to December of 2018. An additional $7,700 per month in damages will be incurred by reason of Attentive's most recent breach of the Agreement.

Demand is hereby made that Attentive *immediately cease and desist* from any further breaches of the Agreement or other violations of ECMD's rights. Please note that, pursuant to Agreement Section 8.7, the Agreement is governed by New York Law and all actions to interpret or enforce the Agreement are exclusively venued in Rochester, New York with all parties waiving defenses based on lack of personal jurisdiction, inconvenient forum and venue. Should Attentive continue its breaches of the Agreement and fail to take all steps necessary to cure those breaches, ECMD will take all steps it deems necessary to protect its rights and interests in law and in equity.

Please provide the undersigned with written confirmation that Attention has ceased any and all breaches of the Agreement and provide a written outline of the actions Attentive intends to take in order to remedy the breaches and damages that have already been inflicted upon ECMD.

Should you wish to discuss this matter, please feel free to contact me at the phone number listed above. ECMD reserves all rights and waives none.

Very truly yours,

WOODS OVIATT GILMAN LLP

F. Michael Ostrander
Please direct responses to Rochester Office

FMO/ps
cc:   Clark R. Hammond, Esq., via email, w/enclosure

{7361611: }

*The art of representing people*

FILED
2019 Sep-03 PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| **C & H MANAGEMENT GROUP, LLC, and ATTENTIVE HEALTH & WELLNESS, LLC,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CASE NO.: 4:19-cv-01066-CLM** |
| **v.** | ) ) ) | |
| **JEROME DELUCCIO, DAVID COFFEY, and ENHANCEDCAREMD,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

**DEFENDANTS' JOINT REPLY BRIEF IN SUPPORT OF THEIR MOTION
FOR PARTIAL DISMISSAL OF PLAINTIFFS' COMPLAINT**

COME NOW Defendants Jerome ("Jerry") DeLuccio, David Coffey, and EnhancedcareMD (collectively "Defendants") and submit this reply brief in support of their motion for partial dismissal of the Complaint (Doc. 5) filed by Plaintiffs Attentive Health & Wellness, LLC ("Attentive") and C&H Management Group. LLC ("C&H"). Plaintiffs' response in opposition (Doc. 9) does little to enlighten this Court about who the proper parties are, nor does it counter Defendants' arguments that the Complaint's claims against Defendants are insufficiently pleaded.

**I. Plaintiff Attentive lacks standing.**

Defendants' motion questions the standing of Attentive, because that entity did not exist when the contracts were entered. Plaintiffs respond by claiming that

"[t]he owners of C&H Management Group, LLC later formed 'Attentive Health & Wellness, LLC' and transferred its rights in the at-issue agreements to this new LLC."  (Doc. 9 at 3; *see also id.* at 3-4 ("Attentive . . . was assigned the business dealings with Defendants by C&H, making it difficult to conclude that Attentive is not a party in interest".)  Plaintiffs submit no proof to support an assignment and have made no effort to re-plead that Attentive is an assignee.  Additionally, the "Addendum" to the Sales Agreement, which Defendants submitted with their motion to dismiss as Exhibit A (Doc. 5-1), and which Plaintiffs have not contested as inauthentic, says nothing about an assignment to Attentive.  Moreover, the Addendum was executed August 1, 2018, prior to the formation of Attentive on September 14, 2018.  *See* Exhibit C (Articles of Formation of Attentive Health & Wellness, LLC)

In *Russell v. Birmingham Oxygen Services, Inc.*, 408 So. 2d 90 (Ala. 1981), the Alabama Supreme Court held that, under circumstances similar to Attentive's, the plaintiff corporate subsidiary of an original contracting party, seeking to enforce a non-compete agreement against two individuals, failed to demonstrate that it had standing to enforce the contract.  Relying on established principles of contract law, the Court reasoned that "[a] third person has no rights under a contract between others unless the contracting parties intend that the third person receive a direct benefit enforceable in court."  *Id.* at 93.  It did not matter that the party seeking to

2

enforce the non-compete was owned by the same person as the contracting party or that he (the common owner) was the person with whom the defendants had dealt on behalf of the original contracting party because "[a] corporation, just like an individual, must enforce its own rights and privileges." *Id.* Further, contrary to the plaintiff's assertion that it was an assignee of the contract, the Court found that the record did not demonstrate "an affirmative showing of an intent to assign." *Id.* Here, the Court should also find that Plaintiffs have not pled that Attentive is an assignee of the agreements and, thus, Attentive does not have standing to sue. *Cf. DWOC, LLC v. TRX All., Inc.*, 156 So. 3d 978, 983 n.2 (Ala. Civ. App. 2014) (citing *Russell* and noting that the absence of allegations to support assignment or third-party beneficiary status in favor of the plaintiff).

Assuming arguendo that assignment occurred and was pleaded, Plaintiffs thereby undermine the standing of C&H as plaintiff. If indeed the assignment occurred, C&H no longer has any right to enforce contracts or otherwise seek relief from the Court.

In light of the representations made in the response in opposition that the rights of C&H were transferred or assigned to Attentive, Defendants supplement their original arguments to advise that causes of action in tort for personal injury, including fraud, tortious interference, and conversion, are not assignable. *See Alabama Farm Bureau Mut. Cas. Ins. Co. v. Anderso*n, 263 So. 2d 149, 154 (Ala.

3

Civ. App. 1972); *Daily v. The Rawlings Co., LLC*, No. 2:15-CV-1138-VEH, 2016

WL 192071, at *18 (N.D. Ala. Jan. 15, 2016) (citing additional Alabama Supreme

Court cases).

As Plaintiffs' response only adds confusion about which Plaintiff may have

the right to raise claims against Defendants, Defendants request that the Court grant

their motion to dismiss for Plaintiffs' failure to state claims upon which relief can be

granted as to all counts of the Complaint.

## II.   Count I – Injunctive Relief

Plaintiffs claim that they need not seek an evidentiary hearing for a temporary

or preliminary injunction because "Defendants" have stipulated that Plaintiffs are

entitled to injunctive relief.  Not to beat a dead horse, but these Defendants are not

parties to the agreements and, thus, are not the proper targets of the Plaintiffs'

purported claim.  And, therefore, it follows that these Defendants have *not* stipulated

that they have violated any agreement. It is incumbent upon Plaintiffs to prove their

entitlement to injunctive relief pursuant to Rule 65 and the law of the Eleventh

Circuit and do so by naming the correct party.  Plaintiffs appear unwilling or unable

to meet the burden, and the request for injunctive relief is due to be dismissed.

## III. Count II - Enhancedcare is a corporation, not a partnership, and, thus, none of the Defendants are not proper parties (Breach of Contract).

To put to rest Plaintiffs' theory that enhancedcareMD is a partnership,

Defendants first pointed the Court to the "Contract Addendum to Executed Contract

4

6/6/17" which identifies "enhancedcare, Inc. and their affiliates" as the party . (Doc. 5-1.)  The Addendum also uses "enhancedcare" in a shorthand form within the Addendum to refer to the corporation.  (*See* Doc. 5-1 at 2 of 4.)  Nonetheless, Plaintiffs continue to deny that "enhancedcare, Inc." was the contracting party.

Plaintiffs also assert that "it appears" there is a partnership.  (Doc. 9 at 5.) They further contend that "[d]iscovery will reveal" that "enhancedcare" is a partnership between David Coffey and Jerry DeLuccio.  (*Id.*)  This sort of rank speculation is inadequate to support a well-pled complaint.

To leave no doubt C&H entered agreements with enhancedcareMD, Inc., a Delaware corporation, Defendants offer conclusive proof that Plaintiffs knew that its contract was with a corporation, not a partnership.  On May 24, 2017, Dr. Tommy Lamb of C&H asked David Coffey of enhancedcareMD, Inc. to provide a W-9 for the purposes of accurately reporting any payments they may make to enhancedcareMD, Inc. *See* Exhibit D (email dated May 24, 2017 with copy of W9 for enhancedcare Inc., transmitted to Tommy Lamb of C&H, prior to the execution of any contracts); *see also* Exhibit E (documentation proving that enhancedcareMD was the legally registered service mark of enhancedcareMD, Inc.).

In light of the foregoing, Defendants request that this Court dismiss Plaintiffs' claims against them for breach of contract.

## IV.   Count III – Interference with Business or Contractual Relations

Plaintiffs claimed they withheld the names and details of any customers with whom Defendants have interfered until "after discovery is completed." (Doc. 9 at 7.) Plaintiffs then describe alleged interference, not pled in the complaint, relating to actual customer Loch Harbour and prospective customer MassMutual. (Doc. 9 at 7-8.) Defendants dispute Plaintiffs' claims and that they are the proper parties in any event; however, this brief is not the place to respond to these unpled allegations or claims. Plaintiffs' concession that they did not include these allegations in their Complaint highlights their defective complaint warranting dismissal of Count III. Again, it is still unclear which Plaintiff may have the right to even bring these claims, much less if such claims could be brought against any of the Defendants as proper parties. The Complaint further fails because it does not plead when the now disclosed assignment occurred between C&H and Attentive and exactly when the purportedly claims arose.

In light of the foregoing, Defendants request that this Court dismiss Plaintiffs' claims against them for Interference with Business or Contractual Relations.

## V.  Count IV – ATSA

Plaintiffs assert that their confidential, protected information is "the specific technical data regarding Plaintiffs' program and plan processes." (Doc. 9 at 10.) To support their allegations, Plaintiffs claim to need a protective order (*see id.*), but have

6

not sought one.  Plaintiffs' response in opposition does not refute that Plaintiffs'

allegations of misappropriation of "trade secrets" are conclusory and the very sort

of allegations to be dismissed for failure to state a claim upon which relief can be

granted.  Accordingly, Defendants request that this Court grant their motion to

dismiss Count IV.

### VI. Count V – Fraud

Plaintiffs' response seems to suggest that Plaintiffs claim is for promissory

fraud and/or fraudulent inducement.  (*See* Doc. 9 at 12 (asserting Defendants acted

fraudulently "before and after entering into contracts…"); *id.* ("Given the short

amount of time between the parties' original contracts and Defendants' tortious

conduct, it is evident that Defendants had these intentions to deceive before and after

the start of the parties' business relationship. . . .").

"A claim of promissory fraud is one based upon a promise to act or not to act

in the future." *Heisz v. Galt Indus., Inc.*, 93 So. 3d 918, 925 (Ala. 2012) (citation

omitted).  A defendant's "[f]ailure to perform [a contract] alone is not sufficient

evidence to show a present intent not to perform.  If it were, then every breach of

contract would be 'tantamount to fraud.'  Rather, there must be some evidence that

would indicate a present intent not to perform . . . . *Id.* at 925–26 (citation omitted).

There are no allegations in the Complaint to support this theory that, before and/or

7

upon entering a contract with C&H, Defendants intended to defraud C&H and breach a contract.

Likewise, as for fraudulent conduct "after" enhancedcareMD, Inc. entered contracts and began doing business with C&H, Plaintiffs' response in opposition fails to address that the Complaint is devoid of the required details (who, what, where, when) concerning the alleged fraud. Whether the fraudulent statements occurred before or after contracting with enhancedcareMD, Inc., the Complaint is unclear about the fraud(s) allegedly perpetrated, and, until such time as this is cured, Defendants cannot properly respond and defend the claims. The need for specificity is even more pronounced in light of C&H's alleged assignment of the agreements to Attentive at some unknown time. As indicated earlier, causes of action sounding in tort for personal injury, including fraud, tortious interference, and conversion, are not assignable. *See Alabama Farm Bureau Mut. Cas. Ins. Co. v. Anderso*n, 263 So. 2d 149, 154 (Ala. Civ. App. 1972); *Daily v. The Rawlings Co., LLC*, No. 2:15-CV-1138-VEH, 2016 WL 192071, at *18 (N.D. Ala. Jan. 15, 2016) (citing additional Alabama Supreme Court cases). Pursuant to Rule 9(b), Defendants request dismissal of Count V.

## VII.  Count V – Conspiracy

Plaintiffs' response to the motion to dismiss all but concedes that, if their pleading is inadequate with respect to the counts alleging underlying torts (tortious

8

interference; fraud; and conversion), the conspiracy claim cannot survive standing alone. If the Court grants the motion for dismissal of Counts III, V and VI, Defendants request that the Court also dismiss the claims of civil conspiracy and collusion asserted in Count V.

## VIII. Count VI – Conversion

Plaintiffs cannot overcome the vagueness of the allegations supporting Count VI – that Defendants "took control of" Plaintiffs' non-specifically identified "intellectual property and proprietary processes." Compl. at ¶ 48.[1] As articulated in *Jackson v. LSI Indus., Inc.*, No. 2:03CV313FWO, 2005 WL 1383180, at *4 (M.D. Ala. June 9, 2005), a case cited in Plaintiffs' response, "a plaintiff must have both title to and a right of possession in the allegedly converted property to maintain a claim." Plaintiffs' claim of a conversion is potentially baseless in addition to being insufficiently pled. The "processes" Plaintiffs believe they owned exclusively may have been publicly known and common to the marketplace of service providers such as enhancedcareMD, Inc. Without particularity in the Complaint, especially concerning which Plaintiff owns the allegedly converted property, Defendants cannot respond to the claim that Plaintiffs' "processes" and intellectual property has

---

[1] If Plaintiffs are resting on the claim that Defendants misappropriated "SIMERP," "SIMERP" was not, still is not, and probably never will be, trademarked. (*See* Exhibit F.)

been taken.  Defendants request that the Court dismiss Count VI for failure to state a claim.

## Conclusion

Altogether, Plaintiffs' response to the motion to dismiss only highlights the insufficient allegations and adds confusion to the question of who is the real party in interest.  On the basis of these arguments and authorities, Defendants respectfully request that the Court grant their motion for partial dismissal of Plaintiffs' Complaint.

Respectfully submitted this the 3rd day of September, 2019.

/s/ Clark R. Hammond
Clark R. Hammond (HAM012)
Ben B. Robinson (ROB181)
chammond@wallacejordan.com
brobinson@wallacejordan.com
*Attorneys for Defendants*

**OF COUNSEL**:
WALLACE JORDAN RATLIFF & BRANDT, LLC
Post Office Box 530910
Birmingham, Alabama  35253
Telephone:   (205)870-0555
Facsimile:   (205)871-7534

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Christie D. Knowles (KNO-015)
Haley K. Tucker (TUC-045)
KNOWLES & SULLIVAN, LLC
400 Broad Street, Suite 105
Gadsden, AL  35901
christie@kkslawgroup.com
haley@kkslawgroup.com


/s/ Clark R. Hammond
OF COUNSEL

Case 4:19-cv-01066-CLM   Document 10-1   Filed 09/03/19   Page 1 of 6

FILED

2019 Sep-03  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit C

**STATE OF ALABAMA**

**DOMESTIC LIMITED LIABILITY COMPANY (LLC)**
**CERTIFICATE OF FORMATION**

PURPOSE: In order to form a limited liability company (LLC) under Section 10A-5A-2.01 of the <u>Code of Alabama 1975</u> this Certificate Of Formation and the appropriate filing fees must be filed with the Office of the Judge of Probate in the county where the entity's initial registered office is located. **The information required in this form is required by Title 10A.**

INSTRUCTIONS: Mail one (1) signed original and two (2) copies of this completed form and the appropriate filing fees to the Office of the Judge of Probate in the county where the limited liability company's (LLC) registered office is/will be located. Contact the Judge of Probate's Office to determine the county filing fees. **Make a separate check or money order payable to the Secretary of State for the state filing fee of $100.00** for standard filing (based on date of receipt and volume) **or $200.00 for expedited service** (processed within approximately 3 business days after date of receipt from the County Probate Office) and the Judge of Probate's Office will transmit the fee along with a certified copy of the Certificate to the Office of the Secretary of State within 10 days after the Certificate is filed. Once the Secretary of State's Office has indexed the filing the information will appear at www.sos.alabama.gov under the Government Records tab and the Business Entity Records link – you may search by entity name. Your notification of filing was provided by the Probate Judge's Office via a stamped copy which is evidence of existence (if it is certified by the Probate Office) according to 10A-1-4.04(c) and the Secretary of State's Office does not send out a copy. You may pay the Secretary of State fees by credit card if the county you are filing in will accept that method of payment. Your entity will not be indexed if the credit card does not authorize and will be removed from the index if the check is dishonored.

```
Marshall County, Alabama
  2018 September-14  1:49PM
  Inst    Book   Page    Pages
3179964  6068     25      5
--------ARTICLES OF ORGANIZ --------
ARTICLES    50.00  INDEX FEE    1.00
PROBATE F    5.00
Total Fees -------------    56.00
Tim Mitchell Judge of Probate
```

**(For County Probate Office Use Only)**

## The information completing this form must be typed (for your convenience the information is fill-able on this computer form on the website above).

1. The name of the limited liability company (must contain the words "Limited Liability Company" or the abbreviation "L.L.C." or "LLC," and comply with <u>Code of Alabama</u>, Title 10A-1-5.06. You may use Professional or Series before Limited Liability Company if they apply or you may use those abbreviations):
Attentive Health & Wellness, LLC

2. **A copy of the Name Reservation certificate from the Office of the Secretary of State must be attached and the name reserved must agree with item 1 above [proves name reservation under 10A-1-4.02(f)].**

**(For SOS Office Use Only)**

This form was prepared by: (type name and full address)

Terri L. Brownlow
Terri L. Brownlow, LLC
302 East Main Street
Albertville, AL  35950

LLC Cert of Formation - 3/2015               Page 1 of 2

# DOMESTIC LIMITED LIABILITY COMPANY (LLC) CERTIFICATE OF FORMATION

3. The name of the Registered Agent located at the Registered Office (only one agent):

   David G. Chaviers

   Street (**No PO Boxes**) address of Registered Office (must be located in Alabama):

   70 Grimes Drive, Guntersville, AL  35976

   Mailing address in Alabama of Registered Office (if different from street address):


4. The undersigned certify that there is at least one member of the limited liability company.

5. Check **only** if the type applies to the Limited Liability Company being formed:

   ☐ Series LLC complying with Title 10A, Chapter 5A, Article 11

   ☐ Professional LLC complying with Title 10A, Chapter 5A, Article 8

6. The filing of the limited liability company is effective immediately on the date filed by the Judge of Probate or at the delayed filing date (cannot be prior to the filing date) specified in this filing.  10A-1-4.12

   The undersigned specify _____/_____/_____ as the effective date (must be on or after the date filed in the office of the county Judge of Probate, but no later than the 90th day after the date this instrument was signed) and the time of filing to be _____:_____  ○ AM  ○ PM   (cannot be noon or midnight – 12:00)

   ☑ Attached are any other matters the members determine to include herein ( if this item is checked there must be attachments with the filing).

   | | |
   |---|---|
   | 09  / 14 /2018 | Signature as required by 10A-5A-2.04 |
   | Date   (MM/DD/YYYY) | |
   | | David G. Chaviers |
   | | Typed Name of Above Signature |
   | | Manager |
   | | Typed Title (Organizer or Attorney-in-fact) |


Additional Organizers/Attorney-in-facts may sign (add additional sheets if necessary).

STATE OF ALABAMA                    )

MARSHALL COUNTY                    )

# CERTIFICATE OF FORMATION
# ATTENTIVE HEALTH & WELLNESS, LLC

The undersigned, desiring to form a limited liability company pursuant to the laws of the State of Alabama, certifies as follows:

1.  **Name.**       The name of the limited liability company is **Attentive Health & Wellness, LLC**.

2.  **Duration.** The existence of the limited liability company shall commence on the date of the filing of this Certificate of Formation in the office of the Judge of Probate of Marshall County, Alabama, and its duration shall be perpetual; provided, however, that the limited liability company shall be dissolved (a) upon the written consent of all of the members, (b) as provided in the Operating Agreement, or (c) as may be required by the Alabama Limited Liability Company Act.

3.  **Purpose.** The purpose for which this limited liability company is organized is to engage in the transaction of any and all lawful business for which limited liability companies may be organized under the laws of the State of Alabama.

4.  **Registered Agent and Registered Office.** The location and mailing address of the initial registered office and the name of the initial registered agent at said address are as follows:

    Registered Agent:              David G. Chaviers
    Location and Mailing           70 Grimes Drive
    Address of Registered Office:  Guntersville, AL 35976

5.  **Initial Members.** The name and mailing address of the initial members of the limited liability company are as follows:

    | Name: | Mailing Address: |
    |---|---|
    | David G. Chaviers | 949 Skyhave Dr., Boaz, AL 35956 |
    | Jo Ann Kirkland | 1044 Harbor Ridge Rd., Guntersville AL 35976 |
    | Tommy Dean Lamb | 1306 Fulton St., Albertville, AL 35950 |
    | Brenda McGinnis | 90 Braswell Rd., Guntersville, AL 35976 |

6.  **Admission of Additional Members.** The members of the limited liability company shall have the right to admit additional members to the limited liability company, as provided in the Operating Agreement.

Attentive Health & Wellness, LLC
Certificate of Formation
Page 2

7. **Initial Manager.** The limited liability company shall be managed by a manager. The name and mailing address of the initial manager, who shall serve as manager until a successor is elected and qualified, is as follows:

Name:             David G. Chaviers

Mailing Address:    70 Grimes Drive
                           Guntersville, AL 35976

IN WITNESS WHEREOF, the undersigned has affixed his hand and seal on this 13th day of September, 2018.

_____
David G. Chaviers

_____
Jo Ann Kirkland

_____
Tommy Lamb

_____
Brenda McGinnis

THIS INSTRUMENT WAS PREPARED BY:
Terri L. Brownlow
Terri L. Brownlow, LLC
302 East Main Street
Albertville, AL 35950

John H. Merrill
Secretary of State

P.O. Box 5616
Montgomery, AL 36103-5616

# STATE OF ALABAMA

## I, John H. Merrill, Secretary of State of Alabama, having custody of the Great and Principal Seal of said State, do hereby certify that

pursuant to the provisions of Title 10A, Chapter 1, Article 5, Code of Alabama 1975, and upon an examination of the entity records on file in this office, the following entity name is reserved as available:

### Attentive Health & Wellness, LLC

This name reservation is for the exclusive use of Terri Brownlow, 302 East Main Street, Albertville, AL 35950 for a period of one year beginning June 07, 2018 and expiring June 07, 2019



**In Testimony Whereof, I have hereunto set my hand and affixed the Great Seal of the State, at the Capitol, in the city of Montgomery, on this day.**

June 07, 2018
_____
**Date**

RES800790

_____
**John H. Merrill**       **Secretary of State**

Case 4:19-cv-01066-CLM   Document 10-2   Filed 09/03/19   Page 1 of 4

FILED

2019 Sep-03  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit D

**Dr Tommy D Lamb <drtlamb@attentivehealthwellness.com>**   Wed, May 24, 2017, 2:56 PM

to me

Thanks so much.   Tell Jerry I'm writing a response to the latest chief counsel memo to provide him information regarding our model and compliance.

Thanks

On Wed, 24 May 2017 14:45:34 -0400, David Coffey <dcoffey@enhancedcaremd.com> wrote:
> Dr Tom,
>
> Attached is our W9.
>
> Looking forward to working with you.
>
> David Coffey
> Senior Vice President
>
> 1290 University Ave., Suite G
> Rochester, NY 14607
> Office: (585) 419-6707
> Fax: (585) 419-2061
> dcoffey@enhancedcaremd.com [1]
> enhancedcaremd.com [2]
>
> https://www.facebook.com/enhancedcare
> [3] https://twitter.com/enhancedcareMD [4]This email and any files
> transmitted with it are confidential and contain privileged or copyright
> information. You must not present this message to another party without
> gaining permission from the sender. If you are not the intended recipient
> you must not copy, distribute or use this email or the information
> contained in it for any purpose other than to notify us. If you have
> received this message in error, please notify the sender immediately, and
> delete this email from your system. We do not guarantee that this
> material is free from viruses or any other defects although due care has
> been taken to minimize the risk. Any views expressed in this message are
> those of the individual sender, except where the sender specifically
> states them to be the views of enhancedcareMD.

> On Tue, May 23, 2017 at 5:25 PM, Jerry DeLuccio  wrote:
> Dave can you handle for Dr Tomthanksjerry
>
> Begin forwarded message:
> FROM: Dr Tommy D Lamb
> SUBJECT: W-9
> DATE: May 23, 2017 at 5:01:37 PM EDT
> TO: "Jerry DeLuccio"
>
> Jerry,
> We will need a W9 from you guys for our CPA and also for Tri-Star that
is
> the TPA for the SuperMec.

| Form **W-9**<br>(Rev. December 2011)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | **Give Form to the requester. Do not send to the IRS.** |
|---|---|---|

Name (as shown on your income tax return)

**enhancedcare Inc**

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor  ☑ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

**1290 University Ave., Suite G**

City, state, and ZIP code

**Rochester, NY 14607**

Requester's name and address (optional)

List account number(s) here (optional)

*See Specific Instructions on page 2.*  *Print or type*

---

**Part I**    **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

| | | | – | | | – | | | | |

Employer identification number

| 4 | 5 | – | 1 | 5 | 6 | 5 | 3 | 9 | 1 |

---

**Part II**    **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here**    Signature of U.S. person ▶    Date ▶ 5/4/2015

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X      Form **W-9** (Rev. 12-2011)

FILED
2019 Sep-03  PM 04:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit E

# United States of America
## United States Patent and Trademark Office



| | |
|---|---|
| **Reg. No. 4,169,294** | ENHANCEDCARE, INC. (DELAWARE CORPORATION) |
| **Registered July 3, 2012** | SUITE 5 |
| | 421 PENBROOKE DRIVE |
| **Int. Cl.: 44** | PENFIELD, NY 14526 |

**SERVICE MARK**

**PRINCIPAL REGISTER**

FOR: ADMINISTRATION OF PRE-PAID HEALTH CARE PLANS HAVING A NETWORK OF PHYSICIANS, WITH A PHYSICIAN OVERSEEING A CUSTOMIZED WELLNESS PLAN TO HELP MEMBERS MAINTAIN AND/OR IMPROVE THEIR HEALTH; PROVIDING AN INTERNET WEBSITE PORTAL OFFERING INFORMATION IN THE FIELD OF A WELLNESS PROGRAM WHICH IS ACCESSIBLE BY HEALTH PLAN MEMBERS AND PHYSICIANS FOR MONITORING AND TRACKING RESULTS OF MEMBERS' WELLNESS PLANS, IN CLASS 44 (U.S. CLS. 100 AND 101).

FIRST USE 7-12-2011; IN COMMERCE 7-12-2011.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "WELLNESS & PATIENT CARE", APART FROM THE MARK AS SHOWN.

THE COLOR(S) RED, GRAY, DARK GRAY IS/ARE CLAIMED AS A FEATURE OF THE MARK.



THE MARK CONSISTS OF A STETHOSCOPE WITH THE EARTUBES, TUBING AND STEM DEPICTED IN DARK GRAY AND THE EARTIPS, CHESTPIECE AND TUNABLE DIA-PHRAGM DEPICTED IN GRAY HANGS TO THE LEFT OF AND CURVES OVER THE TOP OF AND IN FRONT OF THE LEFT SIDE OF A STYLIZED RED OUTLINE OF A HEART. THE OUTLINES OF THE HEART CURVE INSIDE THE HEART'S SHAPE TO FORM THE LETTERS "E" AND "C". THE HEART OUTLINE ALSO CURVES DOWN AND OFF TO THE RIGHT OF THE HEART SHAPE TO FORM THE WAVES AND INTERVALS OF AN EKG READOUT IN RED. TO THE RIGHT OF AND OVER THE END OF THE EKG READOUT ARE THE WORDS "ENHANCEDCAREMD". THE WORD "ENHANCED" IS IN RED, AND THE WORD "CARE" IS IN GRAY, AND "MD" IS IN RED. AT THE BOTTOM UNDER "ENHANCEDCAREMD" AND TO THE RIGHT OF THE EKG READOUT ARE THE WORDS "ENHANCED WELLNESS & PATIENT CARE" IN GRAY.

SN 85-390,723, FILED 8-5-2011.

VIVIAN MICZNIK FIRST, EXAMINING ATTORNEY

Director of the United States Patent and Trademark Office

> **REQUIREMENTS TO MAINTAIN YOUR FEDERAL
> TRADEMARK REGISTRATION**
>
> **WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
> DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the
> 5th and 6th years after the registration date.  *See* 15 U.S.C. §§1058, 1141k.  If the declaration is
> accepted, the registration will continue in force for the remainder of the ten-year period, calculated
> from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a
> federal court.
>
> *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) **and** an
> Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse)  **and** an Application for Renewal between
> every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above
with the payment of an additional fee.

> **The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
> reminder of these filing requirements.**

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with
an extension of protection to the United States under the Madrid Protocol must timely file the Declarations
of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are
based on the U.S. registration date (not the international registration date).  The deadlines and grace periods
for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.
*See* 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications
at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the
International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol,
before the expiration of each ten-year term of protection, calculated from the date of the international
registration.  *See* 15 U.S.C. §1141j.  For more information and renewal forms for the international registration,
see http://www.wipo.int/madrid/en/.

**NOTE:   Fees and requirements for maintaining registrations are subject to change.  Please check the
USPTO website for further information.  With the exception of renewal applications for registered
extensions of protection, you can file the registration maintenance documents referenced above online
at** http://www.uspto.gov.

Case 4:19-cv-01060-CLM   Document 10-4   Filed 09/03/19   Page 1 of 6

# Exhibit F

| To: | Attentive Health & Wellness, LLC (christie@kkslawgroup.com) |
| Subject: | U.S. Trademark Application Serial No. 88455323 - SIMERP - N/A |
| Sent: | August 21, 2019 03:51:50 PM |
| Sent As: | ecom127@uspto.gov |
| Attachments: | |

**United States Patent and Trademark Office (USPTO)**
**Office Action (Official Letter) About Applicant's Trademark Application**

**U.S. Application Serial No.** 88455323

**Mark:** SIMERP

**Correspondence Address:**
CHRISTIE KNOWLES
KNOWLES &
SULLIVAN, LLC
400 BROAD ST
GADSDEN, AL 35901

**Applicant:** Attentive Health & Wellness, LLC

**Reference/Docket No.** N/A

**Correspondence Email Address:**

christie@kkslawgroup.com

## NONFINAL OFFICE ACTION

**The USPTO must receive applicant's response to this letter within  six months of the issue date below or the application will be abandoned**. Respond using the Trademark Electronic Application System (TEAS).  A link to the appropriate TEAS response form appears at the end of this Office action.

**Issue date:  August 21, 2019**

The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issue below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

**DATABASE SEARCH:** The trademark examining attorney has searched the Office's  database of registered and pending marks and has found no conflicting marks that would bar registration under Trademark Act Section 2(d).  TMEP §704.02; *see* 15 U.S.C. §1052(d).

**SUMMARY OF ISSUES:**
- Sections 1 and 45 Refusal – Mark Must Reference Services

**SECTIONS 1 AND 45 REFUSAL – MARK MUST REFERENCE SERVICES**
Registration is refused because the specimen does not show use in commerce of the applied-for mark with the identified services in International Class 36.  Trademark Act Sections 1 and 45, 15 U.S.C. §§1051, 1127; 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a), 1301.04(f)(ii), (g)(i).  Specifically, the specimen fails to show the mark used in a way that would create in the minds of potential consumers a sufficient nexus or direct association between the mark and the services being offered. *In re Universal Oil Prods. Co.*, 476 F.2d 653, 655, 177 USPQ 456, 457 (C.C.P.A. 1973); TMEP §1301.04(f)(ii); *see also In re JobDiva, Inc.*, 843 F.3d 936, 942, 121 USPQ2d 1122, 1126 (Fed. Cir. 2016); *In re Adver. & Mktg. Dev., Inc.*, 821 F.2d 614, 620, 2 USPQ2d 2010, 2014 (Fed. Cir. 1987).

An  application based on Trademark Act Section 1(a) must include a specimen showing the applied-for mark in use in commerce for each

international class of services identified in the application or amendment to allege use. 15 U.S.C. §1051(a)(1); 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a).  A service mark is used in commerce "when it is used or displayed in the sale or advertising of services."  *See* 15 U.S.C. § 1127; 37 C.F.R. §2.56(b)(2).

When determining whether a mark is used in connection with the services in the application, a key consideration is the perception of the user.  *In re JobDiva, Inc.*, 843 F.3d at 942, 121 USPQ2d at 1126 (citing *Lens.com, Inc. v. 1-800 Contacts, Inc.*, 686 F.3d 1376, 1381-82, 103 USPQ2d 1672, 1676 (Fed Cir. 2012)).  A specimen must show the mark used in a way that would create in the minds of potential consumers a sufficient nexus or direct association between the mark and the services being offered.  *In re Universal Oil Prods. Co.*, 476 F.2d at 655, 177 USPQ2d at 457; TMEP §1301.04(f)(ii); *see also In re JobDiva, Inc.*, 843 F.3d at 942, 121 USPQ2d at 1126; *In re Adver. & Mktg. Dev., Inc.*, 821 F.2d at 620, 2 USPQ2d at 2014.

To show a direct association, specimens consisting of advertising or promotional materials must (1) explicitly reference the services and (2) show the mark used to identify the services and their source.  *In re WAY Media, Inc.*, 118 USPQ2d at 1698 (quoting *In re Osmotica Holdings, Corp.*, 95 USPQ2d 1666, 1668 (TTAB 2010)); TMEP §1301.04(f)(ii).  Although the exact nature of the services does not need to be specified in the specimen, there must be something which creates in the mind of the purchaser an association between the mark and the services.  *In re Adair*, 45 USPQ2d 1211, 1215 (TTAB 1997) (quoting *In re Johnson Controls Inc.*, 33 USPQ2d 1318, 1320 (TTAB 1994)).

In the present case, the specimen does not show a direct association between the mark and services because while the specimen explains what a SIMERP is and how it improves employee benefits packages, there is no suggestion that applicant provides advisory services in the field of employee benefits or that applicant processes, administers, and manages employee benefit plans.

Applicant may respond to this refusal by satisfying one of the following for each applicable international class:

(1)     Submit a different specimen (a verified "substitute" specimen) that (a) was in actual use in commerce at least as early as the filing date of the application or prior to the filing of an amendment to allege use and (b) shows the mark in actual use in commerce for the services identified in the application or amendment to allege use. A "verified substitute specimen" is a specimen that is accompanied by the following statement made in a signed affidavit or supported by a declaration under 37 C.F.R. §2.20: "The substitute (or new, or originally submitted, if appropriate) specimen(s) was/were in use in commerce at least as early as the filing date of the application or prior to the filing of the amendment to allege use."  The substitute specimen cannot be accepted without this statement.

(2)     Amend the filing basis to intent to use under Section 1(b), for which no specimen is required. This option will later necessitate additional fee(s) and filing requirements such as providing a specimen.

For an overview of the response options above and instructions on how to satisfy them using the Trademark Electronic Application System (TEAS) response form, see the Specimen webpage.

**Response guidelines.**  Please call or email the assigned trademark examining attorney with questions about this Office action.  Although the trademark examining attorney cannot provide legal advice or statements about applicant's rights, the trademark examining attorney can provide applicant with additional explanation about the refusal in this Office action.  *See* TMEP §§705.02, 709.06.  Although the USPTO does not accept emails as responses to Office actions, emails can be used for informal communications and will be included in the application record.  *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05.

**TEAS PLUS OR TEAS REDUCED FEE (TEAS RF) APPLICANTS – TO MAINTAIN LOWER FEE, ADDITIONAL REQUIREMENTS MUST BE MET, INCLUDING SUBMITTING DOCUMENTS ONLINE:**  Applicants who filed their application online using the lower-fee TEAS Plus or TEAS RF application form must (1) file certain documents online using TEAS, including responses to Office actions (see TMEP §§819.02(b), 820.02(b) for a complete list of these documents); (2) maintain a valid e-mail correspondence address; and (3) agree to receive correspondence from the USPTO by e-mail throughout the prosecution of the application.  *See* 37 C.F.R. §§2.22(b), 2.23(b); TMEP §§819, 820.  TEAS Plus or TEAS RF applicants who do not meet these requirements must submit an additional processing fee of $125 per class of goods and/or services. 37 C.F.R. §§2.6(a)(1)(v), 2.22(c), 2.23(c); TMEP §§819.04, 820.04.  However, in certain situations, TEAS Plus or TEAS RF applicants may respond to an Office action by authorizing an examiner's  amendment by telephone or e-mail without incurring this additional fee.

**How to respond.  Click to file a response to this nonfinal Office action**

/Douglas A. Mondell/
Douglas A. Mondell, Esq.
Trademark Examining Attorney
Law Office 127
(571) 272-0120
douglas.mondell@uspto.gov

Case 4:19-cv-01060-CLM   Document 10-4   Filed 09/03/19   Page 4 of 6

**RESPONSE GUIDANCE**

- **Missing the response deadline to this letter will cause the application to <u>abandon</u>.**  A response or notice of appeal must be received by the USPTO before midnight **Eastern Time** of the last day of the response period.  TEAS and ESTTA maintenance or <u>unforeseen circumstances</u> could affect an applicant's ability to timely respond.

- **<u>Responses signed by an unauthorized party</u>** are not accepted and can **cause the application to <u>abandon</u>.**  If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with <u>legal authority to bind a juristic applicant</u>.  If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find <u>contact information for the supervisor</u>** of the office or unit listed in the signature block.

| To: | Attentive Health & Wellness, LLC (christie@kkslawgroup.com) |
|---|---|
| **Subject:** | U.S. Trademark Application Serial No. 88455323 - SIMERP - N/A |
| **Sent:** | August 21, 2019 03:51:53 PM |
| **Sent As:** | ecom127@uspto.gov |
| **Attachments:** | |

**United States Patent and Trademark Office (USPTO)**

**USPTO OFFICIAL NOTICE**

Office Action (Official Letter) has issued
on **August 21, 2019** for
**U.S. Trademark Application Serial No.** 88455323

Your trademark application has been reviewed by a trademark examining attorney. As part of that review, the assigned attorney has issued an official letter that you must respond to by the specified deadline or your application will be abandoned. Please follow the steps below.

**(1) Read the official letter.**

**(2) Direct questions** about the contents of the Office action to the assigned attorney below.

/Douglas A. Mondell/
Douglas A. Mondell, Esq.
Trademark Examining Attorney
Law Office 127
(571) 272-0120
douglas.mondell@uspto.gov

Direct questions about navigating USPTO electronic forms, the USPTO website, the application process, the status of your application, and/or whether there are outstanding deadlines or documents related to your file to the Trademark Assistance Center (TAC).

**(3) Respond within 6 months** (or earlier, if required in the Office action) from **August 21, 2019**, using the Trademark Electronic Application System (TEAS). The response must be received by the USPTO before midnight **Eastern Time** of the last day of the response period. See the Office action for more information about how to respond.

## GENERAL GUIDANCE

· **Check the status** of your application periodically in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

· **Update your correspondence email address**, if needed, to ensure you receive important USPTO notices about your application.

· **Beware of misleading notices sent by private companies about your application.** Private companies not associated with the USPTO use public information available in trademark registrations to mail and email trademark-related offers and notices – most of which require fees. All **official USPTO correspondence** will only be **emailed from the domain "@uspto.gov."**

*** User:dmondell ***

| # | Total Marks | Dead Marks | Live Viewed Docs | Live Viewed Images | Status/ Search Duration | Search |
|---|---|---|---|---|---|---|
| 01 | 1 | 0 | 1 | 1 | 0:01 | 88455323[SN] |
| 02 | 1 | 0 | 1 | 1 | 0:01 | "Attentive Health & Wellness"[on] |
| 03 | 1 | 0 | 1 | 1 | 0:02 | "SIMERP"[bi,ti] not dead[ld] |
| 04 | 0 | 0 | 0 | 0 | 0:01 | "S IME RP"[bi,ti] not dead[ld] |
| 05 | 0 | 0 | 0 | 0 | 0:01 | "S I M ERP"[bi,ti] not dead[ld] |
| 06 | 0 | 0 | 0 | 0 | 0:02 | "SI ME R P"[bi,ti] not dead[ld] |
| 07 | 0 | 0 | 0 | 0 | 0:01 | "S IMERP"[bi,ti] not dead[ld] |
| 08 | 0 | 0 | 0 | 0 | 0:01 | "S IMER P"[bi,ti] not dead[ld] |
| 09 | 0 | 0 | 0 | 0 | 0:01 | "S I ME RP"[bi,ti] not dead[ld] |
| 10 | 0 | 0 | 0 | 0 | 0:01 | "SIM E R P"[bi,ti] not dead[ld] |
| 11 | 0 | 0 | 0 | 0 | 0:02 | "SI MERP"[bi,ti] not dead[ld] |
| 12 | 0 | 0 | 0 | 0 | 0:01 | "SI M ERP"[bi,ti] not dead[ld] |
| 13 | 0 | 0 | 0 | 0 | 0:01 | "S I MER P"[bi,ti] not dead[ld] |
| 14 | 0 | 0 | 0 | 0 | 0:01 | "S I M E RP"[bi,ti] not dead[ld] |
| 15 | 0 | 0 | 0 | 0 | 0:01 | "SIM ERP"[bi,ti] not dead[ld] |
| 16 | 0 | 0 | 0 | 0 | 0:01 | "SI ME RP"[bi,ti] not dead[ld] |
| 17 | 0 | 0 | 0 | 0 | 0:01 | "S IM E RP"[bi,ti] not dead[ld] |
| 18 | 0 | 0 | 0 | 0 | 0:01 | "S I M ER P"[bi,ti] not dead[ld] |
| 19 | 0 | 0 | 0 | 0 | 0:01 | "SIME RP"[bi,ti] not dead[ld] |
| 20 | 0 | 0 | 0 | 0 | 0:01 | "SI MER P"[bi,ti] not dead[ld] |
| 21 | 0 | 0 | 0 | 0 | 0:01 | "S IM ER P"[bi,ti] not dead[ld] |
| 22 | 0 | 0 | 0 | 0 | 0:02 | "S I ME R P"[bi,ti] not dead[ld] |
| 23 | 0 | 0 | 0 | 0 | 0:01 | "SIMER P"[bi,ti] not dead[ld] |
| 24 | 0 | 0 | 0 | 0 | 0:01 | "SIM E RP"[bi,ti] not dead[ld] |
| 25 | 0 | 0 | 0 | 0 | 0:01 | "S IME R P"[bi,ti] not dead[ld] |
| 26 | 0 | 0 | 0 | 0 | 0:01 | "S IM E R P"[bi,ti] not dead[ld] |
| 27 | 0 | 0 | 0 | 0 | 0:01 | "S I MERP"[bi,ti] not dead[ld] |
| 28 | 0 | 0 | 0 | 0 | 0:01 | "SIM ER P"[bi,ti] not dead[ld] |
| 29 | 0 | 0 | 0 | 0 | 0:01 | "SI M E RP"[bi,ti] not dead[ld] |
| 30 | 0 | 0 | 0 | 0 | 0:01 | "SI M E R P"[bi,ti] not dead[ld] |
| 31 | 0 | 0 | 0 | 0 | 0:01 | "S IM ERP"[bi,ti] not dead[ld] |
| 32 | 0 | 0 | 0 | 0 | 0:01 | "SIME R P"[bi,ti] not dead[ld] |
| 33 | 0 | 0 | 0 | 0 | 0:01 | "SI M ER P"[bi,ti] not dead[ld] |
| 34 | 0 | 0 | 0 | 0 | 0:02 | "S I M E R P"[bi,ti] not dead[ld] |
| 35 | 1 | 0 | 1 | 1 | 0:01 | *SIMERP*[bi,ti] not dead[ld] |
| 36 | 16 | 0 | 16 | 15 | 0:01 | *{"scz"}{v:2}{"m":2}{v:2}{"r":2}p*[bi,ti] not dead[ld] |
| 37 | 1 | 0 | 1 | 1 | 0:01 | *simerp*[bi,ti] |

Session started 8/21/2019 3:05:05 PM

Session finished 8/21/2019 3:08:32 PM

Total search duration 0 minutes 42 seconds

Session duration 3 minutes 27 seconds

Defaut NEAR limit=1ADJ limit=1

Sent to TICRS as Serial Number: 88455323